IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| APPLIED PREDICTIVE TECHNOLOGIES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.   ) | Case No. 2:2019-cv-00496-JNP-CMR |
| ) | |
| MARKETDIAL, INC. and JOHN M. STODDARD, ) | Judge:  Jill N. Parrish |
| ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Applied Predictive Technologies, Inc. ("Plaintiff" or "APT") brings this complaint against defendants MarketDial, Inc. ("MarketDial") and John M. Stoddard a/k/a Johnny Stoddard ("Stoddard"), or collectively ("Defendants"), for patent infringement, misappropriation of trade secrets, and unfair competition.

## NATURE OF THE ACTION

1.     This is a civil action for patent infringement under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*; misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*; misappropriation of trade secrets under the Utah Uniform Trade Secrets Act ("UUTSA"), Title 13, Chapter 24 of the Utah Code (Utah Code Ann. § 13-24-1, *et seq.*); and unfair competition under the Utah Unfair Competition Act, Title 13, Chapter 5a of the Utah Code (Utah Code Ann. § 13-5a-101, *et seq.*).

2.     Defendants MarketDial and Stoddard have engaged in a systematic effort to acquire valuable confidential and trade secret information from APT and improperly use it for their own advantage.  Both of MarketDial's founders, Stoddard and Morgan Davis ("Davis"), previously worked for companies that had contractual working relationships with APT, which

were governed by confidentiality agreements that bound all employees, including Stoddard and Davis. Stoddard and Davis both had potential access to APT's confidential and trade secret information, and were both required to maintain the confidentiality of that information and not to use it for any other purpose.

3.     Specifically, Stoddard worked at McKinsey & Company, Inc. ("McKinsey") approximately from August 2013 to April 2016. McKinsey entered into a Cooperation and Confidentiality Agreement dated November 7, 2013 ("Confidentiality Agreement") with APT by which APT agreed to provide access to APT confidential information in connection with McKinsey's client development and/or client services as well as each party's internal consideration of a potential transaction with other parties. McKinsey agreed that it and its employees would use APT confidential information only for the purposes of the Confidentiality Agreement, and to keep confidential and not disclose such information to anyone other than McKinsey employees with a need to know who were bound by the Confidentiality Agreement. Stoddard was aware of and agreed to be bound by the terms of the Confidentiality Agreement. Stoddard used his status as an employee of McKinsey, subject to the same confidentiality obligations to APT as McKinsey, to gain access to APT's confidential and trade secrets information.

4.     During 2015, Stoddard received APT's confidential and trade secrets information while employed by McKinsey and under confidentiality obligations to both McKinsey and APT. While Stoddard was receiving APT's confidential and trade secrets information on behalf of McKinsey to benefit APT, Stoddard surreptitiously co-founded MarketDial, a Delaware corporation, to compete with APT. Stoddard has prominently promoted his status as Co-Founder of MarketDial and role in founding the company. Stoddard's LinkedIn page (available at

https://www.linkedin.com/in/johnny-stoddard-1382bb34); Stoddard's Facebook page (available at https://www.facebook.com/johnny.stoddard).  Through his employment with McKinsey and after the founding of MarketDial, Stoddard continued to request and receive APT's trade secret information, including relating to its software, business strategies, and customers, described in more detail below.  Since the filing of the original Complaint in this action, Plaintiff APT has obtained additional information regarding Stoddard's activities and the locus of those activities while obtaining APT's trade secrets, working with Davis to form a new business to compete with APT using APT's trade secrets, and working with MarketDial to develop a software product and services to compete with APT using APT's trade secrets and patented technology.  During 2015, the time period during which Stoddard was obtaining APT's trade secrets, Stoddard resided in North Ridgeville, Ohio (near Cleveland), Eagle Mountain, UT (near Salt Lake City), and Penryn, CA (near Sacramento).  Stoddard purported to need access to APT's confidential and trade secret information in connection with joint marketing efforts of McKinsey and APT, purportedly for the benefit of APT, but in reality for his own personal benefit and that of MarketDial, the Delaware company he admittedly co-founded.  Without disclosing his interest in MarketDial, Stoddard learned key aspects of how APT's proprietary software operates and repeatedly requested and received confidential and trade secret information from APT, all under the guise of benefitting the APT and McKinsey relationship.

5.     Stoddard duped APT into providing its confidential information and trade secrets to benefit him personally and his newly-formed company, MarketDial, and used MarketDial, a Delaware corporation, to carry out his scheme to misappropriate APT's trade secrets.  Upon information and belief, Stoddard intentionally misappropriated APT confidential information and trade secrets in violation of McKinsey's Confidentiality Agreement with APT and federal and

state law.  Stoddard began discussions with Davis about starting a new business venture together in January 2015, while they were both employed by others.  Stoddard and Davis continued those discussions, including discussions in the Fall of 2015, after Stoddard obtained APT's trade secrets, focusing on creating a company that would directly compete with APT.  Those communications were conducted by email and phone calls directed to Davis in Utah and included meetings with Davis in person in Utah.  Consistent with those discussions, MarketDial was formed in 2015 with offices in Utah and its only business activity in Utah.  After active discussions in 2015 and early 2016 with Davis about co-founding MarketDial, Stoddard formally joined MarketDial in spring 2016.  Stoddard contends that his work with Davis after Stoddard formally joined MarketDial in Utah were the company's first substantive operations.  When Stoddard joined MarketDial in spring 2016, he moved permanently to Lehi, Utah, where he now resides.  MarketDial's and Stoddard's misappropriation of APT's trade secrets has included their ongoing activities in Utah from Spring 2016 through the present.  MarketDial and Stoddard used a Delaware corporation to carry out the trade secret misappropriation, and APT's injury as a Delaware corporation with Delaware clients has a connection to Delaware sufficient to support personal jurisdiction in Delaware, but it appears that the locus of Defendants' misappropriation activity to date is in Utah.

6.     Upon information and belief, Stoddard and MarketDial have incorporated key features of the functionality of APT's products and services into MarketDial's products and services.  Stoddard and Davis founded MarketDial specifically to compete against APT, have used APT's trade secrets to compete with APT, and have approached APT clients in an effort to siphon them off.  In at least two instances, MarketDial has stolen business from APT, causing APT to suffer substantial damages.  Those efforts of MarketDial and Stoddard during 2015

through the present have occurred in, and have been directed from, Utah, where MarketDial is

headquartered, where all of its employees are located, and where Stoddard resides.

7.     In addition, MarketDial has infringed and continues to infringe one or more

claims of APT's U.S. Patent No. 8,571,916 ("the '916 Patent") at least by making, using, selling,

and/or offering to sell its MarketDial System (the "Accused System") in the United States,

including in this District.

8.     By letter dated December 18, 2017, APT contacted MarketDial and Stoddard in

an attempt to explore with MarketDial and Stoddard the concerns APT had about their use of

APT trade secrets and infringement of APT's patents, seeking more information about the

methodology of MarketDial's software, and requesting a meaningful discussion of these issues,

all in an effort to avoid a legal dispute.  In response, MarketDial admitted by letter that it

competes in the same space as APT and for some of the same customers, but MarketDial

nevertheless refused to meet with APT, pursue any discussions, or provide APT with any

information about the methodology of its software.  MarketDial also denied that Stoddard was

ever privy to APT's confidential and trade secret information, despite clear evidence to the

contrary.  MarketDial further denied that it uses APT's patented technology.  Based upon APT's

investigation, and despite the refusal of MarketDial and Stoddard to cooperate in the requested

discussions, APT determined that MarketDial and Stoddard were using APT's trade secret

information disclosed to Stoddard subject to strict confidentiality obligations and that the

Accused Systems infringe one or more claims of the '916 Patent.  As a result, APT now seeks

relief from this Court to enjoin Defendants from using APT's confidential and trade secret

information and from infringing the '916 Patent.  APT further seeks an award of damages for the

injury it has incurred as a result of Defendants' trade secret misappropriation and willful infringement of APT's patent.

**THE PARTIES**

9.     Plaintiff APT is a corporation, organized and existing under the laws of the State of Delaware, with its principal place of business at 4250 N. Fairfax Drive, 11th Floor, Arlington, Virginia 22203.

10.     Defendant MarketDial is a corporation, organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business in Utah.  Since its creation in 2015, MarketDial has had places of business at 12 W. Market Street, Suite 220, Salt Lake City, Utah 84102 and 175 S Main St Floor 16, Salt Lake City, UT 84111.

11.     Defendant Stoddard is a founder of MarketDial, serves as an officer and director of MarketDial, and, during his misappropriation of APT's trade secrets while working at McKinsey, resided in Utah, Ohio and/or California.  After misappropriating APT's trade secrets and leaving McKinsey, Stoddard moved to Utah and, upon information and belief, now resides at 4151 N. Traverse Mountain Blvd, Apartment 13301, Lehi, Utah 84043.

12.     Upon information and belief, MarketDial directly and/or indirectly develops, designs, manufactures, distributes, markets, offers to sell, and/or sells the Accused System in the United States, including in and from the District of Utah.

**JURISDICTION AND VENUE**

13.     This is a civil action for patent infringement under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*; misappropriation of trade secrets under the DTSA, 18 U.S.C. § 1836, *et seq.*; misappropriation of trade secrets under the UUTSA, Utah Code Ann. § 13-24-1, *et seq.*; and unfair competition under the Utah Unfair Competition Act, Utah Code Ann. § 13-5a-101, *et seq.*

14.     This Court has original subject matter jurisdiction over APT's claims for patent

infringement pursuant to 28 U.S.C. §§ 1331 and 1338(a) and 35 U.S.C. §§ 271 *et seq*.  This

Court has subject matter jurisdiction over APT's federal trade secret claim pursuant to 18 U.S.C.

§ 1836(c) and 28 U.S.C. § 1331 because Plaintiff has asserted a claim for misappropriation of

trade secrets under the Defend Trade Secrets Act of 2016.  This Court has supplemental

jurisdiction over APT's claims under the Utah Uniform Trade Secrets Act and Utah Unfair

Competition Act pursuant to 28 U.S.C. § 1367 because this claim is so related to Plaintiff's

patent infringement claim and federal misappropriation of trade secrets claim that it forms part of

the same case or controversy under Article III of the United States Constitution.

15.     This Court has personal jurisdiction over MarketDial because it is has a regular

and established place of business in this District and therefore resides in this District.

16.     This Court has personal jurisdiction over Stoddard because he resides in this

District.

17.     Venue is proper in this judicial district for APT's claims for patent infringement

pursuant to 28 U.S.C. §§ 1391(c) and 1400(b).  MarketDial has a regular and established place of

business in Utah and therefore resides in this judicial district pursuant to 28 U.S.C. § 1400(b).

18.     Venue is proper in this judicial district for APT's federal trade secret

misappropriation claim under 28 U.S.C. § 1391(b)(2) and claim under the Utah Uniform Trade

Secrets Act because a substantial part of the events giving rise to the claim occurred in the State

of Utah and in this judicial district.

## FACTS

### APT's Innovation and Industry Recognition

19.     APT, founded in 1999, is a global leader in the business analytics software

industry, and helps businesses make decisions based on analysis of their customers' actions using

innovative tools developed by APT at great expense over many years. APT services customers in a variety of industries, including retail, restaurants, financial services, consumer packaged goods, airlines, automotive, hotels, insurance, life sciences, healthcare, and telecommunications and media. APT's software includes the Test & Learn® software system. APT's publicly-known customers include Walmart, Coca-Cola, McDonald's, TD Bank, Starbucks, SunTrust, Big Lots, Victoria's Secret, T-Mobile, and Kellogg's. However, APT also has multiple confidential customers as well.

20.    Through its substantial investment in research and development over the past 19 years, APT has developed innovative, cutting-edge technologies that changed the face of data-driven analytics and resulted in APT's customers making data-driven decisions using APT's proprietary software. As such, sensitive, confidential, and proprietary information and trade secrets form the backbone of APT's success in its business.

21.    APT has devoted a great deal of time and expense to developing trade secrets, including its proprietary and confidential technical information, knowledge, and business strategy. Since its inception in 1999 and through the filing of this Complaint, APT has developed the trade secret information, which gives it an advantage in business over its competitors. As indicated by its success, APT has developed and acquired proprietary information and knowledge in relation to its Test & Learn® software system, including not only in its technical and performance specifications, but also in the business plans and business strategies surrounding its systems and APT's customers. These confidential aspects of the Test & Learn® software system are not disclosed or patented in any patent application filed by APT, including, but not limited to the '916 Patent.

22.     APT's products and services, including the Test & Learn® software system, enable customers to test the efficacy of a business initiative, *e.g.*, a sales promotion, a retention program, or a customer loyalty offer.  Through technologically refined setup of business initiative tests and detailed statistical analysis of the actual and predicted results of the business initiative test, APT is able to determine for the customer the business initiative's true impact and recommend the most profitable action for the customer to take.

23.     APT has won numerous awards for its technological achievements, including:

- 2014 International Business Awards ("IBA") Gold Stevie Winner for Best New Product or Service of the Year - Software - Big Data Solutions for the APT Index;

- 2014 IBA Bronze Stevie Winner for Most Innovative Company of the Year in Canada and the U.S.A. - All Technology Industries;

- 2014 Business Intelligence ("BIG") Award for New Product of the Year for the APT Index;

- 2015 BIG Award for New Product of the Year in the IT/Telecom Category for its Space Planning Optimizer Software;

- 2015 IBA Silver Stevie Winner for Best New Product of Service of the Year - Software - Big Data Solutions  for its Space Planning Optimizer Software;

- 2016 Bronze American Business Award for Network Planner with MasterCard Insights software; and

- 2016 BIG Award for New Product of the Year.

### The Patent-in-Suit

24.     On March 1, 2006, APT filed U.S. Patent Application No. 11/364,197 ("the '197 Application"), which was a continuation-in-part application of U.S. Patent Application No.

10/767,191, filed on January 30, 2004.  The '197 Application duly and legally issued as the '916 Patent on October 29, 2013.  The '916 Patent is entitled "Methods, Systems, and Articles of Manufacture for Determining Optimal Parameter Settings for Business Initiative Testing Models."

25.    APT is the owner by assignment of all right, title, and interest in and to the '916 Patent.  A copy of the '916 Patent is attached to the Complaint as Exhibit A.

26.    The '916 Patent is valid and enforceable under United States Patent Laws.

27.    The '916 Patent claims a technological solution to the critical problem of determining the optimal system parameters for a business initiative test, including by performing virtual tests on a set of virtual test sites using a parameter setting set of selected parameter setting options and determining the inconsistency between the performance data associated with the virtual test sites and the performance data associated with a set of control group sites.  By modifying the selected parameter settings and performing a virtual test, the optimal system parameters can be more quickly and efficiently ascertained by determining which selected parameter settings best minimize the inconsistency between the performance data associated with the virtual test sites and the performance data associated with a set of control group sites.

28.    The claimed inventions of the '916 Patent were not well-known, routine, or conventional at the time of the invention, over twelve years ago, and represent specific improvements over the prior art and prior existing systems and methods.

29.    Although the '916 Patent describes an embodiment where the claimed invention is used by retailers to test a new business initiative, the claimed invention is a technical solution aimed at solving a "big data" problem of recognizing and filtering inconsistent data.  The '916 Patent identifies this problem:

10

> As a result, retailers may not recognize and filter inconsistent data, and therefore be less able to measure the impact of their initiatives.  Accordingly, there is a need for a system and method that automatically identifies one or more analytical parameters that filter out the most inconsistent data to maximize a retailer's ability to analyze the results of an initiative test.  Using more consistent data allows retailers to better identify those initiatives to extend to certain locations that will provide the most anticipated profit gains.

'916 Patent, 2:1-10.  The claimed invention solves this problem by automatically identifying parameters that filter inconsistent data.

30.     For example, the '916 Patent claims, *inter alia*, methods and systems for determining optimal system parameter settings for data analysis systems, including embodiments in business initiative testing software.  The technical problems solved by the '916 Patent include, *inter alia*, isolating the impact of a business initiative and recognizing and filtering out the most inconsistent data to maximize a retailer's ability to analyze the results of a business initiative test.

31.     The specification of the '916 Patent recites a technical solution to these technical problems that is reflected in the claims of the '916 Patent:

> Certain aspects of the present invention enable server 130 to identify and set those model parameters that will best filter out noise associated with date related to the stores where the initiative was applied in order to produce more accurate results regarding the impact of the initiative.  Noise may be a quantified measurement of inconsistent performance data for sites used in the analysis performed by the model.  Aspects of the present invention create a simulation environment where the model performs a number of virtual initiative tests (*e.g.*, initiative tests that have not actually been implemented in a business location) using different parameters.  Based on the results of the virtual tests, server 130 may identify parameter settings that best filter noise from the results.  Those parameter settings are then automatically selected for a particular test type as default settings that are subsequently used in performing actual initiative tests for predicting the performance of selected business locations based on the proposed initiative.

'916 Patent, 17:33-49.

32.     As noted in the prosecution history, each of the systems, apparatuses, software products, and methods that preceded the priority of the '916 Patent is inferior, because each suffered from several shortcomings, including that the prior art systems did not efficiently

determine the optimal parameters for business initiative testing software.  As noted during the

prosecution of the '916 Patent, the prior art systems do not teach the elements of determining

parameter settings for business initiative testing; performing a virtual test on a set of virtual test

sites; and measuring noise from these virtual tests to determine the optimal parameter settings,

whereby the optimal parameter settings best filter noise from the results.  And it is, *inter alia*,

this combination of elements that provides a specific technical solution to the technical problem

of determining optimal parameters for business initiative testing software.

33.     The Abstract of the '916 Patent states the following:

A system, method, and article of manufacture is disclosed for determining optimal
parameter settings for a business initiative testing model used for testing
initiatives for business locations included in a business network.  In one aspect, a
method is disclosed that includes defining a first test type of a business initiative
testing model having a set of parameter settings.  Each parameter setting may
include a set of one or more parameter setting options.  The method may also
include performing virtual tests on a set of virtual test sites based on the defined
test type.  Each virtual test site may reflect a selected business location in the
business network.  Also, the method may include determining a set of optimal
parameter settings for the first test type of the business initiative testing model
based on results from the virtual test.  Moreover, the method may include
configuring the business initiative testing model using the optimal parameter
settings from the set for the first test type to test a business initiative to apply to
the business network.

34.     Among other things claimed, the '916 Patent provides a method and system for

determining optimal parameter settings for business initiative testing software used for testing

business initiatives.  In some embodiments of the '916 Patent inventions, a server may collect

historical performance data associated with performance metrics, such as sales information, foot

traffic, etc.  In some embodiments, the server may also define a test type that is associated with

the business initiative testing model having a set of parameter settings.  A test type may be a type

of business initiative testing model that the server executes when running actual initiative tests to

predict the performance of certain test sites.  For example, a test type may be defined based on a

particular characteristic of the initiative test, such as the length of a test period for the initiative test, etc.  In some embodiments, once the test type is defined, the server may perform a virtual test on the defined test type.  A virtual test reflects a mock initiative test that is performed on a selected number of test sites based on defined configuration settings for the model executed by the server.  The virtual test is considered a mock initiative test because no actual initiative test is planned or has been implemented in any virtual test sites (*e.g.*, business locations identified for purposes of the virtual test).  In this regard, the server creates a simulation environment for running virtual initiative tests for collecting information used for identifying the optimal default model parameters settings for the defined test type.  Performing a virtual test may include configuring the virtual test such that the server iteratively performs a business initiative test for selected virtual test sites for each of a certain number of model parameter settings.  Each model parameter setting may include one or more parameter setting options.  Thus, for each iteration, the server may determine a noise value for each combination of available parameter settings and options and stores the values in a memory device for subsequent processing.

35.     In some embodiments, the server may compare the noise values for each parameter setting combination to determine the parameter settings for the defined test type.  In some embodiments, the server may determine the parameter settings by identifying a parameter setting combination that produced the least amount of noise during the virtual test.  The server may identify this optimal parameter setting combination as a set of parameters settings that are to be used to configure the defined test type when executed for performing actual initiative tests to predict the performance of selected test sites.

36.     These and other improvements over the prior art represent meaningful limitations and/or inventive concepts based upon the state of the art over a decade ago.  Thus, the invention

described and claimed in the '916 Patent provides meaningful limitations and/or inventive concepts and does not claim an abstract idea.

37.     The claimed inventions achieve many benefits over prior art systems and methods, including the benefits noted above.  Further, in view of these specific improvements over a decade ago, the inventions of the asserted claims, when such claims are viewed as a whole and in ordered combination, are not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, typical, and the like, including because, until the inventions of the '916 Patent, the claimed inventions were not existing or even considered in the field.  The claimed inventions in the '916 Patent provide a technical solution to the "big data" problem of recognizing and filtering inconsistent data and are a substantial technological improvement over prior systems that can be applied generally to software, including specific embodiments such as business initiative testing software.

38.     The inventions of the asserted claims are necessarily rooted in computer technology, *i.e.*, recognizing and filtering inconsistent data, including in business initiative testing software, and comprise improvements over prior technologies in order to overcome the problems, including those shortcomings noted above.  The claimed solutions amount to an inventive concept for resolving the particular problems and inefficiencies noted above.

39.     The inventions of the asserted claims could not have been performed by a human, but must instead be performed by a complex computer program, in part due to the required size of the data.  For example, performing a virtual test on the efficacy of a business initiative testing software parameters for a single set of parameter settings would be an incredibly time-consuming process, and not one that could be performed by a human with pen and paper.  Even for a selected pre-period of one month, this could not be performed by a human.  '916 Patent,

9:43-60.  In one example described in the '916 Patent, the virtual test is repeated for each combination of parameter settings.  In an exemplary set of parameters including four parameter settings, and each parameter setting having four respective parameter setting options, this would result in 256 possible parameter setting combinations available for the model to test.  '916 Patent, 20:2-8.  In a further example, the server may select 50 virtual test sites from an available pool of 1000 sites in a business network.  '916 Patent, 20:26-28.  Assuming a one-month test period, this would result in the analysis by virtual test of 12,800 months' worth of performance data.  Such an analysis cannot be performed by a human.  These are "big data" problems that require the technical solutions offered in the '916 Patent.  The asserted claims are thus necessarily rooted in computer technology.

40.     Including as noted above, the claims recite inventions that were not merely a routine or conventional use of conventional devices and technologies.  The inventions of the asserted claims were not well-known, fundamental economic or conventional business practices, nor were they practices to which general-purpose computer components were added after the fact.  Nor were the specifically disclosed and claimed combination of devices, steps, and processes existing in the art prior to the invention of the '916 Patent.

41.     The claims of the '916 Patent do not improperly inhibit further discovery by tying up any building blocks of human ingenuity or technological work.  One is free to practice the prior art of record and the prior art referenced in the specification.

42.     The '916 Patent has been cited as prior art in seven other patents and patent applications, including U.S. Patent No. 9,641,411 assigned to Google Inc.

43.     The combination of the elements of the asserted claims of the '916 Patent do not represent well-understood, routine, or conventional activity.

44.     Claim 1 of the '916 Patent recites:

A method for determining optimal parameter settings for business initiative testing software used for testing initiatives for business locations included in a business network, comprising:

identifying, by a computer, a business initiative testing model having a set of parameter settings;

selecting a first parameter setting set for performing a virtual test, the first parameter setting set including a set of selected parameter setting options each respectively corresponding to one of the parameter settings for the business initiative testing model;

performing, by a computer, the virtual test on a set of virtual test sites, each virtual test site reflecting a selected business location in the business network, wherein each virtual test is a simulated business initiative test performed on test sites where no actual initiative test has been implemented at those test sites, and wherein the virtual test is performed on the virtual test sites using a variation of each parameter setting;

determining, by a computer, actual performance data associated with the set of virtual test sites;

determining, by a computer, actual performance data associated with a set of control group sites reflecting second selected business locations in the business network using the tested parameter settings;

determining a noise value for the first parameter setting set, the noise value reflecting an inconsistency between performance data associated, with the set of virtual test sites and performance data associated with the set of control group sites reflecting second selected business locations in the business network using the tested parameter settings;

determining, by a computer, a set of optimal parameter settings for the business initiative testing model based on results from the virtual test whereby the optimal parameter settings best minimize noise from the results; and

configuring, by a computer, the business initiative testing model using the optimal parameter settings to test a business initiative for application in the business network.

45.     The ordered combination of Claim 1 of at least selecting a first parameter setting set for performing a virtual test, performing the virtual test on a set of virtual test sites, determining a noise value for the first parameter setting set, and determining, by a computer, a set of optimal parameter settings for the business initiative testing model based on results from

the virtual test whereby the optimal parameter settings best minimize noise from the results was novel and innovative over prior technology at the time of the priority date of the '916 Patent.

### Defendants' Misappropriation of APT's Trade Secrets

46.     Stoddard worked for McKinsey as a business analyst from August 2013 to April 2016.  McKinsey is a management consulting firm.  APT and McKinsey agreed to partner on mutual customer relationships and in connection with APT's and McKinsey's client development and client service activities, and agreed to share certain information, subject to strict confidentiality, to pursue such mutual efforts as identified by personnel of both APT and McKinsey.

47.     Pursuant to the Confidentiality Agreement between McKinsey and APT, McKinsey agreed to keep confidential and not to disclose APT's confidential information other than to its employees with a need to know such information and who were bound by nondisclosure obligations consistent with the terms of the Confidentiality Agreement.  Stoddard, as an employee of McKinsey, was subject to the Confidentiality Agreement and the obligations to which McKinsey agreed to preserve APT's confidential information.  Further, based on the terms of the Confidentiality Agreement, APT understands that Stoddard signed a nondisclosure agreement with McKinsey prohibiting the improper use and disclosure of APT's confidential information.  McKinsey confirmed in January 2017 that it had advised Stoddard of his continuing obligation to maintain the confidentiality of APT's confidential information and trade secrets pursuant to the Confidentiality Agreement.

48.     While working for McKinsey, Stoddard worked closely with APT for at least a five-month period in 2015.  During this time period, Stoddard requested and obtained large amounts of APT's confidential and trade secret information pursuant to the Confidentiality Agreement.  This included PowerPoint presentations and case studies provided to Stoddard by

17

APT, including an overview and technical details of APT's Test & Learn® software, as well as identification of APT's confidential clients.  The PowerPoint presentations and case studies reflect years of research and thousands of dollars of personnel time to identify and determine the trade secret methodologies and processes underlying APT's Test & Learn® software system.

49.     Unbeknownst to APT, despite Stoddard continuing to work at McKinsey, in February 2015, before Stoddard obtained trade secrets from APT, Stoddard co-founded, with Davis, MarketDial, a Delaware corporation intending to compete with APT in the predictive software business for retailers.  MarketDial registered as a foreign corporation in Utah on April 2, 2015.

50.     MarketDial specifically holds Davis and Stoddard out to be co-founders of MarketDial.  *See* https://beehivestartups.com/marketdial-allows-you-to-test-before-you-act-21cdc48acd74 (stating that co-founder Morgan Davis "and cofounder Johnny Stoddard, who also worked for years as a consultant, created an easy-to-use platform").  Stoddard's LinkedIn page (available at https://www.linkedin.com/in/johnny-stoddard-1382bb34) and Facebook page (available at https://www.facebook.com/johnny.stoddard) also list Stoddard as being the "Chief Data Scientist / Co-Founder" of MarketDial.

51.     On its website, MarketDial advertises that the MarketDial Accused System was "[b]uilt by ex-McKinsey and -BCG consultants."  *See* https://marketdial.com/features/.

52.     Davis, the CEO of MarketDial, previously worked for the Boston Consulting Group ("BCG") as an Associate from 2012 - 2014.  BCG, a business consulting group, also had a prior relationship with APT, which involved the use of APT's proprietary software for a mutual client, Einstein Noah Restaurant Group ("ENRG").  BCG and APT entered into a Third Party Access Agreement dated January 26, 2012 regarding BCG's use of APT's proprietary software

("Access Agreement") in the course of providing professional services to the ENRG.  Pursuant to the Access Agreement, BCG agreed to maintain the highest standards of confidentiality with regard to APT's software and to protect the software from unauthorized disclosure.  BCG also agreed to use the software only to support ENRG and that no BCG representative provided access to the software would be involved in developing a service that competes, directly or indirectly, with APT's software.

53.    Upon information and belief, Davis was a member of a BCG team that had access to APT's software.

54.    Shortly after MarketDial's founding in February 2015 and through July 2015, Stoddard interacted regularly with APT in the course of his duties at McKinsey.  However, Stoddard intentionally hid from APT that he was a co-founder of a competing company or that he was planning to pursue a competing business for his own personal benefit.  Stoddard repeatedly requested and acquired confidential and trade secret APT information during this time, under the guise of benefiting the McKinsey and APT relationship.  As noted above, this APT trade secret information included PowerPoint presentations and case studies provided to Stoddard by APT, including an overview and technical details of APT's proprietary software, as well as identification of APT's clients, that could be used by MarketDial.

55.    For example, in February 2015, Stoddard requested and received from APT a PowerPoint presentation including details about APT's Test & Learn® process, including its application to the financial services industry and an identification of the key elements of this process with corresponding illustrations.  This PowerPoint presentation also included several pictures that disclosed confidential portions of the user interface architecture of the APT software.

56.     APT sent Stoddard a similarly detailed confidential PowerPoint presentation in June 2015 that included trade secret information about APT's Test & Learn® software and process, the confidential user interfaces, and applications to potential clients.

57.     Further, APT sent Stoddard a case study containing APT confidential information in April 2015, under explicit instructions that the case study was being sent under a non-disclosure agreement between APT and McKinsey and that Stoddard should keep the distribution limited.

58.     In June 2015, Stoddard further requested that APT send him another case study containing APT trade secret information, acknowledging the obligations of McKinsey and its employees under the Confidentiality Agreement and representing that confidential information would only be shared internally within McKinsey.

59.     Stoddard duped APT into providing him APT's confidential, trade secret information and concealed his plans to develop a competing software product through MarketDial.  In providing the requested information to Stoddard, APT detrimentally relied on Stoddard's misrepresentation that he requested this information for the benefit of McKinsey's client development work, which would ultimately benefit APT.  Despite obtaining APT's trade secrets in connection with client development work intended to benefit APT and McKinsey, Stoddard never provided APT any evidence that he actually used such information for work for McKinsey and APT, rather than simply acquiring APT's trade secrets for his own benefit.

### APT's Reasonable Measures to Maintain the Confidentiality of Its Trade Secret Information

60.     At all times, APT has taken reasonable and appropriate measures to maintain the confidentiality of and to protect its proprietary information.

61.     APT requires its employees to enter into non-disclosure and confidentiality agreements to protect its confidential information and trade secrets.

62.     As part of its policies, APT requires that employees properly label information to ensure the confidentiality of its proprietary information.

63.     APT keeps its proprietary information on secure servers, protected by access controls, and requires encryption for proprietary information on employees' computers.  Certain key employees are also required to have an additional layer of security on their laptops to ensure protection of APT's proprietary information and trade secrets.

64.     APT has restricted access to visitors and third parties at its offices and facilities.

65.     APT requires that hard copies of proprietary information be stored in locked cabinets or safes and that those hard copies are shredded when no longer needed.

66.     APT does not permit its employees to use storage devices that are not APT-approved storage devices.

67.     APT also provides training to its employees on the proper handling of APT proprietary and trade secret information.

68.     APT also enters into non-disclosure agreements with clients, partners, vendors, suppliers, and consultants to the extent that APT shares its confidential information or trade secrets with third parties.

69.     Specifically, APT entered into the Confidentiality Agreement with McKinsey. APT also marked documents that it provided to McKinsey employees with the designation: "APT Confidential Information - Distribution by receiving party is prohibited," or similar designation.

70.     APT's Confidentiality Agreement with McKinsey also required that McKinsey's employees be subject to confidentiality obligations to maintain McKinsey information confidential, including all APT confidential information provided to McKinsey personnel.

71.     APT's customers all agree to maintain the confidentiality of APT's software systems, and individual users of the software must, before being permitted to use the APT software systems, agree to an end user's license agreement to maintain the confidentiality of the trade secret software systems as a condition to using APT's software systems.

<u>**Defendants' Improper and Deceitful Conduct**</u>

72.     Prior to and after MarketDial's founding in February 2015, Stoddard had access to and did access APT's confidential information and trade secrets in the course of his employment at McKinsey as part of a joint project with APT.  Stoddard deceived APT into believing that Stoddard needed access to APT's confidential information for legitimate business purposes for APT's benefit and that APT's information would be protected by the Confidentiality Agreement.

73.     Stoddard acquired substantial knowledge of APT's confidential information and trade secrets through his deceitful conduct.  On information and belief, Stoddard co-founded MarketDial in February 2015 to compete with APT.  MarketDial currently offers similar products and services to those offered by APT, including MarketDial's Accused System.

74.     Since MarketDial's founding in February 2015 and prior to Stoddard's departure from McKinsey in April 2016, he repeatedly requested and received confidential APT information under the guise that it was for the benefit of McKinsey's work with APT.  This confidential APT information included PowerPoint presentations and case studies shared by APT with Stoddard, including an overview and technical details of APT's proprietary software, as well as identification of APT's clients.

75.     As Co-Founder and Chief Data Scientist of MarketDial, it is inevitable that
Stoddard intentionally and/or inherently disclosed APT's confidential information and trade
secrets that he obtained while at McKinsey to MarketDial, for the benefit of MarketDial and
Stoddard, and to the detriment of APT.

76.     Upon information and belief, MarketDial and Stoddard have incorporated APT's
confidential information and trade secrets into MarketDial's products and services, including the
Accused System.  For example, on information and belief, MarketDial's Accused System
performs business initiative tests that are very similar to tests performed by APT's products and
services and, based upon the appearance and functionality of MarketDial's Accused System, it
could not have been developed within the time and with the modest investment of resources
devoted by MarketDial to developing the Accused System, without the use of APT trade secrets.
On information and belief, MarketDial has designed and modified its Accused System so as to be
substantially similar—if not virtually identical, in certain aspects—to APT's products and
services.  These modifications include functionalities relating to the creation of a business
initiative test; the confidence value and the selection of the number of business locations in
which to test the business initiative; the selection and analysis of store attribute data; and the
analysis and display of the actual and predicted results of a business initiative test, all of which
appear to have been obtained from APT's trade secrets and which could not have been developed
within the time frame and/or resources devoted by MarketDial unless it used APT's trade secrets.

77.     These actions constitute trade secret misappropriation in violation of state and
federal law, including the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*) and the Utah
Uniform Trade Secrets Act (Utah Code Ann. § 13-24-1, *et seq.*).

78.     On information and belief, APT has lost customers and business opportunities to MarketDial because MarketDial has been able to unfairly compete with APT on, *inter alia*, pricing as a result of Stoddard's and MarketDial's misappropriation of APT's trade secrets.  In addition, upon information and belief, MarketDial has misrepresented that it solely developed the Accused System, and denied that it ever had access to APT's trade secrets or used APT's patented technology.

79.     From the outset of first offering the Accused System in the marketplace, MarketDial has expressly sought to directly compete with APT by contacting its customers and comparing the MarketDial Accused System to APT's systems.

80.     If MarketDial's and Stoddard's willful misappropriation were not enough, MarketDial has engaged in a smear campaign to damage APT in the marketplace through false statements to APT's customers and potential customers, including that APT is "past its prime" and falsely asserting that APT's customers are frustrated with the cost and complexity of the APT solution.  MarketDial's marketing materials also mischaracterize APT's solution in asserting that MarketDial's product is purportedly better than APT's.

81.     MarketDial's and Stoddard's actions have caused and will cause significant financial harm to APT, including loss of customers.  MarketDial's and Stoddard's actions also will cause APT to lose the benefit of its trade secrets and the legitimate competitive advantage that APT has earned though its substantial investments in such trade secrets.  MarketDial's and Stoddard's actions also jeopardize APT's relationships with its customers, prospective customers, suppliers, partners, employees, shareholders and investors, and other third parties and violate APT's intellectual property rights.

## MarketDial's Use of APT's Patented Technology

82.     MarketDial has made, used, offered to sell, and/or sold and continues to make,

use, sell, and/or offer to sell the Accused System within the United States.

83.     MarketDial has infringed the '916 Patent through the manufacture, use, sale

and/or offer for sale of the Accused System.

84.     MarketDial's Accused System is described, *inter alia*, on the MarketDial website,

available at marketdial.com.







85.    The functionality incorporated into MarketDial's Accused System is not yet fully available to APT as APT does not have access to MarketDial's source code.  APT believes that MarketDial infringes at least Claim 1 of its '916 Patent based on its investigation of the minimal publicly-available literature that MarketDial makes available as well as an analysis of the

problem that MarketDial's Accused System purports to solve, as set forth in Count III below.
APT expects to have further support for its infringement allegations upon inspection of the
source code of MarketDial's Accused System and after a reasonable opportunity for further
investigation and discovery.

86.     On December 18, 2017, APT sent a letter to MarketDial asking that it review
APT's '916 Patent and requesting that the parties engage in a meaningful discussion concerning
MarketDial's methodology used in the Accused System and the scope of APT's '916 Patent.
MarketDial refused APT's request.

<u>**COUNT I**</u>

<u>**Misappropriation of Trade Secrets Under Defend Trade Secrets Act**
**Against Defendants MarketDial and Stoddard (18 U.S.C. § 1836, *et seq.*)**</u>

87.     APT repeats, re-alleges, and incorporates by reference the prior allegations of this
Complaint as if fully set forth herein.

88.     APT owns and possesses confidential and trade secret information, as alleged
above.

89.     APT's confidential and trade secret information relates to products and services
used, sold, and ordered in, or intended to be used, sold, and/or ordered in, interstate and foreign
commerce.  Specifically, APT's confidential and trade secret information concerning its business
analytics software, including its Test & Learn® software, is used by customers throughout the
United States and many other countries around the world.  APT's trade secret information is in
addition to and distinct from the disclosures in its patents and includes specific information not
available to the public that would provide a competitor with an unfair economic advantage,
including, without limitation, the following:

a.   APT has incorporated its trade secrets into all of its software offerings, including but not limited to its Test & Learn® software, which uses such trade secrets to improve the value and performance of the software;

b.   APT's Test & Learn® software uses trade secrets to allow rapid measurement of incremental impact of business initiatives, including optimal selection of specific criteria to improve test results;

c.   APT's Test & Learn® software uses patented methods and systems for determining optimal parameter settings for business initiative testing used for testing initiatives for business locations included in a business network, which are enhanced by trade secrets beyond the patented methods that isolate the cause-and-effect impact of each marketing initiative;

d.   APT's trade secrets provide confidential methods that determine specific characteristics that are used to select a set of test locations or markets that will enhance the accuracy of testing, which characteristics were identified and selected by APT based upon many years of trial and error and software engineering utilizing the results of such trial and error;

e.   APT has developed trade secrets that are used in its software to identify specific criteria to be assessed to reduce inaccuracies in the testing of business initiatives;

f.   APT uses the trade secrets in its software to analyze test results and build out models that recommend the markets/sites where particular business programs will have the best impact;

g.   APT's trade secrets include techniques to refine test measurement at a customer level;

28

h.     APT utilizes dashboards that display test results to customers in a confidential format;

i.     APT utilizes a set of particular confidential user interfaces (UIs) and architecture that provide simplified reporting of results for customers; these easy-to-use interfaces provide more effective reporting of test results to customers that can be used by customers to more effectively use the trade secrets incorporated into APT's software to assist customers in analyzing business initiative test results, and to make more effective and profitable business decisions;

j.     APT utilizes trade secrets incorporated into its software to guide clients on the number of sites that should be used to help design tests that are significant and predictive of rollout performance;

k.     APT software incorporates trade secrets that automatically generate a set of key outputs and keeps them up-to-date during the test; a customer using the APT software can then use these APT trade secrets, including a set of APT's confidential UIs,  to easily add outputs to the analysis or turn the results into a presentation;

l.     APT has developed trade secrets that include confidential business strategies and testing methods unique to certain clients or certain industries.

90.     APT's trade secrets, including those detailed in paragraph 89 above, are separate from, in addition to, and distinct from the claims and disclosures of the '916 Patent, which is directed primarily at methods and systems for determining optimal system parameter settings for business initiative testing software.  The trade secrets, on the other hand, involve specific confidential applications, techniques and business methods that APT has developed through

company innovations and trial and error, including improved testing applications and procedures, specific criteria for designing and managing testing, reporting protocols to assist customers, and development of specific industry strategies and other business practices, all of which are confidential and not disclosed in APT's patent.

91.     APT has taken reasonable measures to keep such information secret and confidential by, among other steps, limiting access to such information, requiring employees to attend training on the protection of APT's confidential and trade secret information, and requiring employees to abide by confidentiality agreements and observe APT's policy on protecting APT's proprietary and confidential information, as further detailed in paragraphs 60 through 71.

92.     APT's proprietary and confidential information derives independent economic value from not being generally known to and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.  The independent economic value of APT's trade secrets is demonstrated by, among other things:

> a.     APT has invested tens of millions of dollars in the development of its trade secrets, including the Test & Learn® software system;
>
> b.     the monetary investment that APT has made in the development of client specific strategies that incorporate APT's software;
>
> c.     APT has spent 19 years developing and refining its software, client strategies, and other trade secrets;

     d.      APT has achieved substantial business success using its trade secrets over the past 19 years, the value of which was demonstrated by the acquisition of APT in 2015 by MasterCard for a total of $600 million;

     e.      Competitors such as MarketDial would benefit enormously from access to APT's trade secrets because (i) APT is a global leader in the business analytics software industry, (ii) competitors using APT's trade secrets could develop competing software products without spending multiple years and millions of dollars of investment that APT had to devote to the development of these products; (iii) competitors could develop features similar to those features in APT's software that would not be possible without access to APT's trade secrets; and

     f.      MarketDial has acknowledged the value of APT's trade secrets by specifically directing its market pitches to features of APT's software offerings that it learned from misappropriating APT's trade secrets.

93.     In violation of APT's rights, Defendants Stoddard and MarketDial have willfully misappropriated APT's trade secrets. Stoddard deliberately deceived APT into providing its trade secret information to Stoddard under the guise that the information was for the benefit of the McKinsey and APT relationship, and instead formed MarketDial to use APT's trade secret information for his own benefit. The trade secrets that MarketDial and Stoddard misappropriated from APT include those listed in paragraph 89 of this First Amended Complaint, that were included in PowerPoint presentations and case studies shared by APT with Stoddard, including an overview and technical details of APT's proprietary software, and its confidential business strategies unique to certain clients. For example, in February 2015, Stoddard requested and received from APT a PowerPoint presentation including details about APT's Test & Learn[®]

process, including its application to the financial services industry and an identification of the key elements of this process with corresponding illustrations. This PowerPoint presentation also included several pictures of APT's confidential user interface of its software. APT's software products, including its user interface, are not available to the public, but are provided to customers who are subject to confidentiality obligations. In June 2015, Stoddard also obtained from APT a similarly detailed PowerPoint presentation that included trade secret information about APT's Test & Learn® software and process, the confidential user interface, and its applications to potential clients.

94.     Upon information and belief, Stoddard solicited and collected APT's trade secret information, and used MarketDial as part of a scheme to misappropriate such trade secrets to get MarketDial up and running to develop software products to compete with APT and steal its business. Further, upon information and belief, Stoddard and MarketDial have used and continue to use APT's trade secret information, knowing that it was misappropriated and obtained through deceitful means. At a minimum, Stoddard and MarketDial could not have reasonably compartmentalized trade secret information learned from APT and thus inevitably would have used such information in developing their own competing products. Such misappropriation permitted MarketDial and Stoddard to develop their competing products, and to do so in substantially shorter time and with substantially less investment than could have been accomplished without misappropriation of such trade secrets.

95.     On information and belief, Stoddard is still in possession of APT's trade secret information and is able to access and use this information. Further, on information and belief, given Stoddard's position as the Chief Data Scientist and Co-Founder of MarketDial, it is inevitable that Stoddard has shared and will continue to share APT's trade secret information

with MarketDial, a direct competitor of APT, or fellow MarketDial employees, who may use or are using this information to APT's detriment.  MarketDial admits on its own website that the MarketDial Accused System was "[b]uilt by ex-McKinsey and -BCG consultants."  By virtue of Stoddard's position as the Chief Data Scientist and his intimate knowledge of APT's software functionality and business strategies to which Stoddard was repeatedly exposed through his employment with McKinsey, Stoddard intentionally and/or inevitably relied on and used his knowledge of APT's software solution and trade secrets in his development of MarketDial's software.

96.     Stoddard's and MarketDial's misappropriation of APT's trade secret information has been intentional, knowing, willful, malicious, fraudulent, and oppressive.

97.     If Stoddard's and MarketDial's conduct is not remedied, they will continue to misappropriate, disclose, and use APT's trade secret information for their own benefit and to APT's detriment.

98.     Because APT's remedy at law is inadequate, APT seeks, in addition to damages, permanent injunctive relief to recover and protect its trade secrets and other legitimate business interests.

99.     As the direct and proximate result of Stoddard's and MarketDial's conduct, APT has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

100.     APT has been damaged by all of the foregoing, and is also entitled to an award of exemplary damages and attorneys' fees.

## COUNT II

### Misappropriation of Trade Secrets Under Utah Uniform Trade Secrets Act
### Against Defendants MarketDial and Stoddard (Utah Code Ann. § 13-24-1, *et seq.*)

101.    APT repeats, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

102.    APT owns and possesses confidential and trade secret information, as alleged above.

103.    APT has taken reasonable measures to keep such information secret and confidential by, among other steps, limiting access to such information, requiring employees to attend training on the protection of APT's confidential and trade secret information, and requiring employees to abide by confidentiality agreements and observe APT's policy on protecting APT's proprietary and confidential information.

104.    APT's proprietary and confidential information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

105.    In violation of APT's rights, Defendants Stoddard and MarketDial willfully misappropriated APT's trade secrets.  Stoddard deliberately deceived APT into providing its trade secret information to Stoddard under the guise that the information was for the benefit of the McKinsey and APT relationship.  This trade secret information includes PowerPoint presentations and case studies shared by APT with Stoddard, including an overview and technical details of APT's proprietary software, and its confidential business strategies unique to certain clients.  For example, in February 2015, Stoddard requested and acquired from APT a PowerPoint presentation including details about APT's Test & Learn® process, including its

application to the financial services industry and an identification of the key elements of this process with corresponding illustrations. This PowerPoint presentation also included several pictures of APT's confidential user interface. In June 2015, Stoddard also obtained from APT a similarly detailed PowerPoint presentation that included trade secret information about APT's Test & Learn® software and process, the confidential user interface, and its applications to potential clients.

106.    Upon information and belief, Stoddard solicited and collected APT's trade secret information and used MarketDial as part of a scheme to misappropriate such trade secrets to get MarketDial up and running to develop software products to compete with APT and steal its business. Further, upon information and belief, Stoddard and MarketDial have in fact used APT's information, knowing that it was misappropriated and obtained through deceitful means. At a minimum, Stoddard and MarketDial could not have reasonably compartmentalized trade secret information learned from APT and thus inevitably would have used such information in developing their own competing products. Such misappropriation permitted MarketDial and Stoddard to develop their competing products, and to do so in substantially shorter time and with substantially less investment than could have been accomplished without misappropriation of such trade secrets.

107.    On information and belief, Stoddard is still in possession of APT's trade secret information and is able to access and use this information. Further, on information and belief, given Stoddard's position as the Chief Data Scientist and Co-Founder of MarketDial, it is inevitable that Stoddard has shared and will continue to share APT's trade secret information with MarketDial, a direct competitor of APT, or fellow MarketDial employees, who may use or are using this information to APT's detriment. By virtue of Stoddard's position as the Chief

Data Scientist and his intimate knowledge of APT's software functionality and business strategies that Stoddard was repeatedly exposed to through his employment with McKinsey, Stoddard intentionally and/or inevitably relied on and used his knowledge of APT's software solution and trade secrets in his development of MarketDial's software.

108.   Stoddard's and MarketDial's misappropriation of APT's trade secret information has been intentional, knowing, willful, malicious, fraudulent, and oppressive.

109.   If Stoddard's and MarketDial's conduct is not remedied, they will continue to misappropriate, disclose, and use APT's trade secret information for their own benefit and to APT's detriment.

110.   Because APT's remedy at law is inadequate, APT seeks, in addition to damages, permanent injunctive relief to recover and protect its trade secrets and other legitimate business interests.

111.   As the direct and proximate result of Stoddard's and MarketDial's conduct, APT has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

112.   APT has been damaged by all of the foregoing, and is also entitled to an award of exemplary damages and attorneys' fees.

## COUNT III

## Patent Infringement of U.S. Patent No. 8,571,916 Against Defendant MarketDial

113.    APT repeats, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

114.   MarketDial directly infringes at least claim 1 of the '916 Patent both literally and under the doctrine of equivalents.

115.    The Accused System, as made, used, sold, and/or offered for sale, performs a method for determining optimal parameter settings for business initiative testing software used for testing initiatives for business locations included in a business network.

116.    The Accused System, as made, used, sold, and/or offered for sale, performs each of the limitations of claim 1 of the '916 Patent.

117.    Claim 1 of the '916 Patent recites:

A method for determining optimal parameter settings for business initiative testing software used for testing initiatives for business locations included in a business network, comprising:

identifying, by a computer, a business initiative testing model having a set of parameter settings;

selecting a first parameter setting set for performing a virtual test, the first parameter setting set including a set of selected parameter setting options each respectively corresponding to one of the parameter settings for the business initiative testing model;

performing, by a computer, the virtual test on a set of virtual test sites, each virtual test site reflecting a selected business location in the business network, wherein each virtual test is a simulated business initiative test performed on test sites where no actual initiative test has been implemented at those test sites, and wherein the virtual test is performed on the virtual test sites using a variation of each parameter setting;

determining, by a computer, actual performance data associated with the set of virtual test sites;

determining, by a computer, actual performance data associated with a set of control group sites reflecting second selected business locations in the business network using the tested parameter settings;

determining a noise value for the first parameter setting set, the noise value reflecting an inconsistency between performance data associated, with the set of virtual test sites and performance data associated with the set of control group sites reflecting second selected business locations in the business network using the tested parameter settings;

determining, by a computer, a set of optimal parameter settings for the business initiative testing model based on results from the virtual test whereby the optimal parameter settings best minimize noise from the results; and

configuring, by a computer, the business initiative testing model using the optimal parameter settings to test a business initiative for application in the business network.

118.     On information and belief, the Accused System practices all of the elements of Claim 1 of the '916 Patent.  The Accused System practices a method for determining optimal parameter settings for business initiative testing software used for testing initiatives for business locations included in a business network.  The Accused System identifies, by a computer, a business initiative testing model having a set of parameter settings.  On information and belief, these parameter settings include, but are not limited to, parameters affecting the Accused System's use of outlier performance data obtained during a business initiative test and parameters affecting the amount of historical performance data analyzed by the Accused System. The business initiative testing model is described, *inter alia*, on the MarketDial website, available at marketdial.com.  *See, e.g.,*







119.    On information and belief, the Accused System selects a first parameter setting set for performing a virtual test, the first parameter setting set including a set of selected parameter setting options each respectively corresponding to one of the parameter settings for the business initiative testing model.  On information and belief, these parameter setting options

include, but are not limited to, the setting options relating to parameters affecting the Accused

System's use of outlier performance data obtained during a business initiative test and

parameters affecting the amount of historical performance data analyzed by the Accused System.

On information and belief, the parameter setting affecting the Accused System's use of outlier

performance data obtained during a business initiative test includes a set of parameter setting

options including, but not limited to, parameter setting options to (a) consider the outlier

performance data as-is; (b) disregard the outlier performance data; and (c) weigh the outlier

performance data.  On information and belief, the parameter setting affecting the amount of

historical performance data analyzed by the Accused System includes a set of parameter setting

options including, but not limited to, parameter setting options for the Accused System to (a) use

four years-worth of historical performance data; (b) use two years-worth of historical

performance data; and (c) use less than two years-worth of historical performance data.

120.    On information and belief, the first parameter setting set is selected to perform a

virtual test.  First, if the Accused System includes a set of parameter setting options for both

parameters affecting the Accused System's use of outlier performance data obtained during a

business initiative test and parameters affecting the amount of historical performance data

analyzed by the Accused System, the Accused System selects one of the respective options for

each parameter.  On information and belief, both the parameter setting affecting the Accused

System's use of outlier performance data obtained during a business initiative test and the

parameter setting affecting the amount of historical performance data analyzed by the Accused

System can be set by the Accused System to any one of the respective parameter setting options

within the respective set of parameter setting options.

121.    Second, by selecting one of the respective options for each parameter, on information and belief the Accused System selects the optimal parameter setting options by performing a virtual test on at least some parameter setting options and determining which selected parameter setting options best optimizes the business initiative test.  On information and belief, the Accused System selects the parameter setting options within a respective set of parameter setting options for either or each of the parameter setting affecting the Accused System's use of outlier performance data obtained during a business initiative test and the parameter setting affecting the amount of historical performance data analyzed by the Accused System so as to optimize a given business initiative test.  The Accused System does this, on information and belief, by performing a virtual test on at least some parameter setting options and determining which selected parameter setting options best optimizes the business initiative test.  The precise manner in which the Accused System selects the parameter setting options within a respective set of parameter setting options will be shown by discovery, source code review, and examination and evaluation of the Accused System.

122.    On information and belief, the Accused System performs, by a computer, the virtual test on a set of virtual test sites, each virtual test site reflecting a selected business location in the business network, wherein each virtual test is a simulated business initiative test performed on test sites where no actual initiative test has been implemented at those test sites, and wherein the virtual test is performed on the virtual test sites using a variation of each parameter setting. On information and belief, each such virtual test performed by the Accused System is performed using the actual performance data of test sites in the period prior to the implementation of the initiative test.  Thus, on information and belief, the simulated business initiative test is performed on test sites where no actual initiative test has yet been implemented.  On information and belief,

each such virtual test is performed on the virtual test sites using one of the parameter setting options within the respective set of parameter setting options for each or either of the parameter setting affecting the Accused System's use of outlier performance data obtained during a business initiative test and the parameter setting affecting the amount of historical performance data analyzed by the Accused System.  The virtual test is thereby performed on the virtual test sites using a variation of each parameter setting.  These variations of parameter settings include, but are not limited to, the setting options relating to parameters affecting the Accused System's use of outlier performance data obtained during a business initiative test and parameters affecting the amount of historical performance data analyzed by the Accused System.

123.    On information and belief, the Accused System determines, by a computer, actual performance data associated with the set of virtual test sites.  On information and belief, the Accused System obtains at least two years-worth of historical sales data for the virtual test sites from the pre-period, prior to any implementation of the business initiative.  The Accused System uses actual data provided by its customers.  *See, e.g.*, https://marketdial.com/features.  On information and belief, the data uploaded by the customer is associated with a set of virtual test sites.

## Integrate and Enrich Your Data

 **AUTOMATED DATA UPLOAD**
Easily load your transaction data with no transformations required, we'll even help automate the process.

 **STORE ATTRIBUTE ANALYSIS**
Send any store attribute data you have on hand—square footage, store type, seats, parking spaces, customer satisfaction survey results, etc.

 **ADD LOCATION & LOCAL DEMOGRAPHIC DATA**
MarketDial automatically performs trade-area analysis to enrich your data with consumer demographic and competitive location data.

 **HIGHLY-SECURE**
All data is stored on our highly-secure AWS servers

124.     On information and belief, the Accused System determines, by a computer, actual performance data associated with a set of control group sites reflecting second selected business locations in the business network using the tested parameter settings.  On information and belief, the Accused System obtains at least two years-worth of historical sales data for the control group sites from the pre-period, prior to any implementation of the business initiative.  The Accused System uses actual data provided by its customers.  *See, e.g.*, https://marketdial.com/features. On information and belief, the data uploaded by the customer is associated with a set of control group sites.

125.     On information and belief, the Accused System determines a noise value for the first parameter setting set, the noise value reflecting an inconsistency between performance data associated with the set of virtual test sites and performance data associated with the set of control group sites reflecting second selected business locations in the business network using the tested parameter settings.  On information and belief, the Accused System uses a virtual test to determine the optimal system parameters, comparing the performance data associated with the set of virtual test sites with the performance data associated with the set of control group sites,

thereby determining a noise value associated with each parameter setting set.  The precise manner in which the Accused System determines a noise value will be shown by discovery, source code review, and examination of the Accused System.

126.    On information and belief, the Accused System determines, by a computer, a set of optimal parameter settings for the business initiative testing model based on results from the virtual test whereby the optimal parameter settings best minimize noise from the results.  On information and belief, the Accused System chooses the parameter setting options within a respective set of parameter setting options for either or each of the parameter setting affecting the Accused System's use of outlier performance data obtained during a business initiative test and the parameter setting affecting the amount of historical performance data analyzed by the Accused System so as to optimize a given business initiative test.  On information and belief, the Accused System optimizes the given business initiative test by choosing the respective parameter setting options such that the performance data associated with the set of virtual test sites and the performance data associated with the set of control group sites is best matched to each other, whereby the optimal parameter settings best minimize noise from the results.  The precise manner in which the Accused System determines a set of optimal parameter settings for the business initiative testing model based on results from the virtual test whereby the optimal parameter settings best minimize noise from the results will be shown by discovery, source code review, and examination and evaluation of the Accused System.

127.    On information and belief, the Accused System configures, by a computer, the business initiative testing model using the optimal parameter settings to test a business initiative for application in the business network.  On information and belief, once the Accused System has determined the optimal parameter settings using the above method, these optimal parameter

settings are used to configure the business initiative testing model.  *See, e.g.*,

https://marketdial.com/features and https://marketdial.com.





128.    After adequate discovery, APT reserves the right to assert allegations of infringement of additional claims of the '916 Patent.

129.    MarketDial's direct infringement as described above has injured and continues to injure APT, and APT is entitled to recover damages adequate to compensate it for such infringement, but in no event less than a reasonable royalty.

130.    MarketDial has had actual notice of the '916 Patent since at least December 18, 2017.

131.    MarketDial's infringement of the '916 Patent has been and continues to be willful and deliberate as MarketDial has acted in an objectively reckless manner in view of the high likelihood that its acts constituted infringement of the '916 Patent and with full knowledge of

46

APT's rights in the '916 Patent.  As discussed above, MarketDial has known of the '916 Patent and its infringement of the '916 Patent has continued nevertheless.  APT is entitled to increased damages pursuant to 35 U.S.C. § 284 and attorneys' fees and costs pursuant to 35 U.S.C. §285.

### COUNT IV

### Unfair Competition (Utah Code Ann. § 13-5a-101 *et seq.*)

132.    APT repeats, re-alleges, and incorporates by reference the prior allegations of this Second Amended Complaint as if fully set forth herein.

133.    APT owns and possesses valuable intellectual property, including the '916 Patent and trade secrets described above.

134.    Defendants' unlawful, unfair, and fraudulent acts described above, including Defendants' trade secret misappropriation and patent infringement, have caused a material diminution in the value of APT's intellectual property at an amount to be proven at trial.

135.    As the direct and proximate result of Stoddard's and MarketDial's conduct, APT has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

136.    By virtue of Defendants' intentional unfair acts, APT is also entitled to costs, attorneys' fees, and punitive damages.

### JURY DEMAND

Plaintiff APT respectfully demands a jury trial pursuant to Fed. R. Civ. P. 38 on all issues so triable.

WHEREFORE, Plaintiff APT respectfully demands judgment in its favor and against

MarketDial and Stoddard as follows:

a.  Declaring that MarketDial and Stoddard have misappropriated APT's confidential and trade secret information pursuant to the Defend Trade Secrets Act and Utah Uniform Trade Secrets Act, and that the misappropriation has been willful;

b.  Declaring that MarketDial has infringed the '916 Patent, and that the infringement has been willful;

c.  Awarding damages as described in each of the above claims, in favor of plaintiff APT and against MarketDial and Stoddard in amounts to be determined at trial;

d.  Awarding punitive damages as described above in favor of plaintiff APT and against MarketDial and Stoddard in amounts to be determined at trial;

e.  Enjoining MarketDial and Stoddard and their respective officers, agents, servants, employees and attorneys, and all other persons in active concert or participation with them, from using APT's trade secret information and from selling, offering for sale, marketing, or using the Accused System;

f.  Enjoining MarketDial and its respective officers, agents, servants, employees, attorneys, and those persons in active concert or participation with MarketDial who receive actual notice of the order by personal service or otherwise, from selling, offering for sale, marketing, or using the Accused System MarketDial's Accused System and any other infringement of the '916 Patent;

g.  Awarding exemplary damages in favor of APT and against MarketDial and Stoddard in an amount to be determined at trial;

h.  Granting judgment that MarketDial has willfully infringed one or more claims of the '916 Patent;

i.  Awarding enhanced damages to compensate APT for MarketDial's willful infringement, including damages pursuant to 35 U.S.C. § 284;

j.  Declaring this case exceptional pursuant to 35 U.S.C. § 285 and awarding reasonable attorneys' fees to APT to compensate;

k.  Awarding APT pre-judgment and post-judgment interest, and its attorneys' fees, costs, and other expenses incurred in this action;

l.  Granting APT such other and further relief as this Court deems just and proper.

Date: August 29, 2019                    */s/ Sam Straight*
                                         Kirk R. Ruthenberg (*pro hac vice*)
                                         Nicholas H. Jackson (*pro hac vice*)
                                         DENTONS US LLP
                                         1900 K Street, N.W.
                                         Washington, DC  20006
                                         (202) 496-7500

                                         Jennifer D. Bennett (*pro hac vice*)
                                         DENTONS US LLP
                                         One Market Plaza
                                         Spear Tower, 24th Floor
                                         San Francisco, CA  94105
                                         (650) 798-0325

                                         Patrick Doll (*pro hac vice*)
                                         DENTONS US LLP
                                         2000 McKinney Avenue
                                         Suite 1900
                                         Dallas, TX  75201-1858
                                         (214) 259-1889

                                         Samuel C. Straight (State Bar No. 7638)
                                         Ray Quinney & Nebeker LLP
                                         36 South State Street
                                         Suite 1400
                                         Salt Lake City, UT 84111
                                         Telephone: 801-901-9054
                                         Facsimile: 801-532-7543

                                         *Attorneys for Plaintiff Applied Predictive*
                                         *Technologies, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of August, 2019, I electronically filed the foregoing

**SECOND AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF filing

system which sent notification of such filing to all counsel of record.


_/s/ Brandy Sears_____
Brandy Sears