# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

APPLIED PREDICTIVE           )
TECHNOLOGIES, INC.,            )
                             )
          Plaintiff,           )
                             )
          v.                  )   Case No. 2:2019-cv-00496-JNP-CMR
                             )
MARKETDIAL, INC., JOHN M.       )   Judge:  Jill N. Parrish
STODDARD, AND MORGAN DAVIS,   )
                             )   **JURY TRIAL DEMANDED**
          Defendants.       )

## THIRD AMENDED COMPLAINT

Plaintiff Applied Predictive Technologies, Inc. ("Plaintiff" or "APT") brings this complaint against defendants MarketDial, Inc. ("MarketDial"), John M. Stoddard a/k/a Johnny Stoddard ("Stoddard"), and Morgan Davis ("Davis"), or collectively ("Defendants"), for misappropriation of trade secrets, breach of contract (as third party beneficiary thereof), fraudulent misrepresentation and fraudulent nondisclosure, civil conspiracy, and tortious interference with contractual relations.[1]

## NATURE OF THE ACTION

1.     This is a civil action for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*.; misappropriation of trade secrets under the Utah Uniform Trade Secrets Act ("UUTSA"), Title 13, Chapter 24 of the Utah Code (Utah Code

---

[1] Plaintiff also previously asserted a claim for patent infringement of U.S. Patent No. 8,751,916 ("'916 Patent") against MarketDial. Because the Court granted MarketDial's motion to dismiss that claim on November 25, 2020 (Dkt. 129), Plaintiff provides a placeholder in Count III below but does not repeat the factual allegations, instead relying upon the Second Amended Complaint, which was the subject of the granted Motion to Dismiss. Plaintiff reserves all rights to appeal the Court's ruling and order dismissing its patent infringement claim after a final judgment in the case.

Ann. § 13-24-1, *et seq*.); breaches of contract (as third party beneficiary thereof); fraudulent misrepresentation and fraudulent nondisclosure; civil conspiracy; and tortious interference with contractual relations.

2.     Defendants Stoddard, Davis and MarketDial have engaged in a systematic effort to acquire valuable confidential and trade secret information belonging to APT and improperly use it for their own advantage.  Both of MarketDial's founders, Stoddard and Davis, previously worked for companies that had confidentiality obligations to APT, which confidentiality obligations also bound all employees, including Stoddard and Davis.  Stoddard and Davis both obtained access to APT's confidential and trade secret information, and both were required to maintain the confidentiality of that information and not to use it for any other purpose.  Instead, both Stoddard and Davis began improperly using APT's confidential information as early as February 2015 for their own benefit and to start their own business, MarketDial, in violation of their confidentiality obligations and in violation of both the DTSA and UUTSA.

3.     Specifically, at the time that Stoddard was obtaining APT confidential information and trade secrets from APT while surreptitiously sharing such information with Davis and MarketDial to help launch MarketDial as a competitor to APT, Stoddard worked at McKinsey & Company, Inc. ("McKinsey") as an associate contractually obligated to maintain the confidentiality of information he obtained regarding McKinsey and APT.  Stoddard worked at McKinsey approximately from August 2013 to April 2016.  McKinsey entered into a Cooperation and Confidentiality Agreement dated November 7, 2013 ("APT/McKinsey Confidentiality Agreement") with APT by which APT agreed to provide access to APT confidential information in connection with McKinsey's client development and/or client services as well as each party's internal consideration of a potential transaction with other

parties.  McKinsey agreed that it and its employees would use APT confidential information only for the purposes of the APT/McKinsey Confidentiality Agreement, and to keep confidential and not disclose such information to anyone other than McKinsey employees with a need to know who were bound by the APT/McKinsey Confidentiality Agreement.  Stoddard was aware of and agreed to be bound by the terms of the APT/McKinsey Confidentiality Agreement. Stoddard represented to APT that he would maintain the confidentiality of APT confidential information and held himself out as an employee of McKinsey who would abide by his confidentiality obligations, not use APT information for his own purposes or any purpose other than serving the interests of McKinsey and its client APT.  Discovery has revealed that Stoddard was further obligated to preserve the confidentiality of the APT information provided to McKinsey pursuant to the Proprietary and Confidential Information Agreement ("Stoddard's Employee Agreement") that he entered into on August 9, 2013 as part of his employment with McKinsey.  APT was a third party beneficiary of Stoddard's Employee Agreement with McKinsey, which expressly required that Stoddard hold confidential information of McKinsey and its clients, such as APT, in strictest confidence and not disclose it to persons outside McKinsey.  Stoddard used his status as an employee of McKinsey, subject to the same confidentiality obligations to APT as McKinsey, to gain access to APT's confidential and trade secret information and improperly disclose such information to third parties including Davis and MarketDial, and to use APT's confidential and trade secret information for his own financial benefit.

4.     Davis worked for the Boston Consulting Group ("BCG") as an Associate from 2012 - 2014.  During the time period that Davis worked for BCG, it had a standard Employee Agreement ("BCG Employee Agreement") that governed the confidentiality of information relating to BCG and its clients and a Code of Conduct that further required that BCG employees

maintain certain standards of conduct common to the business management consulting profession, including maintaining the confidentiality of BCG's and clients' information both during and after employment by BCG.  Davis was subject to the confidentiality obligations under both the BCG Employee Agreement and the Code of Conduct, and confidentiality standards of conduct common to the business management consulting profession.  During the course of Davis's employment by BCG he worked with and communicated with clients of BCG who used APT's Test & Learn® software program and who shared with Davis confidential information about APT's Test & Learn® program that was both confidential information of BCG and APT.  In or about January 2015 Davis began using APT's confidential information to build a competing business to APT in coordination with Defendant Stoddard, and began sharing APT confidential information with Stoddard, all in violation of his confidentiality obligations to both BCG and APT.  That competing business, MarketDial, was incorporated in February 2015.  APT issued a subpoena to Davis on May 4, 2021, seeking information about the specific agreements that Davis had with BCG and the specific APT information he obtained while at BCG, but Davis objected to the subpoena and refused to provide any information in response.

5.     In January 2015, Stoddard and Davis began actively discussing their idea to launch a  predictive business analytics company that would compete directly with APT and that business, MarketDial, was incorporated in February 2015. Beginning at least as early as February 2015, Davis and MarketDial, acting through Davis, began requesting that Stoddard seek out and relay APT's confidential and trade secret information to Davis while Stoddard was employed by McKinsey and under confidentiality obligations to both McKinsey and APT, and to share APT's confidential information with Davis and MarketDial.  While Stoddard was employed by McKinsey and receiving APT's confidential and trade secret information on behalf of McKinsey,

allegedly to perform his duties for the benefit of McKinsey and APT, Stoddard and Davis surreptitiously co-founded MarketDial, a Delaware corporation, to compete with APT.  Davis and Stoddard have prominently promoted their status as co-founders of MarketDial and role in founding the company.  Stoddard's LinkedIn page (available at https://www.linkedin.com/in/johnny-stoddard-1382bb34)[2]; Stoddard's Facebook page (available at https://www.facebook.com/johnny.stoddard)[3].  Through his employment with McKinsey, beginning at least as early as February 2015, Stoddard received APT's trade secret and confidential information relating to its software, business strategies, and customers, as described below. At and *after* the formation of MarketDial, Stoddard actively sought access to APT confidential and trade secret information and repeatedly requested that APT provide confidential and trade secret information, while making assurances that APT's information would be kept confidential. Since the filing of the Second Amended Complaint in this action, Plaintiff APT has obtained additional information regarding Stoddard's activities while obtaining APT's trade secrets and confidential information, showing that Stoddard was at the same time working with Davis to form a new business to compete with APT using APT's trade secrets and confidential information, and working with MarketDial to develop a software product and services to compete with APT using APT's trade secrets.  During 2015, the time period during which Stoddard was obtaining APT's trade secrets, Stoddard resided in North Ridgeville, Ohio (near Cleveland), Eagle Mountain, UT (near Salt Lake City), and Penryn, CA (near Sacramento).  At Davis's suggestion and urging, Stoddard purported to need access to APT's confidential and trade secret information in connection with joint marketing efforts of McKinsey and APT, purportedly for the benefit of APT, but in reality for his own and Davis's personal benefit and

---

[2] Last visited July 16, 2021.
[3] Last visited July 16, 2021.

that of MarketDial, the company they admittedly co-founded.  Without disclosing his interest in

MarketDial or that he was discussing with Davis starting up a new business in competition with

APT, Stoddard obtained and repeatedly requested and received from APT, subject to his

confidentiality obligations to APT, key features of how APT's proprietary software operates,

how APT most effectively utilizes its Test & Learn® software with clients, how APT

successfully deploys it software and services to deliver value to clients, and other confidential

and trade secret information from APT, all under the guise of benefitting the APT and McKinsey

relationship.

6.      Stoddard, at Davis's urging, duped APT into providing its confidential

information and trade secrets to benefit him and Davis personally, as well as their newly-formed

company, MarketDial, and used MarketDial to carry out their scheme to misappropriate APT's

trade secrets.  Stoddard, Davis and MarketDial intentionally misappropriated APT confidential

information and trade secrets in violation of at least the APT/McKinsey's Confidentiality

Agreement, Stoddard's Employee Agreement, BCG's agreements with APT, and federal and

state law.  Stoddard and Davis began discussing starting a new business venture together in

January 2015. In January 2015 email communications, Stoddard disclosed to Davis that he ███

███████████████████████████████████████████████████████████

████████████████████████  At no time during the relationship between APT and Stoddard did

Stoddard ever inform APT that he was planning on quitting McKinsey, that he was working on

developing a competitor to APT, or that he was disclosing APT's information to a third party.

7.      Both Stoddard and Davis recognized how difficult it would be to develop a

predicative analytics software tool that could provide value to customers.  Stoddard disclosed to

Davis that "█████████████████████████████████████████"  After

observing the difficulties of competing in the field of predictive business analytics software, Stoddard and Davis developed a scheme to gain access to APT's confidential information and trade secrets, to use APT's confidential information and trade secrets for their own benefit and that of MarketDial, and to directly harm APT for their own benefit.

8.      At least as early as February 16, 2015, Stoddard began accessing APT confidential information, sharing APT's confidential and trade secret information with Davis, identifying APT as the main ██████████ to their ambitions to build a business, and disclosed to Davis that McKinsey was partnering with APT.

9.      MarketDial was officially formed on February 20, 2015.  On the same day that MarketDial was formed, Davis told Stoddard his goal was to "██████████" Stoddard informed Davis that he "████████████████" Davis requested confidential information about APT's software, and Stoddard improperly disclosed to Davis and MarketDial APT's confidential and proprietary PowerPoint explaining APT's business and Test & Learn® software. Davis continued requesting, and Stoddard continued obtaining and sharing with Davis, APT's trade secrets through much of 2015.  The communications between Davis and Stoddard were conducted by email and phone calls directed to Davis in Utah and included meetings with Davis in person in Utah.  After these active discussions in 2015 and early 2016 with Davis regarding APT's trade secret and confidential information, and about co-founding MarketDial, Stoddard formally joined MarketDial as an employee in spring 2016, but was misappropriating trade secrets on behalf of MarketDial starting in February 2015, including on the day MarketDial was formed.  Stoddard contends that he did not begin to work on development of MarketDial's software until he formally joined MarketDial as an employee in April 2016, but discovery has disclosed that Stoddard misappropriated APT's trade secrets, improperly shared them with Davis

and MarketDial and improperly used them on behalf of himself, Davis and MarketDial, beginning in February 2015 and continuing throughout the remainder of 2015, in 2016 before leaving McKinsey, and thereafter as an employee, Chief Data Scientist and Co-Founder of MarketDial.  When Stoddard formally joined MarketDial as an employee in spring 2016, he moved permanently to Lehi, Utah, where he now resides. Davis resides nearby in South Jordan, Utah.  Defendants' misappropriation of APT's trade secrets has included their ongoing activities, including in Utah, from February 2015 through the present.  The locus of Defendants' misappropriation activity to date is in Utah.

10.     Discovery in the case has disclosed that Stoddard's and Davis' misappropriation of APT's trade secrets and confidential information began from the beginning of Stoddard's initial access to APT's trade secrets and confidential information in February 2015, when Stoddard began sharing such information with Davis, with Davis's active and intentional encouragement and inducement, in violation of his confidentiality obligations.

11.     Defendants have used APT's trade secrets and confidential information in developing MarketDial's business strategy, approach to clients and industries, and development of key features and functionality of MarketDial's products and services.  Stoddard and Davis founded MarketDial specifically to compete against APT, have used APT's trade secrets and confidential information to compete with APT, and have approached APT clients in an effort to siphon them off.  In at least two instances, MarketDial has stolen business from APT, causing APT to suffer substantial damages.  Those activities of Defendants during 2015 through the present have occurred in, and have been directed from, Utah, where MarketDial is headquartered, where all of its employees are located, and where Stoddard resides.

12.     By letter dated December 18, 2017, APT contacted Defendants in an attempt to explore with them the concerns APT had about their use of APT trade secrets and infringement of APT's patents, seeking more information about the methodology of MarketDial's software, and requesting a meaningful discussion of these issues, all in an effort to avoid a legal dispute. In response, MarketDial admitted by letter that it competes in the same space as APT and for some of the same customers, but MarketDial nevertheless refused to meet with APT, pursue any discussions, or provide APT with any information about the methodologies employed by its software.  MarketDial also denied that Stoddard was ever privy to APT's confidential and trade secret information, despite clear evidence to the contrary.  Based upon APT's investigation, and despite the refusal of Defendants to cooperate in the requested discussions, APT determined that Defendants were using APT's trade secret information disclosed to Stoddard subject to strict confidentiality obligations and that the MarketDial systems infringe one or more claims of the '916 Patent.  APT now seeks relief from this Court to enjoin Defendants from using APT's confidential and trade secret information.  APT further seeks an award of damages for the injury it has incurred as a result of Defendants' trade secret misappropriation, breach of contract by Stoddard, breach of contract by Davis, fraudulent misrepresentation and fraudulent nondisclosure by Stoddard, civil conspiracy by Defendants, and tortious interference by MarketDial and Davis.

## THE PARTIES

13.     Plaintiff APT is a corporation, organized and existing under the laws of the State of Delaware, with its principal place of business at 4250 N. Fairfax Drive, 11th Floor, Arlington, Virginia 22203.

14.     Defendant MarketDial is a corporation, organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business in Utah.  Since its

creation in 2015, MarketDial has had places of business at 12 W. Market Street, Suite 220, Salt Lake City, Utah 84102 and 175 S Main St Floor 16, Salt Lake City, UT 84111.

15. Defendant Stoddard is a founder of MarketDial, has served as an officer and director of MarketDial, and, during his misappropriation of APT's trade secrets while working at McKinsey, resided in Utah, Ohio and/or California. After misappropriating APT's trade secrets and leaving McKinsey, Stoddard moved to Utah and, upon information and belief, now resides at 4151 N. Traverse Mountain Blvd, Apartment 13301, Lehi, Utah 84043.

16. Defendant Davis is a founder of MarketDial, serves as an officer and director of MarketDial. Upon information and belief, Davis now resides at 6248 W Copper Hawk Dr., South Jordan, Utah 84009.

17. Upon information and belief, MarketDial directly and/or indirectly develops, designs, manufactures, distributes, markets, offers to sell, and/or sells the MarketDial system in the United States, including in and from the District of Utah.

<u>**JURISDICTION AND VENUE**</u>

18. This is a civil action for misappropriation of trade secrets under the DTSA, 18 U.S.C. § 1836, *et seq.*; misappropriation of trade secrets under the UUTSA, Utah Code Ann. § 13-24-1, *et seq.*; breach of contract (as third party beneficiary thereof); fraudulent misrepresentation and fraudulent nondisclosure, civil conspiracy, and tortious interference with contractual relations.

19. This Court has subject matter jurisdiction over APT's federal trade secret claim pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331 because Plaintiff has asserted a claim for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016. This Court has supplemental jurisdiction over APT's claims under the Utah Uniform Trade Secrets Act and APT's other state law claims, because they are so related to Plaintiff's federal misappropriation

of trade secrets claim that they form part of the same case or controversy under Article III of the United States Constitution.

20.     This Court has personal jurisdiction over MarketDial because it has a regular and established place of business in this District and therefore resides in this District.

21.     This Court has personal jurisdiction over Stoddard and Davis because they reside in this District.

22.     Venue is proper in this judicial district for APT's federal trade secret misappropriation claim under 28 U.S.C. § 1391(b)(2) and claims under the Utah Uniform Trade Secrets Act and state law because a substantial part of the events giving rise to them occurred in the State of Utah and in this judicial district.

## FACTS

### APT's Innovation and Industry Recognition

23.     APT, founded in 1999, is a global leader in the business analytics software industry, and helps businesses make decisions based on analysis of their customers' actions using innovative tools developed by APT at great expense over many years.  APT services customers in a variety of industries, including retail, restaurants, financial services, consumer packaged goods, airlines, automotive, hotels, insurance, life sciences, healthcare, and telecommunications and media.  APT's software includes the Test & Learn® software system.  APT's publicly-known customers include Walmart, Coca-Cola, McDonald's, TD Bank, Starbucks, SunTrust, Big Lots, Victoria's Secret, T-Mobile, and Kellogg's.  However, APT also has multiple confidential customers as well.

24.     Through its substantial investment in research and development over the past more than 20 years, APT has developed innovative, cutting-edge technologies that changed the face of data-driven analytics and resulted in APT's customers making data-driven decisions

using APT's proprietary software.  As such, sensitive, confidential, and proprietary information and trade secrets form the backbone of APT's success in its business.

25.     APT has devoted a great deal of time and expense to developing trade secrets, including its proprietary and confidential technical information, knowledge, and business strategy.  Since its inception in 1999 and through the filing of this Complaint, APT has developed the trade secret information, which gives it an advantage in business over its competitors.  As indicated by its success, APT has developed and acquired proprietary information and knowledge in relation to its Test & Learn® software system, including not only in its technical and performance specifications, but also in the business plans and business strategies surrounding its systems and APT's customers.  APT's customers or clients are generally companies that have sought services and access to APT's software.  APT sometimes refers to such companies as customers and sometimes as clients, often using the terms interchangeably.  The confidential aspects of the Test & Learn® software system and the confidential information and trade secrets disclosed to Stoddard while he was employed by McKinsey are not disclosed or patented in any patent application filed by APT, including, but not limited to the '916 Patent.

26.     APT's products and services, including the Test & Learn® software system, enable customers to test the efficacy of a business initiative, *e.g.*, a sales promotion, a retention program, or a customer loyalty offer.  Through technologically refined setup of business initiative tests and detailed statistical analysis of the actual and predicted results of the business initiative test, APT is able to determine for the customer the business initiative's true impact and recommend the most profitable action for the customer to take.

27.     APT has won numerous awards for its technological achievements, including:

- 2014 International Business Awards ("IBA") Gold Stevie Winner for Best New Product or Service of the Year - Software - Big Data Solutions for the APT Index;

- 2014 IBA Bronze Stevie Winner for Most Innovative Company of the Year in Canada and the U.S.A. - All Technology Industries;

- 2014 Business Intelligence ("BIG") Award for New Product of the Year for the APT Index;

- 2015 BIG Award for New Product of the Year in the IT/Telecom Category for its Space Planning Optimizer Software;

- 2015 IBA Silver Stevie Winner for Best New Product of Service of the Year - Software - Big Data Solutions  for its Space Planning Optimizer Software;

- 2016 Bronze American Business Award for Network Planner with Mastercard Insights software; and

- 2016 BIG Award for New Product of the Year.

**Defendants' Misappropriation of APT's Trade Secrets**

28.     Stoddard worked for McKinsey as a business analyst from August 2013 to April 2016.  McKinsey is a business management consulting firm that maintains certain standards of conduct common to the business management consulting profession, including standards requiring its employees to maintain the confidentiality of McKinsey's and clients' information both during and after employment by McKinsey and to avoid conflicts of interest.  APT and McKinsey agreed to partner on mutual customer relationships and in connection with APT's and McKinsey's client development and client service activities, and agreed to share certain information, subject to strict confidentiality, to pursue such mutual efforts as identified by personnel of both APT and McKinsey.  Pursuant to the APT/McKinsey Confidentiality

Agreement, McKinsey agreed to keep confidential and not to disclose APT's confidential information other than to its employees with a need to know such information and who were bound by nondisclosure obligations consistent with the terms of the APT/McKinsey Confidentiality Agreement. Stoddard, as an employee of McKinsey, was subject to the APT/McKinsey Confidentiality Agreement and the obligations to which McKinsey agreed to preserve APT's confidential information.

29.     Davis worked for BCG as an Associate from 2012 - 2014. BCG, a business management consulting firm, had a relationship with APT during that time period, including working with APT clients in connection with APT's Test & Learn® software system. BCG is a business management consulting firm that maintains certain standards of conduct common to the business management consulting profession, including standards requiring its employees to maintain the confidentiality of BCG's and clients' information both during and after employment by BCG. Pursuant to BCG's Code of Conduct and the BCG Employee Agreements with its employees, including on information and belief Davis, BCG employees including Davis were required to maintain the information they learned from clients about APT in the strictest confidence and not disclose it to third parties or other BCG employees without authorization. During the course of Davis' employment by BCG, BCG had a confidential relationship with APT which included, among other agreements, at least one agreement involving the use of APT's proprietary software for at least one mutual client, Einstein Noah Restaurant Group ("ENRG"). BCG and APT entered into a Third Party Access Agreement dated January 26, 2012 regarding BCG's use of APT's proprietary software ("Access Agreement") in the course of providing professional services to ENRG. The Access Agreement required BCG and its employees to maintain the confidentiality of APT's software and information. Pursuant to the

Access Agreement, BCG agreed to maintain the highest standards of confidentiality with regard to APT's software and to protect APT's information from unauthorized disclosure.  BCG also agreed to use the software only to support ENRG and that no BCG representative provided access to the software would be involved in developing a service that competes, directly or indirectly, with APT's software. Upon information and belief, Davis was a member of a BCG team that obtained knowledge about APT's software. Davis, as an employee of BCG, was subject to BCG's Code of Conduct, confidentiality obligations included in a BCG Employee Agreement, the Access Agreement and the obligations to which BCG agreed to preserve APT's confidential information.  Davis learned confidential information about APT's Test & Learn® software system from clients of BCG and, in breach of his obligations to maintain such information in the strictest confidence, disclosed such information to at least Stoddard, used such information to induce Stoddard to breach his agreements with McKinsey, of which APT is a third party beneficiary, to obtain APT's confidential and trade secret information from Stoddard, and used such information in the development of his competing business and the MarketDial testing software.

30.     Further, based on the terms of the APT/McKinsey Confidentiality Agreement, employees of McKinsey were required to maintain the confidentiality of APT's trade secrets and confidential information.  Discovery has also now shown that Stoddard's Employee Agreement with McKinsey, which he executed in 2013, expressly required that Stoddard maintain the confidentiality of client information in strictest confidence, including the APT information shared with Stoddard in 2015 by APT.  McKinsey confirmed in January 2017 that it had advised Stoddard of his continuing obligation to maintain the confidentiality of APT's confidential information and trade secrets pursuant to Stoddard's Employee Agreement and the

APT/McKinsey Confidentiality Agreement. Discovery has also shown that Stoddard repeatedly

disclosed to Davis his confidentiality obligations under the McKinsey agreements, and even told

Davis that " ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

████████" Thus, Davis was well aware of Stoddard's confidentiality obligations to

McKinsey and APT, and his own confidentiality obligations, including under Stoddard's

Employee Agreement with McKinsey, the APT/McKinsey Confidentiality Agreement, Davis'

confidentiality agreements with BCG, and the standards of conduct governing the business

management consulting profession, as reflected in codes of conduct adopted by McKinsey[4],

BCG[5] and others.

31.    Despite his clear conflict of interest, Stoddard made concerted efforts, with

Davis's active, intentional, and malicious encouragement and inducement, to put himself directly

in the middle of McKinsey's confidential projects with APT for at least a five-month period in

2015.  From the very beginning of Stoddard's access to APT's trade secrets and confidential

information in February 2015, Stoddard began sharing such information with Davis without

authorization in breach of Stoddard's Employee Agreement and the APT/McKinsey

Confidentiality Agreement, in violation of the standards of confidentiality common to the

---

[4] McKinsey's Code of Conduct provides that: "Firm members are also prohibited from using client confidential information for any reason other than the service of that client. Such information cannot be used for personal or political ends, or in service of a different client."
https://www.mckinsey.com/~/media/McKinsey/About%20Us/Social%20responsibility/McKinsey-Code-of-Conduct-June-2019.ashx (last accessed July 16, 2021).
[5] BCG's Code of Conduct provides: " ████████████████████████████
████████████████"

business management consulting profession, and in violation of the protections provided to APT

by the DTSA and the UUTSA. During 2015, Stoddard requested and obtained large amounts of

APT's confidential and trade secret information pursuant to the APT/McKinsey Confidentiality

Agreement. This included PowerPoint presentations and case studies provided to Stoddard by

APT, which provided an overview and technical details of APT's Test & Learn$^{®}$ software, a

disclosure of APT's proprietary methods for delivering value to clients, APT's proprietary

business strategies for effectively marketing and selling predictive business analytics software,

and the identification of APT's confidential clients. This confidential and trade secret

information reflects years of research and millions of dollars of personnel time to identify and

determine the trade secret methodologies and processes underlying APT's Test & Learn$^{®}$

software system, APT's proprietary methods for delivering value to clients, and APT's

proprietary business strategies for effectively marketing and selling predictive business analytics

software.

32.     Unbeknownst to APT, despite Stoddard continuing to work at McKinsey, and

seeking and obtaining trade secrets from APT, in February 2015 Stoddard co-founded, with

Davis, MarketDial, a new business that Stoddard and Davis formed to compete with APT in the

predictive analytics software business. MarketDial was incorporated on February 20, 2015, on

the very same day that Stoddard was improperly disclosing to Davis and MarketDial confidential

and proprietary documents of APT, clearly marked as "APT Confidential Information -

Distribution by receiving party is prohibited," that included APT's confidential information and

trade secrets.

33.     MarketDial specifically holds Davis and Stoddard out to be co-founders of

MarketDial. *See* https://newsroom.siliconslopes.com/marketdial-allows-you-to-test-before-you-

act/[6] (stating that co-founder Morgan Davis "and cofounder Johnny Stoddard, who also worked for years as a consultant, created an easy-to-use platform").  Stoddard's LinkedIn page (available at https://www.linkedin.com/in/johnny-stoddard-1382bb34)[7] and Facebook page (available at https://www.facebook.com/johnny.stoddard)[8] also list Stoddard as being the "Chief Data Scientist / Co-Founder" of MarketDial. Davis's LinkedIn page (available at https://www.linkedin.com/in/davismorgan/)[9] also lists Davis as being the CEO/Co-Founder of MarketDial.

34.     On its website, MarketDial advertises that the MarketDial system was "[b]uilt by ex-McKinsey and -BCG consultants."  *See* https://marketdial.com/solutions/overview/.[10]

35.     Shortly after MarketDial's founding in February 2015 and through at least July 2015, and with Davis's active and intentional encouragement and inducement, Stoddard interacted regularly with APT in the course of his duties at McKinsey.  However, Stoddard intentionally hid from APT that he was a co-founder of a competing company or that he was planning to pursue a competing business for his own personal benefit.  With Davis's active, intentional, and malicious encouragement and inducement, Stoddard repeatedly requested and acquired APT's confidential and trade secret information during this time, under the guise of benefiting the McKinsey and APT relationship.  This APT trade secret information included PowerPoint presentations, case studies, technical documents, and strategic discussions that essentially provided Stoddard, and in turn Davis and MarketDial, with a roadmap, or playbook,

---

[6] Last visited July 16, 2021.
[7] Last visited July 11, 2021.
[8] Last visited July 11, 2021.
[9] Last visited July 11, 2021.
[10] Last visited July 16, 2021.

for how to successfully build a predictive analytics software business, which they improperly used to build MarketDial to unfairly compete with APT.

36.     For example, in February 2015, Stoddard requested and received from APT a confidential PowerPoint presentation including details about APT's Test & Learn® process, including its application to the financial services industry and an identification of the key elements of this process with corresponding illustrations including APT's confidential Graphical User Interface (GUI). The PowerPoint further included APT's proprietary methods for delivering value to clients, and APT's proprietary business strategies for effectively marketing and selling predictive business analytics software.

37.     In furtherance of APT's continuing confidential project with McKinsey, and in reliance upon Stoddard's representations that he would maintain APT's information in strict confidence and his contractual confidentiality obligations to APT and McKinsey, APT sent Stoddard a similarly detailed confidential PowerPoint presentation in June 2015 that included trade secret information about APT's Test & Learn® software and process, the confidential GUIs, applications to potential clients, APT's proprietary methods for delivering value to clients, and APT's proprietary business strategies for effectively marketing and selling predictive business analytics software.

38.     Further, APT sent Stoddard a case study containing APT confidential information in April 2015, under explicit instructions that the case study was being sent under a non-disclosure agreement between APT and McKinsey and that Stoddard should keep the distribution limited.

39.     In June 2015, Stoddard further requested that APT send him another case study containing APT trade secret information, acknowledging the obligations of McKinsey and its

employees under the APT/McKinsey Confidentiality Agreement and representing that confidential information would only be shared internally within McKinsey.

40.     Stoddard, with Davis's active, intentional and malicious encouragement and inducement, duped APT into providing Stoddard APT's confidential and trade secret information, and concealed his plans to develop a competing software product through MarketDial.  In providing the requested information to Stoddard, APT detrimentally relied on Stoddard's misrepresentation that he requested this information for the benefit of McKinsey's client development work, which would ultimately benefit APT. Davis and MarketDial knew in February 2015 and thereafter that Stoddard was contractually obligated to keep APT's information confidential and yet specifically and improperly induced Stoddard to share APT's confidential and trade secret information with him.  Davis knew from his experience at BCG that employees are required to maintain the confidentiality of such information as a common standard in business management consulting firms, that it was a common practice to require employees to execute employee agreements with the same or substantially similar terms and confidentiality obligations as those in Stoddard's Employee Agreement.  Davis and MarketDial knew that Stoddard was required to hold such information in strict confidence, not to be disclosed to third parties, and certainly not disclose it to someone such as Davis who was actively planning to compete with APT.  Stoddard also told Davis about his confidentiality obligations under Stoddard's Employee Agreement, stating "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Thus, Davis and MarketDial were well aware of Stoddard's Employee

Agreement with McKinsey, and confidentiality obligations to McKinsey and APT under that and the APT/McKinsey Confidentiality Agreement. Indeed, even with this knowledge of Stoddard's confidentiality agreements prohibiting Stoddard from sharing APT's confidential information, Davis, and MarketDial acting through Davis, induced Stoddard to breach his contract by, among other things, using the benefit of confidential information Davis had learned about APT to identify specific APT confidential information he needed to get from Stoddard and promising Stoddard the opportunity to co-found MarketDial in direct competition with APT, knowing that Stoddard would have to use APT's confidential information in the course of his work for MarketDial, in breach of his confidentiality agreements.

41.     The trade secret and confidential material provided to McKinsey and Stoddard in 2015 provided a roadmap, or playbook, for developing a successful business analytics testing program and business that could effectively compete against APT.  Without access to APT's trade secret and confidential information, MarketDial, Stoddard and Davis could not have developed MarketDial's A/B testing software or the MarketDial business that it contends competes effectively against APT and APT's Test & Learn® software system.

### APT's Reasonable Measures to Maintain the Confidentiality of Its Trade Secret Information

42.     At all times, APT has taken reasonable and appropriate measures to maintain the confidentiality of and to protect its proprietary information.

43.     APT requires its employees to enter into non-disclosure and confidentiality agreements to protect its confidential information and trade secrets.

44.     As part of its policies, APT requires that employees properly label information to ensure the confidentiality of its proprietary information.

45.     APT keeps its proprietary information on secure servers, protected by access controls, and requires encryption for proprietary information on employees' computers.  Certain key employees are also required to have an additional layer of security on their laptops to ensure protection of APT's proprietary information and trade secrets.

46.     APT has restricted access to visitors and third parties at its offices and facilities.

47.     APT requires that hard copies of proprietary information be stored in locked cabinets or safes and that those hard copies are shredded when no longer needed.

48.     APT does not permit its employees to use storage devices that are not APT-approved storage devices.

49.     APT also provides training to its employees on the proper handling of APT proprietary and trade secret information.

50.     APT also enters into non-disclosure agreements with clients, partners, vendors, suppliers, and consultants to the extent that APT shares its confidential information or trade secrets with third parties.

51.     Specifically, APT entered into the APT/McKinsey Confidentiality Agreement with McKinsey.  APT also marked documents that it provided to McKinsey employees with the designation: "APT Confidential Information - Distribution by receiving party is prohibited," or similar designation. The APT/McKinsey Confidentiality Agreement also required that McKinsey's employees be subject to confidentiality obligations to maintain McKinsey information confidential, including all APT confidential information provided to McKinsey personnel.

52.     Likewise, APT entered at least the Access Agreement with BCG.  APT's Access Agreement with BCG required that BCG and its employees maintain the highest standards of

confidentiality with regard to APT's software and information, only provide access to APT software and information to BCG employees who required access in providing the services under the agreement, and that no BCG representative provided access would be involved in developing a service that competes, directly or indirectly, with APT's software.

53.     APT's clients also all agree to maintain the confidentiality of APT's software systems, and individual users of the software must, before being permitted to use the APT software systems, agree to an end user's license agreement to maintain the confidentiality of the trade secret software systems as a condition to using APT's software systems.

**Defendants' Improper and Deceitful Conduct**

54.     Prior to and after MarketDial's founding in February 2015, Stoddard had access to and did access APT's confidential information and trade secrets in the course of his employment at McKinsey as part of a joint project with APT.  With Davis's active,  intentional, and malicious encouragement and inducement, Stoddard deceived APT into believing that Stoddard needed access to APT's confidential information for legitimate business purposes for APT's benefit and that APT's information would be protected by the APT/McKinsey Confidentiality Agreement.

55.     Davis and Stoddard acquired substantial knowledge of APT's confidential information and trade secrets through Stoddard's deceitful conduct.  Stoddard and Davis co-founded MarketDial in February 2015 to compete with APT.  MarketDial currently offers similar products and services to those offered by APT, including MarketDial's software, which is also referred to as MarketDial's A/B testing software (the "MarketDial system").

56.     Upon information and belief, while working at BCG from 2012-2014, Davis had access to APT's confidential and trade secret information.

57.     Since MarketDial's founding in February 2015 and prior to Stoddard's departure from McKinsey in April 2016, and at Davis's inducement and behest, Stoddard repeatedly requested and received confidential APT information under the guise that it was for the benefit of McKinsey's work with APT.  This confidential APT information included PowerPoint presentations and case studies shared by APT with Stoddard, including an overview and technical details of APT's proprietary software, identification of APT's clients, APT's proprietary methods for delivering value to clients, and APT's proprietary business strategies for effectively marketing and selling predictive business analytics software.

58.     Beginning as early as February 2015, with Davis's encouragement and inducement, Stoddard sent Davis the APT confidential and trade secret information he accessed, including a confidential description of APT's Test & Learn® software with a clearly marked confidentiality legend at the bottom of each page stating: "APT Confidential Information - Distribution by receiving party is prohibited." Both Stoddard and Davis knew Stoddard was violating his confidentiality agreements in sending APT's confidential information. Stoddard even stated in his email to Davis that "██████████████████████"

59.     Despite knowing of Stoddard's confidentiality obligations, and despite his own confidentiality obligations relating to information he learned about APT while at BCG, Davis repeatedly requested that Stoddard obtain such APT confidential information. For example, Davis specifically asked Stoddard to send him information on APT's confidential GUI and inquired about whether Stoddard used APT's software, stating "████████████████████ ████████████████████" Additionally, Davis demonstrated his prior knowledge of APT's confidential software that he gained from working with APT's clients while at BCG, including the GUI used by APT's Test & Learn® software, when he improperly disclosed to Stoddard, as

part of the above statement, that "█████████████████████████████████ ███████████████████████████████████████" [Emphasis added.] Davis and Stoddard also discussed their strategy to "███████████" and Davis even expressed his strategy of taking advantage of APT's confidence in the value of its confidential trade secrets to harm APT, stating "██████████████████████████████████████████"

60.     As Co-Founder and Chief Data Scientist of MarketDial, it is inevitable that Stoddard intentionally and/or inherently disclosed to MarketDial and used APT's confidential information and trade secrets that he obtained while at McKinsey, for the benefit of MarketDial, Stoddard, and Davis, and to the detriment of APT.

61.     As Co-Founder and CEO of MarketDial, it is inevitable that Davis intentionally and/or inherently disclosed to MarketDial and used APT's confidential information and trade secrets that he obtained from Stoddard and while working at BCG, for the benefit of MarketDial, Stoddard, and Davis, and to the detriment of APT.

62.     Upon information and belief, Defendants have incorporated APT's confidential information and trade secrets into MarketDial's products and services, including the MarketDial system, and have used APT's confidential information and trade secrets to develop their business strategy, software development strategy, and client development strategy.  For example, on information and belief, the MarketDial system performs business initiative tests that are very similar to tests performed by APT's products and services and, based upon the appearance and functionality of the MarketDial system and MarketDial's claims about the system, it could not have been developed within the time and with the modest investment of resources devoted by MarketDial to developing the MarketDial system, without the use of APT trade secrets.  On information and belief, MarketDial has designed and modified its business strategy and

MarketDial system so as to be substantially similar—if not virtually identical, in certain aspects—to APT's products and services.  These modifications include functionalities relating to the creation of a business initiative test; the confidence value and the selection of the number of business locations in which to test the business initiative; the selection and analysis of store attribute data; and the analysis and display of the actual and predicted results of a business initiative test, all of which appear to have been obtained from APT's trade secrets and which could not have been developed by MarketDial in the manner and time in which it allegedly developed them unless it used APT's trade secrets.  Defendants could not have developed the MarketDial system to effectively compete against APT and APT's Test & Learn® software without the misappropriation of APT's trade secrets and confidential information in breach of their confidentiality obligations described in this Third Amended Complaint.

63.     These actions constitute trade secret misappropriation in violation of state and federal law, including the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*) and the Utah Uniform Trade Secrets Act (Utah Code Ann. § 13-24-1, *et seq.*).

64.     APT has lost customers and business opportunities to MarketDial because MarketDial has been able to unfairly compete with APT on, *inter alia*, pricing as a result of Defendants' misappropriation of APT's trade secrets and offering a software product and business service that could not have been developed without use of APT's confidential and trade secret information.  In addition, upon information and belief, MarketDial has misrepresented that it solely developed the MarketDial system and denied that it ever had access to APT's trade secrets or used APT's confidential information.

65.     From the outset of first offering the MarketDial system in the marketplace, MarketDial has expressly sought to directly compete with APT by contacting its customers and comparing the MarketDial system to APT's systems.

66.     If Defendants' willful misappropriation were not enough, MarketDial has engaged in a smear campaign to damage APT in the marketplace through false statements to APT's customers and potential customers, including that APT is "past its prime" and falsely asserting that APT's customers are frustrated with the cost and complexity of the APT solution. MarketDial's marketing materials also mischaracterize APT's solution in asserting that MarketDial's product is purportedly better than APT's.

67.     Defendants' actions have caused and will cause significant and irreparable financial harm to APT, including loss of customers.  Defendants' actions also will cause APT to lose the benefit of its trade secrets and the legitimate competitive advantage that APT has earned though its substantial investments in such trade secrets.  Defendants' actions also jeopardize APT's relationships with its customers, prospective customers, suppliers, partners, employees, shareholders and investors, and other third parties and violate APT's intellectual property rights.

## COUNT I

### Misappropriation of Trade Secrets Under Defend Trade Secrets Act
### Against Defendants MarketDial, Stoddard and Davis (18 U.S.C. § 1836, *et seq.*)

68.     APT repeats, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

69.     APT owns and possesses confidential and trade secret information, as alleged above.

70.     APT's confidential and trade secret information relates to products and services used, sold, and ordered in, or intended to be used, sold, and/or ordered in, interstate and foreign

commerce.  Specifically, APT's confidential and trade secret information concerning its business analytics software, including its Test & Learn® software system, is used by customers throughout the United States and many other countries around the world.  APT's trade secret information is in addition to and distinct from the disclosures in its patents and includes specific information not available to the public that would provide a competitor with an unfair economic advantage, including, without limitation, the following:

a.   APT has incorporated its trade secrets into all of its software offerings, including but not limited to its Test & Learn® software, which uses such trade secrets to improve the value and performance of the software;

b.   APT's Test & Learn® software uses trade secrets to allow rapid measurement of incremental impact of business initiatives, including optimal selection of specific criteria to improve test results;

c.   APT's Test & Learn® software uses patented methods and systems for determining optimal parameter settings for business initiative testing used for testing initiatives for business locations included in a business network, which are enhanced by trade secrets beyond the patented methods that isolate the cause-and-effect impact of each marketing initiative;

d.   APT's trade secrets provide confidential methods that determine specific characteristics that are used to select a set of test locations or markets that will enhance the accuracy of testing, which characteristics were identified and selected by APT based upon many years of trial and error and software engineering utilizing the results of such trial and error;

e.   APT has developed trade secrets that are used in its software to identify specific criteria to be assessed to reduce inaccuracies in the testing of business initiatives;

f.   APT uses the trade secrets in its software to analyze test results and build out models that recommend the markets/sites where particular business programs will have the best impact;

g.   APT's trade secrets include techniques to refine test measurement at a customer level;

h.   APT utilizes dashboards that display test results to customers in a confidential format;

i.   APT utilizes a set of particular confidential user interfaces (UIs) and architecture that provide simplified reporting of results for customers; these easy-to-use interfaces provide more effective reporting of test results to customers that can be used by customers to more effectively use the trade secrets incorporated into APT's software to assist customers in analyzing business initiative test results, and to make more effective and profitable business decisions;

j.   APT utilizes trade secrets incorporated into its software to guide clients on the number of sites that should be used to help design tests that are significant and predictive of rollout performance;

k.   APT software incorporates trade secrets that automatically generate a set of key outputs and keeps them up-to-date during the test; a customer using the APT software can then use these APT trade secrets, including a set of APT's confidential UIs,  to easily add outputs to the analysis or turn the results into a presentation;

l.      APT has developed trade secrets that include confidential business strategies and testing methods unique to certain clients or certain industries;

m.      APT has developed trade secrets that include confidential strategies for, among other things (i) effectively deploying APT's Test & Learn® software through partnerships with consulting firms, (ii) enhancing client work with a robust and scalable Test & Learn® software platform, and (iii) using the Test & Learn® software platform to drive marketing effectiveness;

n.      APT has developed trade secrets that include compilations of certain of the trade secrets described above that, when taken together, provide a roadmap, or playbook, for effectively deploying predictive analytics software tools to clients, building an effective predictive analytics software business, effectively marketing predictive analytics software to potential clients and effectively providing competitive predictive analytics software products and services ("APT's Trade Secret Playbook").

71.     APT's trade secrets, including those detailed in paragraph 70 above, are separate from, in addition to, and distinct from the claims and disclosures of the '916 Patent, which is directed primarily at methods and systems for determining optimal system parameter settings for business initiative testing software.  The trade secrets, on the other hand, involve specific confidential applications, techniques and business methods that APT has developed through company innovations and trial and error, including improved testing applications and procedures, specific criteria for designing and managing testing, reporting protocols to assist customers, APT's proprietary methods for delivering value to clients, APT's proprietary business strategies for effectively marketing and selling predictive business analytics software and development of

specific industry strategies and other business practices, all of which are confidential and not disclosed in APT's patent.

72.     APT's Trade Secret Playbook is a compilation of trade secret and confidential information shared only with APT's potential working partners, such as McKinsey, under confidentiality agreements that prohibit the use and disclosure of such information.  APT's Trade Secret Playbook was shared in confidence with McKinsey and Stoddard subject to the APT/McKinsey Confidentiality Agreement and Stoddard's Employee Agreement.

73.     APT has taken reasonable measures to keep such trade secret and confidential information secret and confidential by, among other steps, limiting access to such information, requiring employees to attend training on the protection of APT's confidential and trade secret information, and requiring employees to abide by confidentiality agreements and observe APT's policy on protecting APT's proprietary and confidential information, as further detailed above.

74.     APT's trade secret and confidential information derives independent economic value from not being generally known to and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.  The independent economic value of APT's trade secrets is demonstrated by, among other things:

a.     APT has invested tens of millions of dollars in the development of its trade secrets, including the Test & Learn® software system;

b.     the monetary investment that APT has made in the development of client specific strategies that incorporate APT's software;

c.     APT has spent more than 20 years developing and refining its software, client strategies, and other trade secrets;

d.   APT has achieved substantial business success using its trade secrets, the value of which was demonstrated by the acquisition of APT in 2015 by Mastercard for a total of $600 million; APT is now a wholly owned subsidiary of Mastercard International Incorporated.

e.   Competitors such as MarketDial would benefit enormously from access to APT's trade secrets because (i) APT is a global leader in the business analytics software industry, (ii) competitors using APT's trade secrets could develop competing software products without spending multiple years and millions of dollars of investment that APT had to devote to the development of these products; (iii) competitors could develop features similar to those features in APT's software that would not be possible without access to APT's trade secrets; competitors could use the successful business and technical strategies disclosed in APT's Trade Secret Playbook to unfairly compete with APT; and

f.   MarketDial has acknowledged the value of APT's trade secrets by specifically directing its market pitches to competition with APT, alleged advantages and disadvantages of APT, and features of APT's software offerings that it learned from misappropriating APT's trade secrets.

75.   In violation of APT's rights, Defendants have willfully misappropriated APT's trade secrets.  With Davis's and MarketDial's active, intentional, and malicious encouragement and inducement, Stoddard deliberately deceived APT into providing its trade secret information to Stoddard under the guise that the information was for the benefit of the McKinsey and APT relationship, and instead co-founded MarketDial to use APT's trade secret information for his and Davis's own benefit.  The trade secrets that MarketDial, Stoddard, and Davis

misappropriated from APT include those listed in paragraph 70 of this Third Amended Complaint, that were included in PowerPoint presentations, case studies, and other confidential documents shared by APT with Stoddard, including an overview and technical details of APT's proprietary software, its confidential business strategies unique to certain clients, and APT's Trade Secret Playbook.  For example, in February 2015, Stoddard requested and received from APT a PowerPoint presentation including details about APT's Test & Learn® process, including its application to the financial services industry and an identification of the key elements of this process with corresponding illustrations.  This PowerPoint presentation also included several images of APT's confidential user interface of its software.  APT's software products, including its user interface, are not available to the public, but are provided to customers who are subject to confidentiality obligations. Stoddard sent this PowerPoint presentation to Davis, knowingly violating his confidentiality obligations and the confidentiality marking on the presentation itself. In June 2015, Stoddard also obtained from APT a similarly detailed PowerPoint presentation that included trade secret information about APT's Test & Learn® software and process, the confidential user interface, its applications to potential clients, and APT's Trade Secret Playbook.

76.     Stoddard solicited and collected APT's trade secret information and used MarketDial as part of a scheme with Davis to misappropriate such trade secrets to start MarketDial, develop predictive analytics software products to compete with APT, to develop an effective business and marketing strategy to unfairly compete with APT, and to steal APT's business by using APT's own confidential business, technical and marketing strategy.  Further, upon information and belief, Defendants have used and continue to use APT's trade secret information, knowing that it was misappropriated and obtained through deceitful means.  At a

minimum, Defendants could not have reasonably compartmentalized trade secret information learned from APT and thus inevitably would have used such information in developing their own competing products.  Such misappropriation permitted Defendants to develop their competing products, to develop a product to go to market in substantially shorter time and with substantially less investment than could have been accomplished without misappropriation of such trade secrets, and to develop a product and service that MarketDial has used to compete against APT in a manner that could not have been accomplished in the absence of Defendants' misappropriation.

77.     On information and belief, Defendants are still in possession of APT's trade secret information and are able to access and use this information.  Further, on information and belief, given Stoddard's position as the Chief Data Scientist and Co-Founder of MarketDial, and Davis's position as the CEO/Co-Founder of MarketDial, it is inevitable that they have shared and will continue to share APT's trade secret information with MarketDial, a direct competitor of APT, or fellow MarketDial employees, who may use or are using this information to APT's detriment.  Additionally, it is inevitable that Defendants have used and will continue to use APT's trade secret information in the development of the MarketDial system and in competition with APT to the detriment of APT and for the benefit of MarketDial, Stoddard and Davis. MarketDial admits on its own website that the MarketDial system was "[b]uilt by ex-McKinsey and -BCG consultants."  By virtue of Davis's position as CEO and Stoddard's position as the Chief Data Scientist and their intimate knowledge of APT's software functionality and business strategies, including APT's Trade Secret Playbook, Davis and Stoddard intentionally and/or inevitably relied on and used their knowledge of APT's software solution and trade secrets in their development of the MarketDial system and MarketDial's business.

78.     Defendants' misappropriation of APT's trade secret information has been intentional, knowing, willful, malicious, fraudulent, and oppressive.

79.     If Defendants conduct is not remedied, they will continue to misappropriate, disclose, and use APT's trade secret information for their own benefit and to APT's detriment.

80.     Because APT's remedy at law is inadequate, APT seeks, in addition to damages, permanent injunctive relief to recover and protect its trade secrets and other legitimate business interests, including enjoining the marketing, sale, or use of the MarketDial system and the continued use by MarketDial, Stoddard or Davis of any APT trade secrets or confidential information.

81.     As the direct and proximate result of Defendants conduct, APT has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.  APT seeks all available remedies under the DTSA, including without limitation both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation.

82.     APT has been damaged by all of the foregoing and is also entitled to an award of exemplary damages and attorneys' fees.

## COUNT II

### Misappropriation of Trade Secrets Under Utah Uniform Trade Secrets Act Against Defendants MarketDial, Stoddard and Davis (Utah Code Ann. § 13-24-1, *et seq*.)

83.     APT repeats, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

84.     APT owns and possesses confidential and trade secret information, as alleged above.

85.     APT has taken reasonable measures to keep such information secret and confidential by, among other steps, limiting access to such information, requiring employees to

attend training on the protection of APT's confidential and trade secret information, and requiring employees to abide by confidentiality agreements and observe APT's policy on protecting APT's proprietary and confidential information.

86.    APT's proprietary and confidential information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

87.    In violation of APT's rights, Defendants willfully misappropriated APT's trade secrets.  With Davis's encouragement, Stoddard deliberately deceived APT into providing its trade secret information to Stoddard under the guise that the information was for the benefit of the McKinsey and APT relationship.  This trade secret information includes PowerPoint presentations and case studies shared by APT with Stoddard, including an overview and technical details of APT's proprietary software, its confidential business strategies unique to certain clients, and the APT Trade Secret Playbook.  For example, in February 2015 Stoddard obtained a confidential description of APT's Test & Learn® software that was clearly marked as APT's confidential proprietary information, but Stoddard promptly disclosed the APT trade secret document to Davis in response to Davis' request and in violation of both Stoddard's and Davis's confidentiality obligations. Additionally, in February 2015, Stoddard requested and acquired from APT a PowerPoint presentation including details about APT's Test & Learn® process, including its application to the financial services industry and an identification of the key elements of this process with corresponding illustrations.  This PowerPoint presentation also included several images of APT's confidential user interface. In June 2015, Stoddard also obtained from APT a similarly detailed PowerPoint presentation that included trade secret

information about APT's Test & Learn® software and process, the confidential user interface, its applications to potential clients, and APT's Trade Secret Playbook.

88.     Stoddard solicited and collected APT's trade secret information and used MarketDial as part of a scheme with Davis to misappropriate such trade secrets to start MarketDial, to develop predictive analytics software products to compete with APT, to develop an effective business and marketing strategy to unfairly compete with APT,  and to steal APT's business by using APT's own confidential business, technical and marketing strategy.  Further, upon information and belief, Defendants have in fact used APT's information, both that previously received by Davis at BCG and that solicited by Stoddard at McKinsey with Davis's encouragement, knowing that it was misappropriated and obtained through deceitful means.  At a minimum, Defendants could not have reasonably compartmentalized trade secret information learned from APT and thus inevitably would have used such information in developing their own competing products.  Such misappropriation permitted Defendants to develop a competing product to go to market, and to do so in substantially shorter time and with substantially less investment than could have been accomplished without misappropriation of such trade secrets and to develop a product and service that MarketDial has used to compete against APT in a manner that could not have been accomplished in the absence of Defendants' misappropriation.

89.     On information and belief, Defendants are still in possession of APT's trade secret information and are able to access and use this information.  Further, on information and belief, given Stoddard's position as the Chief Data Scientist and Co-Founder of MarketDial, and Davis's position as the CEO and Co-Founder of MarketDial, it is inevitable that they have shared and will continue to share APT's trade secret information with MarketDial, a direct competitor of APT, or fellow MarketDial employees, who may use or are using this information to APT's

detriment.  By virtue of Davis's position as CEO and Stoddard's position as the Chief Data Scientist, and their intimate knowledge of APT's software functionality and business strategies that they were exposed to through their employment with BCG and McKinsey, as well as their willful solicitation of further APT information, Davis and Stoddard intentionally and/or inevitably relied on and used their knowledge of APT's software solution and trade secrets in their development of the MarketDial system.

90.     Defendants' misappropriation of APT's trade secret information has been intentional, knowing, willful, malicious, fraudulent, and oppressive.

91.     If Defendants' conduct is not remedied, they will continue to misappropriate, disclose, and use APT's trade secret information for their own benefit and to APT's detriment.

92.     Because APT's remedy at law is inadequate, APT seeks, in addition to damages, permanent injunctive relief to recover and protect its trade secrets and other legitimate business interests.

93.     As the direct and proximate result of Defendants' conduct, APT has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.  APT seeks all available remedies under the UUTSA, including but not limited to both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation.

94.     APT has been damaged by all of the foregoing and is also entitled to an award of exemplary damages and attorneys' fees.

## COUNT III

## Patent Infringement of U.S. Patent No. 8,571,916 Against Defendant MarketDial

95.     APT repeats, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

96.     APT previously asserted a claim for patent infringement of the '916 Patent against MarketDial. Because the Court granted MarketDial's motion to dismiss that claim on November 25, 2020 (Dkt. 129), APT does not re-plead it here but, to the extent it may be appropriate to preserve APT's patent infringement claim, incorporates by reference the prior allegations of Count III of the Second Amended Complaint, as if fully set forth herein. The Court's Order dismissing this claim (Dkt. 129) is appealable at the conclusion of the case. APT intends to appeal the Court's Order (Dkt. 129) and thus reserves all rights to do so.  *Nystrom v. TREX Co*., 339 F.3d 1347, 1350 (Fed. Cir. 2003) (explaining rule that generally "parties may only appeal" a "final decision" resolving all claims).  The dismissal will not be final until judgment is entered at the end of the case.

## COUNT IV

### Breach of Contract (as Third-Party Beneficiary thereof) Against Stoddard

97.     APT repeats, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

98.     Stoddard worked at McKinsey approximately from August 2013 to April 2016. On August 9, 2013, Stoddard entered into Stoddard's Employee Agreement as part of his employment with McKinsey. Stoddard's Employee Agreement required, among other things, that Stoddard, during his employment and thereafter, would hold all McKinsey and client confidential information in strict confidence and not disclose it, in whole or in part, to other employees of McKinsey or anyone outside of McKinsey except as explicitly authorized. Stoddard's Employee Agreement further required that, should Stoddard leave McKinsey, he would not take any actions that would give the appearance of disclosure and, during his employment and thereafter, would not use or disclose any confidential information even if he

happened to receive the same information from another source outside McKinsey, and would not act in any manner that might create the appearance that he is using confidential information in ways likely to damage the interests of McKinsey or its clients. Stoddard's Employee Agreement further required Stoddard, upon his departure from McKinsey, to immediately return to McKinsey all confidential information and other information received by him in connection with his employment, including copies, extracts or works derived therefrom.

99.     On November 7, 2013, McKinsey entered into the APT/McKinsey Confidentiality Agreement with APT. APT and McKinsey agreed to partner on mutual customer relationships and in connection with APT's and McKinsey's client development and client service activities, and agreed to share certain information, subject to strict confidentiality, to pursue such mutual efforts as identified by personnel of both APT and McKinsey.  Under the APT/McKinsey Confidentiality Agreement, APT agreed to provide access to APT confidential information in connection with McKinsey's client development and/or client services as well as each party's internal consideration of a potential transaction with other parties.  McKinsey agreed that it and its employees would use APT confidential information only for the purposes of the APT/McKinsey Confidentiality Agreement, and to keep confidential and not disclose such information to anyone other than McKinsey employees with a need to know who were bound by the Confidentiality Agreement.  Stoddard, as an employee of McKinsey, was subject to the Confidentiality Agreement and the obligations to which McKinsey agreed to preserve APT's confidential information. Stoddard was obligated to preserve the confidentiality of the APT information provided to McKinsey pursuant to Stoddard's Employee Agreement with McKinsey. McKinsey confirmed in January 2017 that it had advised Stoddard of his continuing obligation to

maintain the confidentiality of APT's confidential information and trade secrets pursuant to the APT/McKinsey Confidentiality Agreement.

100.    Stoddard also clearly acknowledged his confidentiality obligations to APT by stating that "



" Thus, as Stoddard admitted, APT was a McKinsey client and third party beneficiary of Stoddard's Employee Agreement with McKinsey.

101.    Under the confidentiality obligations of Stoddard's Employee Agreement and the APT/McKinsey Confidentiality Agreement, Stoddard requested and received substantial APT confidential and trade secret information for at least a five-month period in 2015. Stoddard misrepresented that he requested this information for the benefit of McKinsey's and APT's client development work, which would ultimately benefit APT. The APT confidential and trade secret information that Stoddard received included, e.g., PowerPoint presentations and case studies provided to Stoddard by APT, including an overview and technical details of APT's Test & Learn® software, identification of APT's confidential clients, and APT's Trade Secret Playbook. These trade secrets reflect years of research and thousands of dollars of personnel time to identify and determine the trade secret methodologies and processes underlying APT's Test & Learn® software system.

102.    Despite Stoddard's confidentiality obligations to McKinsey and APT pursuant to Stoddard's Employee Agreement and the APT/McKinsey Confidentiality Agreement, Stoddard sent Davis the APT confidential and trade secret information he accessed, including at least one

APT presentation regarding APT's Test & Learn® software with a clearly marked confidentiality legend at the bottom of each page stating: "APT Confidential Information - Distribution by receiving party is prohibited." Stoddard knew sending this information was a violation and breach of his confidentiality obligations. Stoddard even stated in his email to Davis that "███ ████████████████" Stoddard solicited and collected APT's trade secret information and used MarketDial as part of a scheme with Davis to misappropriate such trade secrets to start MarketDial, to develop predictive analytics software products to compete with APT, to develop an effective business and marketing strategy to unfairly compete with APT,  and to steal APT's business by using APT's own confidential business, technical and marketing strategy.  Further, upon information and belief, Defendants have in fact used APT's trade secret and confidential information to in developing the MarketDial  system, to develop its business, technical and marketing strategy, and to unfairly compete with and steal clients from APT, knowing that misappropriated APT trade secret and confidential information was obtained through deceitful means.  At a minimum, Defendants could not have reasonably compartmentalized trade secret information learned from APT and thus inevitably would have used such information in developing their own competing products.  Such misappropriation permitted Defendants to develop a product to go to market, and to do so in substantially shorter time and with substantially less investment than could have been accomplished without misappropriation of such trade secrets, and to develop a product and service that MarketDial has used to compete against APT in a manner that could not have been accomplished in the absence of Defendants' misappropriation.

103.    Thus, Stoddard willfully and intentionally breached at least Stoddard's Employee Agreement with McKinsey, which APT is a third-party beneficiary of pursuant to the

APT/McKinsey Confidentiality Agreement and as a client of McKinsey specifically protected under Stoddard's Employee Agreement. Stoddard breached Stoddard's Employee Agreement and the APT/McKinsey Confidentiality Agreement with APT at least by (1) disclosing APT confidential information that he received as an employee of McKinsey to Davis and MarketDial, (2) taking actions that give the appearance of disclosure of APT confidential information, (3) using APT confidential information in ways likely to damage the interests of McKinsey and its client, APT, and (4) not returning to McKinsey all APT information received by him in connection with his employment. The foregoing likewise constitutes a breach of Stoddard's implied covenant of good faith and fair dealing.

104.   APT fully complied with all its obligations under the APT/McKinsey Confidentiality Agreement. Upon information and belief, McKinsey complied with all its obligations under the Employee Agreement with Stoddard.

105.   As a direct and proximate result of Stoddard's material breach of Stoddard's Employee Agreement and the APT/McKinsey Confidentiality Agreement, APT has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

106.   APT has been damaged by all of the foregoing and is also entitled to an award of attorneys' fees, costs, and any other damages available at law.

## COUNT V

### Breach of Contract (as Third-Party Beneficiary thereof) Against Davis

107.   APT repeats, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

108.     Davis worked at BCG from 2012-2014. Upon information and belief, Davis entered an employment agreement with BCG that required Davis to maintain the confidentiality of BCG and its clients' confidential information. BCG and Davis obtained APT confidential information through work with certain BCG clients who were using APT's Test & Learn® software and consulting with BCG regarding issues relating to the use of APT's Test & Learn® software. BCG had a relationship with APT in connection with APT's and BCG's mutual client services and activities, and agreed to share certain information, subject to strict confidentiality, to pursue such mutual efforts. APT's and BCG's relationship involved several confidentiality and access agreements requiring BCG and its employees to maintain the confidentiality of APT's software and information. Pursuant to the Access Agreement, BCG agreed to maintain the highest standards of confidentiality with regard to APT's software and to protect the software from unauthorized disclosure.

109.     Additionally, BCG's Code of Conduct required that Davis maintain all information about APT in strict confidence and not disclose it to third parties.

110.     APT was a BCG client and third party beneficiary of Davis's employment and other agreements with BCG, and a party to the Access Agreement, which were intended to benefit APT's and BCG's mutual interests and clients, and preserve the confidentiality of APT's information.

111.     Upon information and belief, Davis obtained confidential information about APT's software and confidential information while employed by BCG. As described above, Davis likewise continued to solicit confidential and trade secret APT information from Stoddard. Despite Davis's confidentiality obligations to BCG and APT, Davis solicited, collected, and used APT's trade secret information and used MarketDial as part of a scheme with Stoddard to

misappropriate such trade secrets to start MarketDial, to develop predictive analytics software products to compete with APT, to develop an effective business and marketing strategy to unfairly compete with APT,  and to steal APT's business by using APT's own confidential business, technical and marketing strategy, with Davis's stated purpose to "take apt down." Further, upon information and belief, Defendants have in fact used APT's trade secret and confidential information in developing the MarketDial system, to develop its business, technical and marketing strategy, and to unfairly compete with and steal clients from APT, knowing that misappropriated APT trade secret and confidential information was obtained through deceitful means.  At a minimum, Defendants could not have reasonably compartmentalized trade secret information learned from APT and thus inevitably would have used such information in developing their own competing products.  Such misappropriation permitted Defendants to develop a product to go to market in substantially shorter time and with substantially less investment than could have been accomplished without misappropriation of such confidential information and trade secrets, to develop a product and service that MarketDial has used to compete against APT in a manner that could not have been accomplished in the absence of Defendants' misappropriation, and to unfairly compete in a way that could not have been accomplished without misappropriation of such confidential information and trade secrets.

112.    Thus, Davis willfully and intentionally breached at least his employment and other agreements with BCG, all of which APT is a third-party beneficiary of as a client of BCG. Davis breached his agreement with BCG and the Access Agreement at least by (1) disclosing APT confidential information that he received as an employee of BCG to Stoddard and MarketDial, (2) using APT confidential information for his own purposes, and (3) developing MarketDial, a company and service that competes directly with APT and APT's software. The

foregoing likewise constitutes a breach of Stoddard's implied covenant of good faith and fair dealing.

113.     APT fully complied with all its obligations under the Access Agreement. Upon information and belief, BCG complied with all its obligations its agreements with Davis.

114.     As a direct and proximate result of Davis's material breach of his employment and other agreements with BCG, APT has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

115.     APT has been damaged by all of the foregoing and is also entitled to an award of attorneys' fees, costs, and any other damages available at law.

## COUNT VI

### Fraudulent Misrepresentation and Fraudulent Nondisclosure Against Stoddard

116.     APT repeats, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

117.     As discussed in detail above, discovery has shown that while working at McKinsey, and during the time period of at least February 2015 through July 2015, Stoddard repeatedly represented that he needed access to and was accessing APT's confidential and trade secret information to service the needs of, and for the benefit of, APT, McKinsey and their mutual clients. For example, Kevin Keane of APT was initially speaking with partners at McKinsey, including Stephanie Coyles, and Stoddard was not even on the email distribution list, but Stoddard reached out directly by email to Kevin Keane on February 20, 2015 asking for more APT information, and directing that APT's confidential information should be sent directly to Stoddard:



118.    Having gotten himself on the email distribution list for APT confidential information being shared with McKinsey pursuant to the APT/McKinsey Confidentiality Agreement, Stoddard further sought our APT PowerPoint presentations and APT's industry-specific confidential information, including under the guise of repackaging such confidential information for use at McKinsey, stating:



119.    Stoddard was put on notice and knew that he was being provided confidential APT information that was not to be disseminated beyond its direct recipients at McKinsey. For example, Kevin Keane at APT made clear that, "



"

120.    Stoddard was also on notice that the APT documents he was accessing at McKinsey were confidential based upon clear confidentiality legends, including that the APT confidential PowerPoint that Stoddard improperly shared with Davis on February 20, 2015, the first day Stoddard told APT to send the APT confidential documents directly to him:  "APT Confidential Information: Distribution by receiving party is prohibited."

121.     Stoddard further recognized that this information was only to be shared with appropriate people and that he received the information subject to a non-disclosure agreement, stating, "█████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████" Stoddard also specifically requested APT white papers.

122.     Stoddard also repeatedly represented that he was treating APT's information as confidential subject to Stoddard's Employee Agreement and the APT/McKinsey Confidentiality Agreement and that he was acting as an employee of McKinsey consistent with McKinsey's policies and practices. As just one example, Stoddard explicitly told APT: "████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████"

123.     Stoddard made numerous representations to APT during 2015 holding himself as an employee of McKinsey operating consistent with the confidentiality obligations to McKinsey and APT as a McKinsey employee, and failing to disclose to APT that he was operating under a conflict of interest because he was working with Davis on developing a competitor to APT and that he was disclosing APT's confidential information to Davis and MarketDial in violation of Stoddard's Employee Agreement, the APT/McKinsey Confidentiality Agreement, and his other

confidentiality obligations to McKinsey and APT.  Stoddard's fraudulent representations and fraudulent failures to disclose were made in numerous emails and phone conferences during 2015, including without limitation:

(a)  Numerous emails sent by Stoddard to APT, including emails sent on the following dates:

> February 20, 2015
> February 23, 2015
> February 24, 2015
> February 25, 2015
> March 5, 2015
> March 24, 2015
> April 24, 2015
> April 27, 2015
> May 4, 2015
> May 15, 2015
> June 19, 2015
> June 22, 2015
> July 10, 2015
> July 15, 2015
> July 16, 2015
> July 20, 2015

(b)  Numerous phone conferences in which Stoddard participated, including but limited to phone conferences indicated by Outlook invitations for the following dates;

> Feb. 20, 2015
> April 24, 2015
> April 27, 2015
> May 4, 2015
> June 19, 2015
> July 16, 2015
> July 20, 2015

At no time during any of these conversations or in any of these emails did Stoddard ever give any indication that he might be operating under any potential conflict of interest, that he was working on developing a competing business, that he had any interest in predictive business

analytics beyond his work with McKinsey and APT, or that he had disclosed or might disclose any APT information to any third party.

124.    Stoddard's representations regarding both his needs and intentions with respect to accessing and using APT's confidential and trade secret information, and representations that he would treat such information as confidential, were intentional representations of presently existing material facts that Stoddard made to induce APT to share its confidential and trade secret information with him and but for which APT would not have shared such information.

125.    As discussed in detail above, Stoddard's representations were false at the time they were made, and he knew they were false, because rather than obtaining APT's confidential and trade secret information for work with and for the benefit of APT's and McKinsey's mutual endeavors and keeping it confidential, , Stoddard instead was already (a) sharing APT's confidential information with Morgan Davis and MarketDial, (b) using it for his own benefit directly contrary to APT's interests, and (c) using it for the purpose of competing with APT. Stoddard's action were in violation of McKinsey's policies, Stoddard's Employee Agreement, and the APT/McKinsey Confidentiality Agreement requiring that such information be held in strictest confidence and not used for the purpose of competing with clients. By February 2015 Stoddard and Davis had already schemed to form, and by February 20, 2015 had in fact incorporated, a competing business for their own personal benefit: MarketDial. Certain of Stoddard's emails sharing APT's confidential information with Davis and MarketDial in February 2015 even contained the subject line "█████████" Contrary to his material representations, Stoddard put himself directly in the middle of McKinsey's confidential projects with APT for the very purpose and intention of obtaining and relaying APT's confidential and

trade secret information to Davis and MarketDial in order to form a competing business and product, to APT's detriment and irreparable damage.

126.     Stoddard similarly withheld and did not disclose to APT (or McKinsey) that by January 2015 he was discussing forming a predictive business analytics software company with Davis to compete with APT, co-founded that competing business, MarketDial, with Davis in February 2015, and before and for months after that time requested and accessed APT confidential and trade secret information for the purpose of sharing it with Davis and MarketDial, and did in fact relay APT's confidential and trade secret information to Davis and MarketDial as discussed above.  Such conduct by Stoddard was directly contrary to his representations regarding his purpose for requesting, accessing, and using the information, his representations that he would keep the information confidential, and his duty to disclose such information to APT (and to McKinsey) in view of the foregoing agreements and representations. In Stoddard's Employee Agreement he even explicitly agreed "█████████████████████████████████████████████████████████" or "███████████████████████████████████" or "██████████████████████████████████████████████████████████████████████████████████████████" Stoddard's omission of and failure to disclose that he was discussing forming and did in fact co-found a business to compete with APT by February 2015, and that he planned to and did relay APT's confidential information to Davis and MarketDial, was material  to APT and relied upon by APT in deciding to disclose information to Stoddard.  APT would not have provided Stoddard with any of its confidential or trade secret information had APT known that Stoddard was even discussing forming a business to compete with APT, much less that Stoddard had actually co-founded such business already at

the time, and had APT known that Stoddard planned to and was in fact breaching his confidentiality representations and obligations.

127.     APT acted reasonably in sharing its confidential and trade secret information pursuant to the APT/McKinsey Confidentiality Agreement and McKinsey's agreements with its employees, including Stoddard's Employee Agreement, as well as in view of Stoddard's representations that he needed and would use such information for the benefit of APT and APT's and McKinsey's mutual business endeavors, and keep such information confidential. APT relied on Stoddard's representations, and concealment that he was co-founding and working with a secret competitor of APT's, and was induced by those representations to share its confidential and trade secret information for APT's and McKinsey's purported benefit and believing that it would be kept confidential. APT did not know, and would not have shared such information had it known, that Stoddard was forming, and did in fact co-found, a competing business while requesting and accessing APT's information, and that Stoddard planned to and did in fact share APT's confidential information with Davis and MarketDial.

128.     As a proximate result of the wrongful acts herein alleged, APT has suffered and will continue to suffer significant damage in an amount to be proven at trial. APT has been damaged  as detailed throughout this Third Amended Complaint, and specifically by disclosing its confidential information to Stoddard, who in turn disclosed such information to Davis and MarketDial to be used improperly to build a business to directly compete with APT using APT's protected confidential and trade secret information. Stoddard's actions have caused and will cause significant and irreparable financial harm to APT, including loss of customers and other business relationships and its legitimate competitive advantage that APT has earned though its

substantial investments in its confidential information and trade secrets. APT is also entitled to punitive damages as a result of Stoddard's willful, intentionally fraudulent conduct.

## **COUNT VII**

### **Civil Conspiracy Against Stoddard, Davis, and MarketDial**

129.    APT repeats, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

130.    APT's claim for civil conspiracy stands separate and independently from APT's claims of trade secret misappropriation pled above and is not based on the same nucleus of facts as the trade secret claims as explained herein.

131.    Defendants knowingly and willfully conspired and agreed among themselves to fraudulently and tortiously gain access to and acquire valuable APT confidential and proprietary information and data to develop MarketDial, its business strategy, its software and software development strategy, and its client development strategy and list of target clients; enter into the A/B testing and business analytics market at very little to no cost, and compete against and " ██

██ " APT. Specifically, and as set forth in detail throughout this Third Amended Complaint, Davis and MarketDial encouraged, requested, and induced Stoddard to commit fraud, to misrepresent his purpose and intentions with respect to APT's confidential information, and to fraudulently omit that he was using such information to co-found a business to directly compete with APT, all in violation of Stoddard's Employee Agreement, the APT/McKinsey Confidentiality Agreement, and Stoddard's explicit representations to APT. Davis and Stoddard both knew of their and each other's confidentiality obligations to APT, and, despite those obligations, conspired to wrongfully, through fraud and tortious interference, obtain APT's

confidential information to form a directly competing business and "███████████" Davis and

MarketDial repeatedly asked Stoddard to obtain APT's confidential information in breach of his

agreements and by committing fraud, and Stoddard repeatedly conveyed APT's confidential

information, what he referred to as "███████████" to Davis and MarketDial.

132.    Defendants committed the wrongful acts herein alleged pursuant to, and  in

furtherance of, the conspiracy and above-alleged agreement.

133.    As alleged above, Defendants furthered the conspiracy by intentionally

concealing the reasons they were seeking and acquiring APT's information, purporting to do so

for the benefit of APT, McKinsey and BCG, as well as APT's, McKinsey's, and/or BCG's

mutual clients and projects. Through their intentional misrepresentations and fraudulent

omissions, that they would maintain their confidentiality obligations and use APT's information

only for APT's and their employers' benefit, Stoddard and Davis built a competing A/B testing

platform and founded MarketDial in order to compete with, steal customers from, and "take

down" APT.

134.    As a proximate result of the wrongful acts herein alleged, APT has suffered and

will continue to suffer significant damage in an amount to be proven at trial. Defendants are

jointly and severally liable to APT, and APT is entitled to punitive damages against Defendants.

APT's damages were the result of willful and malicious or intentionally fraudulent conduct, or

conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights

of others.

## COUNT VIII

## Tortious Interference with Contract Against Davis and MarketDial

135.    APT repeats, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

136.    As discussed herein, Stoddard worked at McKinsey approximately from August 2013 to April 2016. Stoddard's Employee Agreement with McKinsey required, among other things, that Stoddard, during his employment and thereafter, would hold all McKinsey and client confidential information in strict confidence and not disclose it, in whole or in part, to other employees of McKinsey or anyone outside of McKinsey except as explicitly authorized. Stoddard's Employee Agreement further required that, should Stoddard leave McKinsey, he would not take any actions that would give the appearance of disclosure and, during his employment and thereafter, would not use or disclose any confidential information even if he happened to receive the same information from another source outside McKinsey, and would not act in any manner that might create the appearance that he is using confidential information in ways likely to damage the interests of McKinsey or its clients. Stoddard's Employee Agreement further required Stoddard, upon his departure from McKinsey, to immediately return to McKinsey all confidential information and other information received by him in connection with his employment, including copies, extracts or works derived therefrom.

137.    Pursuant to the APT/McKinsey Confidentiality Agreement, APT agreed to provide confidential access to APT confidential information in connection with McKinsey's client development and/or client services as well as each party's internal consideration of potential transactions with other parties.  McKinsey agreed that it and its employees would use APT confidential information only for the purposes of the APT/McKinsey Confidentiality Agreement, and to keep confidential and not disclose such information to anyone other than McKinsey employees with a need to know who were bound by the Confidentiality Agreement.

Stoddard, as an employee of McKinsey, was subject to the APT/McKinsey Confidentiality Agreement and the obligations to which McKinsey agreed to preserve APT's confidential information. Stoddard was obligated to preserve the confidentiality of the APT information provided to McKinsey pursuant to Stoddard's Employee Agreement with McKinsey.  McKinsey confirmed in January 2017 that it had advised Stoddard of his continuing obligation to maintain the confidentiality of APT's confidential information and trade secrets pursuant to APT/McKinsey Confidentiality Agreement. As described above and herein, APT was thus a third party beneficiary of Stoddard's Employee Agreement with McKinsey as a client of McKinsey.

138.     As described above, Davis, and MarketDial, knew in 2015 and thereafter that Stoddard had a confidentially agreement with McKinsey that required Stoddard to maintain APT's confidential information and trade secrets in strict confidence and not disclose such information to Davis or MarketDial.  Davis was subject to similar confidentiality obligations pursuant to the BCG Code of Conduct and the BCG Employee Agreement.  Davis was also subject to the standards of conduct common to and governing the business management consulting profession, as reflected in codes of conduct adopted by BCG, McKinsey and others, that required business analysts and other employees of business management consulting firms to (a) maintain confidential information learned about clients, (b) to avoid conflicts of interest while employed by such firms, (c) to avoid disclosing or using confidential information after leaving such firms, and (d) to avoid, both during and after employment, even the appearance of using confidential information in ways likely to damage the interests of the firm or its clients .

139.     Stoddard also disclosed to Davis his confidentiality obligations under Stoddard's Employee Agreement, the APT/McKinsey Confidentiality Agreement to Davis, and even told

Davis that "███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████" Thus, Davis and MarketDial were well aware of Stoddard's Employee Agreement

with McKinsey, and confidentiality obligations to McKinsey and APT under that and the

APT/McKinsey Confidentiality Agreement.

140.    Despite knowing of Stoddard's confidentiality obligations, and despite Davis's

own confidentiality obligations to APT, Davis, and MarketDial acting through Davis, requested

that Stoddard obtain APT confidential and trade secret information while Stoddard worked at

McKinsey with APT and induced Stoddard to breach those confidentiality agreements, including

by offering to go into business with Stoddard as a co-founder of MarketDial. Beginning as early

as February 2015, with Davis's encouragement and inducement, Stoddard sent Davis the APT

confidential and trade secret information he accessed, including one of the above-referenced

APT presentation regarding APT's Test & Learn® software with a clearly marked confidentiality

legend at the bottom of each page stating: "APT Confidential Information - Distribution by

receiving party is prohibited."  Davis used APT confidential information that he had learned

while at BCG, including information about APT's GUI for the APT's Test & Learn® software

system, to specifically entice Stoddard to breach his confidentiality agreements and disclose

details about APT's Test & Learn® software system to Davis and MarketDial. Both Stoddard and

Davis clearly knew Stoddard was violating his confidentiality agreement in sending APT's

confidential information. Stoddard even stated in his email to Davis that "████████████████

█████████" As another example, Davis specifically asked Stoddard to send him information on

APT's confidential graphical user interface (GUI) and inquired about whether Stoddard used

APT's software, stating " ███████████████████████████████ " Davis

and Stoddard also regularly discussed their, and MarketDial's, strategy to " ██████████ " and

Davis even expressed his strategy of taking advantage of APT's confidence in the value of its

confidential trade secrets to harm APT, stating " ████████████████████████████████

████████████████ "

     141.    As a direct and proximate result of Davis's and MarketDial's encouragement,

inducement, and interference, Stoddard duped APT into providing Stoddard APT's confidential,

trade secret information and concealed his and Davis's plans to develop, and actual development

of, a competing software product through MarketDial.  In providing the requested information to

Stoddard, APT detrimentally relied on Stoddard's misrepresentation that he requested this

information for the benefit of McKinsey's client development work, which would ultimately

benefit APT. MarketDial, Davis, and Stoddard acquired substantial knowledge of APT's

confidential information and trade secrets through their deceitful conduct which, as explained

above, breached Stoddard's Employee Agreement with McKinsey and confidentiality obligations

to APT.  Stoddard and Davis co-founded MarketDial in February 2015 to compete with APT.

MarketDial currently offers similar products and services to those offered by APT, including the

MarketDial system. Further, upon information and belief, Defendants have in fact used APT's

trade secret and confidential information in developing the MarketDial system, to develop its

business, technical and marketing strategy, and to unfairly compete with and steal clients from

APT, knowing that misappropriated APT trade secret and confidential information was obtained

through deceitful means.  At a minimum, Defendants could not have reasonably

compartmentalized trade secret information learned from APT and thus inevitably would have

used such information in developing their own competing products.  Such misappropriation

permitted Defendants to develop a product to go to market in substantially shorter time and with

substantially less investment than could have been accomplished without misappropriation of

such trade secrets, and to develop a product and service that MarketDial has used to compete

against APT in a manner that could not have been accomplished in the absence of Defendants'

misappropriation.

142.    Davis and MarketDial thus knowingly and tortiously interfered with APT's rights

and benefits under and as a third-party beneficiary of Stoddard's Employee Agreement and the

APT/McKinsey Confidentiality Agreement. Despite being aware of Stoddard's confidentiality

obligations to APT and McKinsey under such agreements, Davis and MarketDial knowingly

encouraged, induced, and caused Stoddard to breach such agreements as explained above, and

interfered with the relationships between Stoddard, McKinsey, and APT as well as with APT's

business and clients. As Davis admitted, his specific intent was to "███████████" Davis and

MarketDial used improper means to tortiously interfere with APT's contractual and business

relations, including at least:

    a.    Violation standards of conduct common to and governing the business

    management consulting profession, which prohibited Davis from using information he

    had learned about APT's Test & Learn® software system while at BCG to induce

    Stoddard to breach his agreements to maintain APT's information as confidential;

    b.    Davis' active and malicious participation in the fraudulent activity of Stoddard

    that induced APT to share its confidential and trade secret information with Stoddard;

c.      Davis' active and malicious participation in the civil conspiracy alleged in Count

VII which included inducing Stoddard to breach his agreements to maintain APT's

information as confidential; and

d.      Davis' active and malicious interference with Stoddard agreements to maintain

APT's information as confidential, with the stated intention, and as part of a conspiracy,

to "t█████████████"

143.    As a direct and proximate result of Davis's and MarketDial's knowing and

improper interference convincing Stoddard to breach his and McKinsey's confidentiality

obligations to APT, APT has suffered and will continue to suffer irreparable injury and

significant damages, in an amount to be proven at trial.  Davis's and MarketDial's tortious

interference was willful and intentional and in wonton disregard of APT's rights and entitles

APT to punitive damages from Davis and MarketDial.  APT's damages were the result of willful

and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and

reckless indifference toward, and a disregard of, the rights of others.

144.    APT has been damaged by all of the foregoing and is also entitled to an award of

attorneys' fees, costs, and any other damages available at law.

## JURY DEMAND

Plaintiff APT respectfully demands a jury trial pursuant to Fed. R. Civ. P. 38 on all issues

so triable.

WHEREFORE, Plaintiff APT respectfully demands judgment in its favor and against

MarketDial, Stoddard, and Davis as follows:

a.  Declaring that MarketDial, Stoddard, and Davis have misappropriated APT's confidential and trade secret information pursuant to the Defend Trade Secrets Act and Utah Uniform Trade Secrets Act, and that the misappropriation has been willful;

b.  Awarding all available damages as described in each of the above claims, in favor of plaintiff APT and against MarketDial, Stoddard, and Davis in amounts to be determined at trial;

c.  Awarding punitive damages as described above in favor of plaintiff APT and against MarketDial, Davis, and Stoddard in amounts to be determined at trial. Enjoining MarketDial, Stoddard, and Davis, and their respective officers, agents, servants, employees and attorneys, and all other persons in active concert or participation with them, from using APT's trade secret information and from selling, offering for sale, marketing, or using the MarketDial system;

d.  Awarding exemplary damages in favor of APT and against MarketDial and Stoddard in an amount to be determined at trial;

e.  Awarding APT pre-judgment and post-judgment interest, and its attorneys' fees, costs, and other expenses incurred in this action;

f.  Granting APT such other and further relief as this Court deems just and proper.

Date: July 16, 2021

/s/ *Kirk R. Ruthenberg*

Kirk R. Ruthenberg (*pro hac vice*)
Nicholas H. Jackson (*pro hac vice*)
DENTONS US LLP
1900 K Street, N.W.
Washington, DC  20006
(202) 496-7500

Jennifer D. Bennett (*pro hac vice*)
DENTONS US LLP
One Market Plaza
Spear Tower, 24th Floor
San Francisco, CA  94105
(650) 798-0325

Katherine R. McMorrow (*pro hac vice*)
DENTONS US LLP
601 S. Figueroa St., Ste 2500
Los Angeles, CA 90017
kate.mcmorrow@dentons.com

Samuel C. Straight (State Bar No. 7638)
Ray Quinney & Nebeker LLP
36 South State Street
Suite 1400
Salt Lake City, UT 84111
Telephone: 801-901-9054
Facsimile: 801-532-7543

*Attorneys for Plaintiff Applied Predictive Technologies, Inc.*