FILED
2022 APR 8 PM 3:53
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| APPLIED PREDICTIVE TECHNOLOGIES, INC.,<br><br>Plaintiff,<br>v.<br><br>MARKETDIAL, INC., JOHN M. STODDARD, and MORGAN DAVIS,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL DISMISSAL**<br><br>Case No. 2:19-cv-00496-JNP-CMR<br><br>District Judge Jill N. Parrish |

Plaintiff Applied Predictive Technologies, Inc. ("APT") sued Defendants MarketDial, Inc. ("MarketDial"), John M. Stoddard, and Morgan Davis (collectively, "Defendants") for various claims, including misappropriation of trade secrets, breach of contract, fraud, civil conspiracy, and tortious interference with contract. ECF Nos. 1, 188. Before the court is Defendants' Motion for Partial Dismissal of APT's Third Amended Complaint (ECF No. 195). Oral argument on the motion was held on March 10, 2022. For the reasons set forth herein, the court GRANTS IN PART and DENIES IN PART Defendants' motion. Specifically, the court dismisses APT's claims for breach of contract against Stoddard (count IV) and breach of contract against Davis (count V) WITH PREJUDICE. The court similarly dismisses APT's claims for fraudulent misrepresentation and fraudulent nondisclosure against Stoddard (count VI), civil conspiracy against Stoddard, Davis, and MarketDial (count VII), and tortious interference with contract against Davis and MarketDial (count VIII) WITHOUT PREJUDICE. The court declines to dismiss APT's claims for misappropriation of trade secrets against Davis (counts I and II).

1

# BACKGROUND[1]

Stoddard and Davis are the co-founders of MarketDial, a predictive business analytics company that competes directly with APT. Before founding MarketDial, Stoddard and Davis worked at McKinsey & Company, Inc. ("McKinsey") and Boston Consulting Group ("BCG"), respectively. While employed at McKinsey and BCG, Stoddard and Davis were required to comply with employee agreements, which governed the confidentiality of their firm's clients' information. Specifically, Stoddard's Employee Agreement with McKinsey contained the following provisions:

> Confidential Information includes information of the Firm, such as the Firm's frameworks, approaches and industry and other proprietary knowledge (including Properties), and information relating to personnel and compensation processes, structure and approaches. Confidential Information also includes information of the Firm's clients, such as clients' names, business plans and trade secrets. I agree, during my employment at the Firm and thereafter, to hold all such Confidential Information in strict confidence and not to disclose such information, in whole or in part . . . to persons outside the Firm, except as I am explicitly authorized to do so.
> . . .
> Should I leave the Firm, I will not take any actions that would give the appearance of disclosure. Therefore, I agree that, during my employment at the Firm and thereafter, I will not use or disclose any Confidential Information even if I happen to receive the same information from another source outside the Firm, and I will not act in any manner that might create the appearance that I am using Confidential Information in ways likely to damage the interests of the Firm or its clients.

ECF No. 196-1 at 1–2. Davis's Employee Agreement with BCG contained similar provisions, under which Davis agreed that he would "not identify any client of BCG to anyone outside BCG without the permission of that client or an officer of BCG" and would not, "[d]uring and after [his] employment by BCG, unless otherwise specifically approved by BCG, . . . use Confidential

---

[1] "The facts are recited from the complaint on a motion to dismiss, but the court makes no findings of facts as to such allegations." *See Spence v. Basic Rsch.*, No. 2:16-cv-925-CW, 2017 U.S. Dist. LEXIS 85175, at *2 n.1 (D. Utah May 31, 2017).

Information for the benefit of anyone other than BCG or a client of BCG to whom the Confidential Information relates." ECF No. 196-2 at 1–2.

On November 7, 2013, "[a] few months after Stoddard began at McKinsey," McKinsey and APT entered into a confidentiality agreement "under which APT provided access to its confidential information in connection with McKinsey's client development and client services, and for each party's consideration of potential transactions with other parties." ECF No. 210 at 8. The confidentiality agreement required McKinsey "(i) not to use (or allow any of its employees to use) any of [APT's] Confidential Information for any other purpose and (ii) to keep confidential and not disclose [APT's] Confidential Information other than to those of [McKinsey's] employees who have a need to know such information and who are bound by nondisclosure obligations consistent with the terms of [the confidentiality agreement]." *Id.* (emphasis omitted). Similarly, "[d]uring Davis's employment with BCG, BCG and APT entered into a Third Party Access Agreement dated January 26, 2012 regarding BCG's use of APT's proprietary software in the course of providing professional services to a mutual client." *Id.* at 10. The Third Party Access Agreement required BCG and its employees to "maintain the highest standards of confidentiality with regard to the Software" and prohibited disclosure to others, including "other BCG employees who are not providing the Services." *Id.* at 10–11 (emphasis omitted). The Access Agreement further required that "[n]o BCG representative provided access to the Software . . . be involved in developing a service which competes, directly or indirectly, with the Software." *Id.* at 11.

In spite of these confidentiality agreements, "[i]n January 2015, Stoddard and Davis began actively discussing their idea to launch a predictive business analytics company that would compete directly with APT." ECF No. 189 ¶ 5. In February 2015, Stoddard and Davis incorporated such a business, MarketDial. *Id.* Even though Stoddard was still employed by McKinsey and

bound by his Employee Agreement at this time, he "requested and received substantial APT confidential and trade secret information"—including PowerPoint presentations and case studies—"for at least a five-month period in 2015." *Id.* ¶ 101. Although Stoddard represented to APT that he was requesting the "information for the benefit of McKinsey's and APT's client development work," he was actually sending "the APT confidential and trade secret information he accessed" to Davis for MarketDial's use. *See id.* ¶¶ 101–02. In one email to Davis that contained APT's confidential information, Stoddard wrote, "You didn't get this from me." *Id.* ¶ 102.

In addition, "[d]espite knowing of Stoddard's confidentiality obligations [to APT], and despite Davis's own confidentiality obligations to APT," Davis and MarketDial "requested that Stoddard obtain APT confidential and trade secret information." *Id.* ¶ 140. Stoddard and Davis subsequently used APT's confidential information to develop the MarketDial system, which is similar to products and services offered by APT; "to develop [MarketDial's] business, technical[,] and marketing strategy"; and to compete with APT. *Id.* ¶ 141.

Based on the foregoing, on June 28, 2018, APT sued MarketDial and Stoddard for patent infringement and misappropriation of trade secrets. APT subsequently amended its complaint multiple times, filing its Third Amended Complaint ("TAC") on July 27, 2021. ECF No. 188. The TAC added Davis as a defendant in the case, as well as contract claims against Stoddard and Davis and various tort claims against all Defendants. Defendants moved for partial dismissal of the TAC under Federal Rule of Civil Procedure 12(b)(6). Specifically, Defendants moved to dismiss APT's claims for misappropriation of trade secrets against Davis (counts I and II); breach of contract against Stoddard (count IV); breach of contract against Davis (count V); fraudulent misrepresentation and fraudulent nondisclosure against Stoddard (count VI); civil conspiracy

against Stoddard, Davis, and MarketDial (count VII); and tortious interference with contract against Davis and MarketDial (count VIII).

## LEGAL STANDARD

Dismissal of a claim under Federal Rule of Civil Procedure 12(b)(6) is appropriate where the plaintiff fails to "state a claim upon which relief can be granted." "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citation omitted). Thus, when considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013).

A complaint survives a motion to dismiss for failure to state a claim when the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Indeed, the complaint must allege more than labels or legal conclusions and its "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ANALYSIS

Defendants move to dismiss Counts IV through VIII of APT's TAC in their entirety. Defendants also move to dismiss Counts I and II as to Davis. The court addresses the parties'

arguments with respect to Counts IV through VIII first and then addresses their arguments regarding Counts I and II.

## I.      Count IV (Breach of Contract Against Stoddard)

Defendants move to dismiss APT's breach of contract claim against Stoddard.

### A.      *Choice of Law Analysis*

Based on the allegations in APT's TAC, it was unclear which state's law should be applied to APT's breach of contract claim against Stoddard. Accordingly, the court ordered the parties to brief the issue.[2] ECF No. 267. APT argues that Ohio law—rather than Utah law—should govern the claim because, as an initial matter, Ohio law and Utah law concerning intended third-party beneficiaries differ such that "the outcome [is] even clearer under Ohio law." ECF No. 274 at 3. Specifically, APT contends that while "it is well-established under Ohio case law that '[t]he third party need not be named in the contract, as long as he is contemplated by the parties to the contract and sufficiently identified,'" *id.* (quoting *Gallagher Sharp, L.L.P.  v. Miller Goler Faeges Lapine, L.L.P.*, 137 N.E.3d 647, 656 (Ohio Ct. App. 2019)) (emphasis omitted), "Utah courts have not expressly addressed this issue," *id.* Moreover, "while Utah courts require a 'separate and distinct benefit' running to the third party" for that party to be a third-party beneficiary to the contract, *id.* at 4 (citing *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 28 P.3d 669, 684 (Utah 2001)) (emphasis omitted), "Ohio courts have not expressed such a requirement," *id.*

Defendants respond that there is no conflict between Utah and Ohio law with respect to third-party beneficiaries and, therefore, Utah law governs APT's claim. Specifically, Defendants contend that, contrary to APT's assertions, "Utah courts have long held that a 'clear intent to

---

[2] The court similarly ordered the parties to brief the choice of law issue with respect to counts V–VIII.

benefit a third party, whether specifically named in the contract or not,' is sufficient to confer third-party beneficiary status." ECF No. 282 at 3 (quoting *M.H. Walker Realty Co. v. Am. Sur. Co. of N.Y.*, 211 P. 998, 1004 (Utah 1922)) (emphasis omitted). Defendants further assert that although Utah law requires the contracting parties to clearly intend "to confer a separate and distinct benefit upon the third party" for that third-party to have enforceable rights under the contract, *id.* (citation omitted), Ohio law has a similar requirement. In particular, for an individual to be a third-party beneficiary under Ohio law, "the performance of [the] promise must also satisfy a duty owed by the promisee to the beneficiary," which is the practical equivalent of Utah's "separate and distinct benefit" test. *Id.* at 4 (citation omitted). The court agrees with Defendants and analyzes APT's breach of contract claim against Stoddard under Utah law.

"[W]hen a federal court exercises supplemental jurisdiction over state law claims in a federal question lawsuit," the federal court "'applies the substantive law, including choice of law rules, of the forum state.'" *BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999) (citation omitted). Under Utah law, "a choice of law analysis is preceded by a determination of whether there is a true conflict between the laws of those states that are interested in the dispute." *One Beacon Am. Ins. Co. v. Huntsman Polymers Corp.*, 276 P.3d 1156, 1165 n.10 (Utah Ct. App. 2012). A true conflict exists if "the outcome would differ depending on which state's law is applied." *Johnson v. Blendtec, Inc.*, 500 F. Supp. 3d 1271, 1279 (D. Utah 2020) (citation omitted). When there is no conflict between the states' laws, a choice of law analysis is unnecessary, *see St. Paul Fire & Marine Ins. v. Com. Union Assurance*, 606 P.2d 1206, 1208 n.1 (Utah 1980), and the court "may apply the law of the forum," *Snyder v. Celsius Energy Co.*, 866 F. Supp. 1349, 1353 n.9 (D. Utah 1994).

Here, there is no true conflict between Utah and Ohio law regarding third-party beneficiaries. First, as Defendants note, neither Utah nor Ohio law requires that a third-party beneficiary be explicitly named in the contract. *See M. H. Walker*, 211 P. at 1004; *Chitlik v. Allstate Ins. Co.*, 299 N.E.2d 295, 297 (Ohio Ct. App. 1973) ("The third party need not be named in the contract, as long as he is contemplated by the parties to the contract and sufficiently identified."). Similarly, the court agrees with Defendants that Utah's "separate and distinct benefit" test is not materially different from Ohio's third-party beneficiary test. Specifically, under Ohio law, one is a third-party beneficiary of a contract "if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either[:] (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Hill v. Sonitrol of Sw. Ohio*, 521 N.E.2d 780, 784 (Ohio 1988) (internal quotation marks and citation omitted). In other words, "[a] third-party beneficiary is defined as one for whose benefit a promise has been made in a contract but who is not a party to the contract." *Drew v. Weather Stop Roofing Co., LLC*, 154 N.E.3d 136, 140 (Ohio Ct. App. 2020) (citation omitted). Accordingly, similar to Utah law, Ohio law requires the contracting parties to intend to confer a distinct benefit on the third-party in order for that party to be a third-party beneficiary with enforceable rights under the contract. Because the court cannot discern a true conflict between Utah and Ohio law regarding third-party beneficiary status, the court analyzes APT's breach of contract claim against Stoddard under Utah law. *See Snyder*, 866 F. Supp. at 1353 n.9.

  B.  *Substantive Analysis*

  Defendants argue that APT's breach of contract claim against Stoddard fails as a matter of law because APT was neither a party nor an intended third-party beneficiary of the contract that

Stoddard allegedly breached, his Employee Agreement with McKinsey. Specifically, Defendants contend that even though Stoddard's Employee Agreement required Stoddard to maintain the confidentiality of McKinsey's clients' information—including that of APT—the parties were not intending to confer a separate and distinct benefit on McKinsey's clients. Rather, according to Defendants, McKinsey's motives were primarily selfish. *See* ECF No. 214 at 2 n.1 ("[B]y ensuring the protection of client information, [McKinsey] ensures its ability to attract clients, maintain trust, and accordingly profit. Accordingly, the benefit is intended for [McKinsey]," not APT).

Defendants further contend that APT's argument that the surrounding circumstances support APT's status as a third-party beneficiary to the Stoddard-McKinsey contract misses the mark. In particular, Defendants assert that, rather than focusing on the contract that is actually at issue, APT focuses on its contract with McKinsey, which "sheds no light on the intentions of Stoddard and McKinsey with respect to the Stoddard-McKinsey Agreement," which was executed three months before APT and McKinsey entered into their contract. *See id.* at 3–4.

APT responds that "the express language of the contracts, combined with the surrounding circumstances, makes clear that APT—as a client of . . . McKinsey . . . —is an intended third-party beneficiary of" Stoddard's Employee Agreement with McKinsey. ECF No. 210 at 4. Specifically, APT contends that Stoddard's contract with McKinsey "impose[d] strict confidentiality obligations that r[a]n not only to [McKinsey], but *separately and distinctly* to [McKinsey's] '*clients*,'" such as APT. *Id.* at 5. "Indeed," according to APT, "requiring Stoddard to safeguard client information directly benefits clients like APT beyond benefits to McKinsey." *Id.* at 6. APT further asserts that "the surrounding circumstances corroborate the language and intent of the agreement[], providing further evidence that the parties intended to confer separate and distinct benefits to APT." *Id.* at 8. In particular, APT argues that the confidentiality agreement that it entered

with McKinsey, which "cover[ed] the exact kind of client confidential information contemplated by Stoddard's Employee Agreement, . . . further solidifies that APT was an intended beneficiary of McKinsey's Employee Agreement with Stoddard," *id.*, as does the fact that Stoddard recognized that his confidentiality obligations to APT were covered by that agreement. The court disagrees.

"One of the most basic principles of contract law is that, as a general rule, only parties to the contract may enforce the rights and obligations created by the contract." *Wagner v. Clifton*, 62 P.3d 440, 442 (Utah 2002). However, one exception is for third-party beneficiaries. *See id.* Under Utah law, to be a third-party beneficiary with enforceable rights under the contract, "[t]he written contract must show that the contracting parties 'clearly intended to confer a separate and distinct benefit upon the third party.'" *Id.* (citation omitted). "'[I]t is not enough that the parties to the contract know, expect or even intend that others will benefit from the [contract] . . . . The contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear." *Brodkin v. Tuhaye Golf, LLC*, 355 P.3d 224, 230 (Utah Ct. App. 2015) (quoting *SME Indus.*, 28 P.3d at 684) (alterations in original). Indeed, "only if the written contract's clear intent is to confer rights upon a third party may that third party enforce rights and obligations of the contract," *Wagner*, 62 P.3d at 442; "a party only incidentally benefitted has no right to recover under the contract," *SME Indus.*, 28 P.3d at 684. Moreover, "[u]nder Utah law, [t]he existence of third party beneficiary status is determined by examining [the] written contract. [I]f the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Fornazor Int'l, Inc. v. Huntsman*, No. 2:14-CV-291 TS, 2015 U.S. Dist. LEXIS 142314, at *21–22 (D. Utah Oct. 19, 2015) (internal quotation marks and citations omitted).

Here, APT has failed to establish that it was a third-party beneficiary of Stoddard's Employee Agreement with McKinsey. Specifically, although the contract[3] explicitly required Stoddard to protect clients' confidential information in addition to McKinsey's confidential information, it is not clear that these contract provisions were undertaken for McKinsey's clients' direct benefit or that they were intended to confer enforceable rights on McKinsey's clients. As Defendants point out, it is likely that these provisions were included in the Employee Agreement for *McKinsey's* benefit. In particular, such confidentiality obligations among its employees likely helps McKinsey recruit clients, instill their trust, and maintain their business. A potential client would likely be hesitant to solicit McKinsey's services if it knew that McKinsey's employees were free to share the client's trade secrets with the world. Moreover, if McKinsey were ever sued by a client for disclosing the client's trade secrets, such provisions would likely be helpful if McKinsey decided to sue, in turn, the employee who disclosed the trade secrets. Thus, although Stoddard and McKinsey may have known, expected, or even intended that McKinsey's clients would benefit from Stoddard's Employee Agreement, the contract does not affirmatively make it clear that the confidentiality provisions were undertaken for McKinsey's clients' direct benefit. In fact, the provision prohibiting McKinsey employees from "tak[ing] any actions that would give the appearance of disclosure" of a client's confidential information further suggests that the provisions were included primarily for McKinsey's benefit. *See* ECF No. 210 at 6. It is unlikely that a client

---

[3] Defendants attached Stoddard's Employee Agreement with McKinsey to their motion for partial dismissal. Because Stoddard's Employee Agreement is referred to in APT's TAC, is central to APT's breach of contract claim, and is indisputably authentic, the court may consider the contract without converting Defendants' motion to dismiss to a motion for summary judgment. *See GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

has much interest in whether it appears that a McKinsey employee disclosed the client's confidential information; the client is likely primarily interested in whether its confidential information *has* been disclosed or not. McKinsey, on the other hand, has a strong interest in preventing the appearance of disclosure, since such appearance could damage McKinsey's relationships with its clients or prospective clients and could expose McKinsey to potential lawsuits. In short, the primary intention of this provision, as well as the other provisions protecting the confidentiality of clients' information, is intended to protect McKinsey's interests. As a result, APT has failed to establish that it was a third-party beneficiary of Stoddard's Employee Agreement. Accordingly, because APT was not a party to the contract, APT has no right to recover under the contract and its breach of contract claim must be dismissed.[4]

---

[4] Because "the language within the four corners" of Stoddard's Employee Agreement is unambiguous, the court may determine the parties' intentions regarding third-party beneficiary status "from the plain meaning of the contractual language" and may interpret the contract as a matter of law, without considering the circumstances surrounding the contract's execution. *See Fornazor Int'l*, 2015 U.S. Dist. LEXIS 142314, at *21–22 (citation omitted). That said, the court also notes that the surrounding circumstances to which APT points do not clearly indicate that Stoddard's Employee Agreement was undertaken for APT's direct benefit. Specifically, the terms of McKinsey's Cooperation and Confidentiality Agreement with APT, which was entered into three months after Stoddard's Employee Agreement was executed, shed limited light on Stoddard's and McKinsey's intentions when they executed the Employee Agreement. And, contrary to APT's assertion, the fact that APT's agreement with McKinsey "cover[ed] the exact kind of client confidential information contemplated by Stoddard's Employee Agreement" and "explicitly include[d] McKinsey employees like Stoddard within its scope" actually undercuts APT's contention that it was a third-party beneficiary to Stoddard's Employee Agreement. *See* ECF No. 210 at 8. If APT was a third-party beneficiary to Stoddard's Employee Agreement, there would have been no need to include redundant, duplicative provisions in the APT-McKinsey agreement.

In addition, the fact that the APT-McKinsey agreement required *McKinsey* to prevent its employees from the unauthorized use of APT's confidential information further suggests that the confidentiality provisions in Stoddard's Employee Agreement were primarily undertaken for McKinsey's benefit. In particular, the confidentiality provisions were likely a means by which McKinsey could attempt to prevent such misuse, thereby protecting itself from the legal exposure that would result from an employee's apparent or actual misuse of APT's information.

Furthermore, the fact that Stoddard recognized—correctly—that he was obligated to protect APT's confidential information under his Employee Agreement with McKinsey does not indicate an intention that APT have enforceable rights under that contract. Rather, it may simply

## II.   **Count V (Breach of Contract Against Davis)**

Defendants move to dismiss APT's breach of contract claim against Davis.

### A.   *Choice of Law Analysis*

Both parties agree that Massachusetts law applies to APT's breach of contract claim against Davis. The Boston Consulting Group, Inc. Employee Agreement ("BCG Employee Agreement") under which APT is suing Davis contains a governing law provision, which provides that "[t]his agreement shall be governed, interpreted and enforced in accordance with the laws of Massachusetts." *See* ECF 196-2 § 4(c). Because Utah courts "generally uphold choice-of-law provisions based on the intent of the contracting parties and a respect of the parties' right to choose the governing law for a contract," *GRB Enters. LLC v. JPMorgan Chase Bank, N.A.*, No. 2:11-cv-833-DAK, 2012 WL 845418, at *3 (D. Utah Mar. 12, 2012), the court concludes that Massachusetts law governs APT's breach of contract claim against Davis.

### B.   *Substantive Analysis*

Similar to their arguments with respect to APT's breach of contract claim against Stoddard, Defendants argue that APT's breach of contract claim against Davis fails as a matter of law because APT was neither a party to, nor a third-party beneficiary of, Davis's BCG Employee Agreement.[5] Specifically, Defendants contend that Davis and BCG "did not clearly express an intention to confer any separate and distinct benefit on APT." *See* ECF No. 196 at 10. Defendants further note that while § 4(a) of the BCG Employee Agreement "specifically names BCG's subsidiaries as

_____

suggest that Stoddard recognized that he breached his agreement with McKinsey and, consequently, could face consequences from McKinsey.

[5] Defendants attached the BCG Employee Agreement to their motion for partial dismissal. Because the BCG Employee Agreement is referred to in APT's TAC, is central to APT's breach of contract claim against Davis, and is indisputably authentic, the court may consider the contract without converting Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) to a motion for summary judgment. *See GFF Corp.*, 130 F.3d at 1384.

beneficiaries with rights to enforce the agreement," there is no mention that APT—or any other BCG clients—have the right to enforce the agreement. *See id.* at 10 n.7. Moreover, Defendants contend that APT's discussion of the "surrounding circumstances" is misguided because APT focuses on its agreement with BCG, which "sheds no light on the intentions of Davis and BCG with respect to the Davis-BCG Agreement." *See* ECF No. 214 at 4.

APT responds in much the same way that it did regarding its breach of contract claim against Stoddard—that Davis's BCG Employee Agreement "impose[d] strict confidentiality obligations that r[a]n not only to [BCG], but *separately and distinctly* to [BCG's] '*clients*.'" ECF No. 210 at 5. APT points to provisions in the BCG Employee Agreement that required Davis to protect BCG's clients' information and that distinguished clients' confidential information from BCG's confidential information. APT further contends that the surrounding circumstances, including the terms of the Third Party Access Agreement that BCG and APT entered, support the conclusion that APT was a third-party beneficiary of Davis's BCG Employee Agreement. The court disagrees.

Under Massachusetts law, "[a] plaintiff may sue for breach of a contract to which she is not a party where she is a third-party beneficiary of that contract." *Orell v. UMass Mem. Med. Ctr.*, 203 F. Supp. 2d 52, 67 (D. Mass. 2002).

> A third party is an intended beneficiary of a contract if: "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties to the contract and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

*Id.* at 67–68 (quoting *Flattery v. Gregory*, 489 N.E.2d 1257, 1261 (Mass. 1986)). "Because third-party beneficiary status constitutes an exception to the general rule that a contract does not grant enforceable rights to nonsignatories, . . . a person aspiring to such status must show with special

clarity that the contracting parties intended to confer a benefit on him." *Kelly v. Deutsche Bank Nat'l Tr. Co.*, 789 F. Supp. 2d 262, 267 (D. Mass. 2011) (quoting *McCarthy v. Azure*, 22 F.3d 351, 362 (1st Cir. 1994)) (alteration in original); *see also Rymes Heating Oils, Inc. v. Springfield Terminal Ry., Inc.*, 265 F. Supp. 2d 147, 151 (D. Mass. 2003) ("To determine whether an entity is an intended beneficiary, courts 'look at the language and circumstances of the contract for indicia of intention' and the 'intent must be clear and definite.'" (citation omitted)). Moreover, "[u]nder Massachusetts law, contract interpretation is a question of law for the court unless the contract is ambiguous." *Lisciotti v. Lattanzio*, No. 04-2155, 2006 Mass. Super. LEXIS 450, at *13 (Sept. 14, 2006).

Here, APT has failed to establish that it was a third-party beneficiary of Davis's BCG Employee Agreement. In particular, APT has failed to "show with special clarity that" Davis and BCG intended to confer a benefit on APT, *see Kelly*, 789 F. Supp. 2d at 267 (citation omitted), or that "recognition of a right to performance in [APT] is appropriate to effectuate the intention[s]" of Davis and BCG, *see Orell*, 203 F. Supp. 2d at 67–68 (citation omitted). Although it is true that the BCG Employee Agreement required Davis to protect BCG's clients' confidential information, it is not clear that such confidentiality provisions were intended to confer a benefit on BCG's clients, as opposed to BCG itself. Indeed, like the Stoddard-McKinsey agreement, the primary intention behind the confidentiality provisions in the BCG Employee Agreement may have been to further and protect BCG's interests by facilitating client recruitment and retention and mitigating potential legal exposure.

Indeed, one of the contract provisions to which APT points actually further supports the conclusion that the confidentiality requirements were primarily intended to benefit BCG, rather than BCG's clients. That contract provision provides: "During and after my employment by BCG,

15

*unless otherwise specifically approved by BCG*, I will not: . . . use Confidential Information for the benefit of anyone other than BCG or a client of BCG to whom the Confidential Information relates." ECF No. 210 at 6 (emphasis added). Pursuant to this provision, BCG—and not the client—has the power to authorize a BCG employee to use or disclose a client's confidential information. Therefore, if disclosure or use of a client's confidential information benefits *BCG*, BCG may authorize an employee to disclose or use such information, even if such actions are contrary to the client's interests. Thus, this provision indicates that the contract is truly intended to benefit BCG and further its interests, rather than its clients' interests. To the extent that clients, such as APT, benefit from the confidentiality provisions, the benefits appear to be merely incidental. *See McLarnon v. Mass. Gen. Hosp.*, No. 00-2910-C, 2001 Mass. Super. LEXIS 570, at *7–8 (Oct. 9, 2001) ("The rights of a third-party beneficiary to enforce a contract arises 'when one person, for a valuable consideration, engages with another, by simple contract, to do some act for the benefit of a third.' Thus, enforcement rights do not extend to anyone or everyone potentially benefitted by the contracting parties' agreement, but only to those who can demonstrate from the language and circumstances of the contract that the parties clearly and definitely intended the beneficiaries to benefit from the promised performance." (internal citation omitted)).

Moreover, another contract provision also supports the conclusion that the parties did not intend to grant enforceable rights to APT. As Defendants note, the BCG Employee Agreement explicitly grants the right to enforce the Agreement to BCG and its subsidiaries. *See* ECF No. 196-2 § 4(a) ("BCG and any Subsidiary shall have the right to enforce this agreement."). The fact that BCG's clients, such as APT, were not similarly granted such explicit enforcement rights in the contract further supports the conclusion that the parties did not intend for them to have the right to enforce the BCG Employee Agreement. *See Smart v. Gillette Co. Long-Term Disability Plan*, 70

16

F.3d 173, 179 (1st Cir. 1995) ("The maxim [*expressio unius est exclusio alterius*] instructs that, when parties list specific items in a document, any item not so listed is typically thought to be excluded. While this interpretive maxim is not always dispositive, it carries weight." (internal citation omitted)). Thus, the court concludes that APT was not a third-party beneficiary of Davis's BCG Employee Agreement.[6] Because APT was not a direct party to that contract, APT has no right to recover under that contract and its breach of contract claim against Davis must be dismissed.[7]

### III.  Count VI (Fraudulent Misrepresentation and Fraudulent Nondisclosure Against Stoddard)

Defendants move to dismiss APT's fraudulent misrepresentation and fraudulent nondisclosure claim against Stoddard.

#### A.  *Choice of Law Analysis*

APT argues that its fraud claim should be analyzed under Ohio law. Specifically, APT contends that there is a conflict between Utah and Ohio law with respect to fraud claims for monetary damages. Whereas Utah law requires a plaintiff to prove the elements of fraud by clear

---

[6] Because Davis's BCG Employee Agreement is unambiguous, the court determines that APT was not a third-party beneficiary to that contract as a matter of law, and it need not examine the circumstances surrounding that contract's execution. *See Baystate Fin. Servs., LLC v. Pinto*, No. 2084CV02507, 2021 Mass. Super. LEXIS 29, at *8 (Feb. 18, 2021) ("[P]roper interpretation of [an] unambiguous written contract is [a] question of law that may be resolved on [a] motion to dismiss for failure to state a claim." (citation omitted)). That said, the surrounding circumstances to which APT points do not clearly and definitely indicate that APT was a third-party beneficiary to Davis's BCG Employee Agreement. Specifically, the terms of the Third Party Access Agreement that APT and BCG entered shed limited—if any—light on Davis's and BCG's intentions when they executed Davis's BCG Employee Agreement. In addition, the fact that the Third Party Access Agreement contained terms that overlapped with the confidentiality provisions in the BCG Employee Agreement actually supports the conclusion that APT's interests were not protected by that contract and, therefore, APT pursued such protection in the Access Agreement.

[7] Defendants also argue that APT's breach of contract claim against Davis should be dismissed because it was brought in the wrong venue. Because the court dismisses the claim for the reasons described above, the court need not—and does not—address the parties' arguments regarding venue.

and convincing evidence, "under Ohio law, when a plaintiff seeks monetary damages on its fraud claim—as APT does here—the plaintiff is required to prove the claim only by the preponderance of the evidence." ECF No. 274 at 8 (citing Utah and Ohio cases supporting these propositions). APT further contends that, as a result, the court must determine whether Utah or Ohio has the most significant relationship to the fraud claim, and that Ohio has the most significant relationship. Thus, according to APT, the court should apply Ohio law to its fraud claim.

In response, Defendants argue that Utah law should govern APT's fraud claim against Stoddard. Defendants contend that, "[a]ssuming a conflict exists," Utah has the most significant relationship to the fraud claim. ECF No. 282 at 9. The court disagrees.

As an initial matter, the court agrees with APT that there is a conflict between Utah and Ohio law regarding the burden of proof required to establish a fraud claim for monetary damages. Utah law requires a plaintiff to establish each element of fraud by clear and convincing evidence. *Secor v. Knight*, 716 P.2d 790, 794 (Utah 1986) ("[I]n order to prevail on a claim of fraud, all the elements of fraud must be established by clear and convincing evidence."). In contrast, Ohio law requires a plaintiff seeking monetary damages to establish each element of fraud by only the preponderance of the evidence. *Navistar, Inc. v. Dutchmaid Logistics, Inc.*, 171 N.E.3d 851, 866 (Ohio Ct. App. 2021) ("[A] party seeking a monetary remedy must prove fraud by the preponderance of the evidence." (citation omitted)). Because the outcome of APT's fraud claim could depend on whether Utah or Ohio law is applied, a true conflict between the states' laws exists, and the court must conduct a conflict of law analysis. *See Johnson*, 500 F. Supp. 3d at 1279.

To determine "which state's laws should apply to a given circumstance" when there is a true conflict of laws, Utah courts "apply the 'most significant relationship' approach as described

in the Restatement (Second) of Conflict of Laws." *Soundvision Techs., LLC v. Templeton Grp. Ltd.*, 929 F. Supp. 2d 1174, 1192 (D. Utah 2013) (internal citation omitted).

> Utah courts consider the following factors when determining which state has the most significant relationship to a tort dispute: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil [sic], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."

*Id.* (citation omitted). "Further, 'these contacts are to be evaluated according to their relative importance with respect to the particular issue.'" *Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1060 (Utah 2002) (quoting Restatement (Second) Conflict of Laws § 145(2) (1971)). Whereas "the place of injury is less significant in the case of fraudulent misrepresentations," *Anapoell v. Am. Express Bus. Fin. Corp.*, No. 2:07-CV-198-TC, 2007 WL 4270548, at *12 (D. Utah Nov. 30, 2007) (citation and emphasis omitted), "the place of the alleged conduct carries more weight," *id.*

Here, the factors weigh in favor of Ohio. Specifically, the conduct at issue—that is, the conduct that caused APT's alleged injuries—is Stoddard's alleged misrepresentations and nondisclosures. According to APT, "Stoddard was living in Ohio in 2015 when he made the misrepresentations and nondisclosures to Kevin Keane of APT that gave rise to this claim." ECF No. 274 at 10. Moreover, "[t]he emails Stoddard sent to APT that form the basis of [the fraud] claim—emails in which he misrepresented that he was seeking APT information for use with McKinsey and would limit its use to McKinsey—were sent when he was working in Ohio." *Id.* Thus, although, as Defendants contend,[8] the information that Stoddard allegedly fraudulently obtained may have subsequently been transmitted to Utah, received in Utah, and misused in Utah,

---

[8] The court notes that Defendants' contentions are not an admission of wrongdoing, but are simply arguments based on the allegations in APT's TAC.

the allegedly fraudulent conduct that caused and set in motion APT's alleged injuries occurred in

Ohio. Moreover, at the time of the allegedly fraudulent conduct, Stoddard was domiciled in Ohio

and APT's principal place of business was in Virginia, where APT's alleged injuries may have been

experienced most strongly. The court concludes that Ohio—and not Utah—has the most significant

relationship to APT's fraud claim against Stoddard. Therefore, it will apply Ohio law to the claim.

*See Soundvision Techs.*, 929 F. Supp. 2d at 1192.

        B.     *Substantive Analysis*

        Defendants argue that APT's fraud claim against Stoddard is preempted by the Utah

Uniform Trade Secrets Act ("UUTSA"). Specifically, Defendants contend that the UUTSA

preempts a claim if "the claim fails without allegations regarding misuse of information," ECF No.

196 at 13 (quoting *Premier Sleep Sols., LLC v. Sound Sleep Med., LLC*, No. 2:20-cv-00062-JNP-

JCB, 2021 U.S. Dist. LEXIS 63002, at \*19 (D. Utah Mar. 30, 2021)), and that "[i]f allegations

regarding the acquisition and misuse of APT's information are removed from Count VI, there is

nothing left of this claim," *id.* at 14. In particular, Defendants contend that "the claimed injuries

APT alleges resulted from the purported fraud overlap entirely with the claimed injuries APT

alleges resulted from Defendants' purported misappropriation." ECF No. 214 at 8. Defendants

further contend that "[i]f the allegations of injury alleged to arise from Stoddard's purported fraud

are removed, APT has no action for fraudulent misrepresentation or nondisclosure." *Id.* Defendants

also assert that, because the fraud claim is inextricably intertwined with allegations regarding the

misuse of confidential information, the claim is preempted regardless of which state's law is

applied to the claim.

APT responds that the UUTSA does not preempt its fraud claim against Stoddard.[9] APT argues that the allegations in the TAC "make clear that Stoddard's fraudulent misrepresentations and nondisclosures are based on wrongful conduct separate and apart from his *misappropriation* of trade secrets." ECF No. 210 at 14. In particular, APT contends that "Stoddard's fraudulent conduct went well beyond misappropriation. He made fraudulent misrepresentations and nondisclosures by holding himself out as trying to help McKinsey consult for APT, when in reality he was directly developing a business to compete with APT." *Id.* APT further contends that its "fraud claim against Stoddard is not preempted by the UUTSA because the claim is not being asserted under Utah law." *Id.* at 15.

The UUTSA preemption provision provides that the UUTSA "displaces conflicting tort, restitutionary, and other law *of this state* providing civil remedies for misappropriation of a trade secret." UTAH CODE § 13-24-8(1) (emphasis added). Because APT's fraud claim is brought under Ohio law, the court agrees with APT that the *Utah* Uniform Trade Secrets Act does not preempt APT's claim since the UUTSA's preemption provision applies only to claims brought under Utah law. *See Aortech Int'l PLC v. Maguire*, No. 2:14-cv-00171-RJS-EJF, 2016 U.S. Dist. LEXIS 147079, at *16–17 (D. Utah Oct. 21, 2016) (noting that the UUTSA "does not preempt claims arising under laws of other forums").

---

[9] APT also argues that "[b]ecause Defendants are challenging whether the confidential information meets the UUTSA's definition of trade secret and comes within the purview of the UUTSA, Defendants cannot invoke the statute's preemption provision at this stage of the case." ECF No. 210 at 13. APT relies on *ClearOne Communications, Inc. v. Chiang*, No. 2:07-cv-37 TC, 2007 U.S. Dist. LEXIS 91693 (D. Utah Dec. 13, 2007), to support this proposition. However, five years later, the Utah Court of Appeals soundly rejected the approach taken by the *ClearOne* court, describing it as the minority view and adopting the majority view that the UUTSA "preempts claims based on the unauthorized use of information, irrespective of whether that information meets the statutory definition of a trade secret." *CDC Restoration & Constr., LC v. Tradesmen Contrs., LLC*, 274 P.3d 317, 329–30 (Utah Ct. App. 2012). Therefore, the court rejects APT's argument that it is premature to resolve Defendants' preemption argument.

That said, the court concludes that the *Ohio* Uniform Trade Secrets Act ("OUTSA") preempts APT's fraud claim against Stoddard. The OUTSA contains the same preemption provision as the UUTSA. *See* OHIO REVISED CODE § 1333.67(A) ("[S]ections 1333.61 to 1333.69 of the Revised Code displace conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret."). And Ohio courts have adopted the majority interpretation of the preemption provision, under which "common-law claims are preempted only to the extent that they are based on misappropriation-of-trade-secrets facts." *Off. Depot, Inc. v. Impact Off. Prods., LLC*, 821 F. Supp. 2d 912, 919 (N.D. Ohio 2011) (noting that "[i]ntermediate appellate courts in the State of Ohio have applied the majority view"). Thus, under Ohio law, "a non-[O]UTSA claim survives only if [the] plaintiff alleges factual matter beyond [the] misappropriation-of-trade-secrets or other information."[10] *Id.*

Here, APT's fraud claim fails without allegations regarding Stoddard's misuse of APT's confidential information. Under Ohio law,

> [t]he elements of fraud are: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with intent to mislead another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance.

---

[10] At oral argument, APT presented the argument that the preemption provision of the OUTSA is operative only if the plaintiff brings a claim under the OUTSA. The court rejects this argument. Specifically, the preemption provision of the OUTSA explicitly provides that the OUTSA "displace[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." OHIO REVISED CODE § 1333.67(A). There is nothing in the statutory language that suggests that such displacement is contingent on the plaintiff first presenting a claim under the OUTSA. This plain meaning interpretation of the preemption provision of the Uniform Trade Secrets Act has been adopted by federal courts. *See PC Connection, Inc. v. Price*, No. 15-cv-208-PB, 2015 WL 6554546, at *6–8 (D.N.H. Oct. 29, 2015) (holding that plaintiff's conversion and breach of fiduciary duties claims were preempted, at least in part, by the New Hampshire Uniform Trade Secrets Act ("NHUTSA"), even though the plaintiff did not present a claim under the NHUTSA).

*Levy v. Seiber*, 57 N.E.3d 331, 338 (Ohio Ct. App. 2016). As Defendants note, when the allegations regarding Stoddard's misuse of APT's confidential information are removed from the TAC, APT fails to allege that it was injured by Stoddard's allegedly fraudulent conduct. Specifically, all of APT's alleged injuries stem from Stoddard's alleged misuse of APT's information. *See, e.g.*, ECF No. 189 ¶ 128 ("APT has been damaged as detailed throughout this Third Amended Complaint, and specifically *by disclosing its confidential information to Stoddard, who in turn disclosed such information to Davis and MarketDial to be used improperly to build a business to directly compete with APT using APT's protected confidential and trade secret information*. Stoddard's actions have caused and will cause significant and irreparable financial harm to APT, including loss of customers and other business relationships and its legitimate competitive advantage that APT has earned through its substantial investments *in its confidential information and trade secrets*." (emphasis added)). Because "a resulting injury" is an essential element of a fraud claim under Ohio law, *Levy*, 57 N.E.3d at 338, and APT fails to allege any injury that is independent of Stoddard's alleged misuse of APT's information, APT's fraud claim is preempted by the OUTSA.[11] *See Off. Depot*, 821 F. Supp. 2d at 919.  Therefore, APT's fraud claim against Stoddard must be dismissed.[12] *See* OHIO REVISED CODE § 1333.67(A).

---

[11] At oral argument, APT attempted to articulate a theory of injury that is independent of Defendants' alleged misappropriation of APT's confidential information. Specifically, APT stated that, as a result of Stoddard's allegedly fraudulent conduct, APT was deprived of the full benefit of its relationship with McKinsey and that such an injury is independent of Defendants' alleged misuse of APT's information. Even if the court assumes that such an injury is independent of Defendants' alleged misappropriation of APT's confidential information, a fair reading of APT's TAC reveals that APT did not allege such an injury, and APT certainly did not mention that alleged injury in its prayer for damages, as demonstrated in the main text above. *See* ECF No. 189 ¶ 128. Therefore, APT may not rely on this newly asserted theory of injury for this claim or for APT's other tort claims (i.e., civil conspiracy and tortious interference with contract).

[12] In its opposition to Defendants' motion for partial dismissal, APT asked in passing for the opportunity to amend its complaint if the court concluded that any of its tort claims were preempted by either the UUTSA or OUTSA. The court notes that under the local rules, a party must move for

IV.     **Count VII (Civil Conspiracy Against Stoddard, Davis, and MarketDial)**

Defendants move to dismiss APT's civil conspiracy claim against Stoddard, Davis, and MarketDial.

   *A.  Choice of Law Analysis*

APT argues that the court should apply Ohio law, rather than Utah law, to its civil conspiracy claim. As a preliminary matter, APT contends that there is a true conflict between Ohio and Utah law because "a meeting of the minds" is an express element of civil conspiracy under Utah law, whereas, according to APT, Ohio law

> does not require proof of a meeting of the minds as a specific element of civil conspiracy. Instead, Ohio courts hold that a formal agreement between defendants is not required, but rather "only a common understanding or design, even if tacit, to commit an unlawful act." In short, Ohio courts simply do not require an express agreement as part of a civil conspiracy.

ECF No. 274 at 11 (quoting *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996)) (internal citation omitted).

Defendants respond, in part, that "Ohio law requires proof of 'a malicious combination to injure,' which is equivalent to Utah's requirement of a 'meeting of the minds.'" ECF No. 282 at 11–12 (internal citation omitted). Moreover, Defendants assert that, contrary to APT's contention, a formal agreement among conspirators is not required under Utah law. Thus, according to Defendants, there is no conflict between Utah and Ohio law and, therefore, the court should apply Utah law to APT's civil conspiracy claim. The court agrees.

As Defendants suggest, there is no true conflict between Utah and Ohio law with respect to civil conspiracy. Although Utah law requires the plaintiff to establish that there was "a meeting

---

leave to amend a pleading, *see* DUCIVR 15-1, and that "[a] party may not make a motion . . . in a response," DUCIVR 7-1(a)(3). Therefore, APT's attempt to move for leave to amend its complaint was not valid under the local rules.

of the minds on the object or course of action" of the conspiracy, *Lawrence v. Intermountain, Inc.*, 243 P.3d 508, 513 (Utah Ct. App. 2010), the plaintiff need not "prove that the parties actually came together and entered into a formal agreement to do the acts complained of by direct evidence. Instead, conspiracy may be inferred from circumstantial evidence, including the nature of the act done, the relations of the parties, and the interests of the alleged conspirators," *Israel Pagan Est. v. Cannon*, 746 P.2d 785, 791 (Utah Ct. App. 1987) (internal citation omitted). Moreover, under Utah law, mere "knowing and intentional participation" in the conspiracy is sufficient to establish a meeting of the minds. *See Lawrence*, 243 P.3d at 513. Thus, Utah's "meeting of the minds" element is the practical equivalent of Ohio's "malicious combination to injure" element, which "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *See Gosden*, 687 N.E.2d at 496. Because it does not appear that the outcome of APT's civil conspiracy claim "would differ depending on which state's law is applied," there is no true conflict between Ohio and Utah law, *see Johnson*, 500 F. Supp. 3d at 1279 (citation omitted), and the court may apply Utah law, *see Snyder*, 866 F. Supp. at 1353 n.9. Therefore, the court applies Utah law to APT's civil conspiracy claim against Stoddard, Davis, and MarketDial.

B.      *Substantive Analysis*

Defendants argue that APT's civil conspiracy claim must be dismissed because it is preempted by the UUTSA. Specifically, Defendants assert that "there is nothing left" of the civil conspiracy claim when "the allegations regarding acquisition and misuse of APT's information are removed." ECF No. 196 at 14–15.[13]

---

[13] Defendants also assert that APT's conspiracy claim is barred by the intracorporate conspiracy doctrine. Because the court dismisses APT's conspiracy claim on the basis of preemption, the court

APT responds that its "civil conspiracy claim is not preempted because it stands independent from the misappropriation allegations." ECF No. 210 at 17. According to APT, "Davis and MarketDial encouraged, requested, and induced Stoddard to fraudulently misrepresent his purpose and intentions with respect to APT and fraudulently fail to disclose that he was using such information to co-found a business to directly compete with APT, which was a direct breach of Stoddard's Employee Agreement. Defendants subsequently built a competing platform in order to compete with, steal customers from, and 'take down' APT. This conduct is separate and apart from misappropriation that gives rise to APT's UUTSA claim—the claim does not fail without misappropriation."[14] *Id.* at 17 (internal citations omitted). The court disagrees.

As stated previously, the UUTSA contains a preemption provision providing that the UUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." UTAH CODE § 13-24-8(1). In interpreting the scope of the UUTSA's preemption provision, the Utah Court of Appeals held that "a claim is preempted to the extent that it is based on factual allegations supporting a misappropriation of trade secrets or otherwise confidential information." *CDC Restoration*, 274 P.3d at 331. Accordingly, "if proof of a non-[U]UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets, it is preempted irrespective o[f] whatever surplus elements of proof were necessary to establish it." *Id.* (citation omitted). "Stated differently, if the [non-UUTSA] claim fails without the allegations regarding misuse of information, the [U]UTSA preempts it." *Giles Constr., LLC v. Tooele Inventory Sol., Inc.*, No. 2:12-cv-37, 2015 WL 3755863,

_____

need not—and does not—address the parties' arguments regarding the intracorporate conspiracy doctrine.

[14] APT also contends that its civil conspiracy claim is not preempted by the UUTSA because the claim is governed by Ohio law. As discussed above, the court concludes that APT's civil conspiracy claim is actually governed by Utah law.

at *6 (D. Utah June 16, 2015). "However, to whatever extent that a claim is 'based upon wrongful conduct independent of the misappropriation of trade secrets' or otherwise confidential information, it is not preempted." *CDC Restoration*, 274 P.3d at 331 (citation omitted).

Here, APT's civil conspiracy claim fails without the allegations regarding misuse of information. As an initial matter, according to the allegations in the TAC, the entire object of the alleged conspiracy was to misappropriate APT's confidential information. *See* ECF No. 189 ¶ 131 ("Defendants knowingly and willfully conspired and agreed among themselves to fraudulently and tortiously gain access to and acquire valuable *APT confidential and proprietary information and data* to develop MarketDial, its business strategy, its software and software development strategy, and its client development strategy and list of target clients; enter into the A/B testing and business analytics market at very little to no cost, and compete against and 'take down' APT." (emphasis added)).

Moreover, under Utah law, an essential element for a civil conspiracy claim is "one or more unlawful, overt acts." *Israel Pagan*, 746 P.2d at 790. According to the TAC, APT alleges that the unlawful, overt acts committed by Defendants were fraud and tortious interference. *See* ECF No. 189 ¶ 131 ("[Defendants] conspired to wrongfully, *through fraud and tortious interference*, obtain APT's confidential information to form a directly competing business and 'take APT down.'" (emphasis added)). However, as discussed above with respect to fraud and below with respect to tortious interference, these allegedly unlawful acts are not independent of Defendants' alleged misappropriation of APT's information. Similarly, to the extent that the unlawful act or acts is Stoddard's alleged breach of his Employee Agreement with McKinsey, the alleged breach was his misuse of APT's confidential information. Thus, when allegations of misuse of APT's information

are removed, APT does not allege one or more unlawful, overt acts committed in furtherance of the alleged conspiracy.

In addition, all of APT's alleged damages stem from Defendants' alleged misuse of APT's information. Accordingly, APT also cannot establish damages—which is an essential element of a civil conspiracy claim—when allegations of misuse of APT's information are removed. Therefore, the court concludes that APT's civil conspiracy claim is preempted by the UUTSA.[15] *See Giles Constr.*, 2015 WL 3755863, at *6. Thus, APT's civil conspiracy claim against Stoddard, Davis, and MarketDial must be dismissed. *See* UTAH CODE § 13-24-8(1).

## V.    Count VIII (Tortious Interference with Contract Against Davis and MarketDial)

Defendants move to dismiss APT's tortious interference with contract claim against Davis and MarketDial.

### A.  *Choice of Law Analysis*

APT argues that the court should apply Virginia law to its tortious interference with contract claim. As an initial matter, APT contends that there is a conflict between Utah and Virginia law with respect to the elements of a tortious interference with contract claim. Specifically, according to APT, whereas Utah law requires the plaintiff to establish that the interference with contract occurred by "improper means," Virginia law has no such requirement unless "the interference is with a contract which is terminable at will or when the interference is merely with an expectancy (contract or business)." *See* ECF No. 274 at 13. APT asserts that those exceptions are not relevant here, *see id.* ("The agreements Davis and MarketDial tortiously interfered with are not terminable at will—i.e., they are not the kind of contingent contracts or expectancies where improper methods

---

[15] The court similarly concludes that if APT's civil conspiracy claim were analyzed under Ohio law, the OUTSA would preempt the claim. *See* OHIO REVISED CODE § 1333.67(A); *Off. Depot*, 821 F. Supp. 2d at 919.

become a requisite element in Virginia."), and, therefore, the court must determine which state has the most significant relationship to the claim. APT argues that Virginia has the most significant relationship to the tortious interference claim because "the place where the injury occurred is Virginia"; "the conduct causing the injury occurred in Utah, Ohio, and Virginia"; "the domiciles and places of business of the parties are in both Virginia and Utah"; and "the relationships between the parties to the contracts subject to the tortious interference are in Virginia . . ., New York . . ., and Ohio," and "[a]ny 'relationship' between APT and Davis/MarketDial, to the extent one exists for this analysis[,] would have been in both Virginia and Utah." *Id.* at 14–15. Thus, APT concludes that the court should apply Virginia law to the tortious interference claim.

Defendants do not dispute that there is a conflict between Utah and Virginia law with respect to the essential elements of a tortious interference claim. However, Defendants contend that Utah is the state with the most significant relationship to the claim. In particular, Defendants assert that, contrary to APT's contentions, the place of the alleged injury is not exclusively Virginia but is numerous states because, "[p]er the TAC, APT operates nationally and internationally" and, therefore, the alleged economic injury would be felt in those places as well. ECF No. 282 at 13. "Thus," according to Defendants, the "place of injury" factor "'does not point to any particular state because the injury occurred in many states.'" *Id.* (quoting *Bates v. Cook, Inc.*, 615 F. Supp. 662, 677 (M.D. Fla. 1984)). Defendants further contend that, more importantly, "no aspect of MarketDial and Davis's purported misconduct occurred in Virginia." *Id.* at 14. Rather, "by APT's own allegations, MarketDial and Davis acted exclusively in Utah." *Id.* Defendants assert that because the location of the alleged misconduct is the most important factor in the choice of law analysis, Utah law should govern APT's tortious interference with contract claim. The court agrees.

As a preliminary matter, the court agrees with APT that there is a true conflict between Virginia and Utah law with respect to the elements of a tortious interference with contract claim. "In order to win a tortious interference claim under Utah law, a plaintiff must . . . prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff." *Davidson v. Baird*, 438 P.3d 928, 945 (Utah Ct. App. 2019) (quoting *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015)). In contrast, under Virginia law, "[t]he necessary elements to establish a prima facie case [for tortious interference with contract rights] are: '(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.'" *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va. 2014) (quoting *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985)). Accordingly, as APT notes, Utah law requires the plaintiff to establish that the defendant interfered with the contract by improper means—such as "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood[s]," *C.R. Eng. v. Swift Transp. Co.*, 437 P.3d 343, 353 (Utah 2019) (citation omitted)—whereas Virginia law has no such requirement for a contract of the type at issue here. Because the outcome of APT's tortious interference claim could depend on whether Utah or Virginia law is applied, there is a true conflict between the states' laws, and the court must conduct a conflict of laws analysis. *See Johnson*, 500 F. Supp. 3d at 1279.

Applying the most significant relationship test, the court concludes that Utah is the state with the most significant relationship to APT's tortious interference claim. First, as Defendants note, although the alleged injury may have been felt most strongly in Virginia—APT's principal

30

place of business—because APT does business across the country, it is likely that any injury from Defendants' alleged tortious interference occurred in many states, minimizing the weight that should be placed on the "place of injury" factor in the analysis. *See Bates*, 615 F. Supp. at 677 ("Where, as here, the injury occurred in two or more states, this contact does not play as important a role."). Thus, the place of Davis's and MarketDial's alleged conduct should be "given particular weight in determining which state's law is applicable." *See id.*; *Waddoups*, 54 P.3d at 1060. As APT acknowledges, Utah is the place "from where Davis and MarketDial were interfering." ECF No. 274 at 15. Therefore, Utah has the most significant relationship to APT's tortious interference claim and the court will analyze that claim under Utah law.[16] *See Soundvision Techs.*, 929 F. Supp. 2d at 1192.

B.     *Substantive Analysis*

Defendants argue that the UUTSA preempts APT's tortious interference claim against Davis and MarketDial because "[a]bsent allegations regarding misuse of information," the claim would vanish. ECF No. 196 at 15. Specifically, Defendants contend that the tortious interference claim "alleges that Mr. Davis and MarketDial worked through Mr. Stoddard to obtain APT's confidential and trade secret information so they could misuse that information in a competing business. Upon removing allegations regarding the acquisition and misuse of APT's information, the claim falls apart." *Id.* (internal citation omitted). In particular, Defendants assert that "[w]ithout the actual disclosure or misuse of the purported trade secret and confidential information protected

---

[16] For the sake of completeness, the court further notes that, according to the TAC, Davis is domiciled in Utah, MarketDial is domiciled in both Delaware and Utah, and APT is domiciled in both Delaware and Virginia. *See* ECF No. 189 ¶¶ 13–14, 16. Moreover, there is no apparent relevant relationship between Davis and MarketDial and APT. Therefore, the other factors considered in the most significant relationship test do not weigh strongly in either Utah's or Virginia's direction.

by the confidentiality agreements raised in the TAC, there is simply no harm to APT and no claim of tortious interference." ECF No. 214 at 11.

APT responds that its tortious interference claim is not preempted "because it does not depend on or necessarily involve alleged misuse of confidential information." ECF No. 210 at 19 (citation omitted). Specifically, APT contends that the allegations contained in the TAC "are much broader than Defendants' characterization; they encompass a range of interfering conduct that diverges from the misappropriation and falls outside the scope of the UUTSA." *Id.* The court disagrees and concludes that the UUTSA preempts APT's tortious interference claim.

Similar to APT's fraud and civil conspiracy claims, APT's claim for tortious interference cannot survive without allegations regarding the misuse of its information. First, the contractual obligations with which Davis and MarketDial allegedly interfered were Stoddard's confidentiality obligations to APT. *See, e.g.*, ECF No. 189 ¶ 140 ("Despite knowing of Stoddard's confidentiality obligations, and despite Davis's own confidentiality obligations to APT, Davis, and MarketDial[,] acting through Davis, requested that Stoddard obtain APT confidential and trade secret information while Stoddard worked at McKinsey with APT and induced Stoddard to breach those confidentiality agreements, including by offering to go into business with Stoddard as a co-founder of MarketDial. Beginning as early as February 2015, with Davis's encouragement and inducement, Stoddard sent Davis the APT confidential and trade secret information he accessed."); *id.* ¶ 143 ("As a direct and proximate result of Davis's and MarketDial's knowing and improper interference convincing Stoddard to *breach his and McKinsey's confidentiality obligations to APT*, APT has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial." (emphasis added)). Moreover, APT's alleged injuries stem entirely from the alleged misuse of its information. *See, e.g., id.* ¶ 141 ("As a direct and proximate result of Davis's

and MarketDial's encouragement, inducement, and interference, Stoddard duped APT into providing Stoddard APT's confidential, trade secret information and concealed his and Davis's plans to develop, and actual development of, a competing software product through MarketDial."); *id.* ("Further, upon information and belief, Defendants have in fact used APT's trade secret and confidential information in developing the MarketDial system, to develop its business, technical and marketing strategy, and to unfairly compete with and steal clients from APT, knowing that misappropriated APT trade secret and confidential information was obtained through deceitful means. At a minimum, Defendants could not have reasonably compartmentalized trade secret information learned from APT and thus inevitably would have used such information in developing their own competing products. Such misappropriation permitted Defendants . . . to develop a product and service that MarketDial has used to compete against APT in a manner that could not have been accomplished in the absence of Defendants' misappropriation."). Thus, when allegations of misuse of APT's information are removed, APT has failed to allege an injury caused by Davis and MarketDial's alleged tortious interference, which is an essential element of such a claim. Therefore, the court concludes that APT's tortious interference claim against Davis and MarketDial is preempted by the UUTSA, *see Giles Constr.*, 2015 WL 3755863, at *6, and must be dismissed, *see* UTAH CODE § 13-24-8(1).

## VI.    Counts I and II (Misappropriation of Trade Secrets Against Davis)

Defendants move to dismiss APT's misappropriation of trade secrets claims against Davis. According to Defendants, both count I, asserting a violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and count II, asserting a violation of the UUTSA, are barred by the applicable statutes of limitations as to Davis. Specifically, Defendants contend that both the DTSA and UUTSA are subject to three-year limitations periods and that, based on the allegations

contained in the original complaint that APT filed in this case, "APT was plainly aware (or reasonably should have been aware) of Mr. Davis'[s] alleged misappropriation by *at least* the filing of the original complaint in this matter more than three years ago." ECF No. 196 at 20. Therefore, according to Defendants, these claims against Davis are time-barred.

APT responds that its misappropriation of trade secrets claims against Davis are not precluded by the relevant statutes of limitations. Specifically, APT asserts that "for a limitations defense to ever succeed at the Rule 12(b)(6) stage of litigation, it must be readily apparent from the face of the complaint and clear from the allegations that the claims are time-barred," and "[n]othing on the face of the TAC shows that APT's misappropriation claims against Davis are time-barred." ECF No. 210 at 22. APT further asserts that "[w]hen APT brought suit, it did not have information or belief that Davis had personally engaged in conduct to obtain APT's trade secrets from Stoddard." *Id.* at 23. Rather, according to APT, it only discovered this alleged fact "after Defendants' document production" in 2021. *Id.* at 23–24. APT further contends that "the question of when APT should have discovered its claims," as well as "APT's diligence pursuing that information, are fact questions not usually appropriate for a Rule 12(b)(6) motion." *Id.* at 25. The court agrees and declines to dismiss APT's misappropriation claims against Davis.

"A statute of limitations bar is an affirmative defense, but may be resolved on a motion to dismiss if 'the dates given in the complaint make clear that the right sued upon has been extinguished.'" *Kang Sik Park v. First Am. Title Ins. Co.*, 743 F. App'x 902, 904 (10th Cir. 2018) (unpublished) (citation omitted). In addition, the court may glean the relevant dates by "consider[ing] 'matters of which a court may take judicial notice,'" including a party's previous filings in the case. *See Wei v. Univ. of Wyo. Coll. of Health Sch. Pharm.*, 759 F. App'x 735, 740 (10th Cir. 2019) (unpublished) (quoting *Warnick v. Cooley*, 895 F.3d 746, 754 n.6 (10th Cir. 2018)).

Here, neither the TAC nor APT's original complaint "make clear that the right sued upon has been extinguished." *See Kang Sik Park*, 743 F. App'x at 904. As both parties note, both the DTSA and the UUTSA have limitations periods of three years. *See* 18 U.S.C. § 1836(d) ("A civil action under subsection (b) may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered."); UTAH CODE § 13-24-7 ("An action for misappropriation shall be brought within three years after the misappropriation is discovered or, by the exercise of reasonable diligence, should have been discovered."). Thus, the issue is whether the allegations in the TAC or the original complaint "make clear" that APT discovered, or should have discovered, Davis's alleged misappropriation of APT's trade secrets more than three years before APT filed the misappropriation claims against Davis on July 27, 2021. *See* ECF No. 188.

As Defendants essentially concede, the TAC does not contain dates from which it can be concluded that APT discovered, or should have discovered, Davis's alleged misappropriation more than three years before July 27, 2021. Rather, Defendants primarily rely on the allegations in APT's original complaint—which was filed on June 28, 2018, *see* ECF No. 1—to argue that "APT was plainly aware (or reasonably should have been aware)" of Davis's alleged misappropriation before July 27, 2018, *see* ECF No. 196 at 20. To be sure, APT's original complaint contains allegations from which a reasonable person could infer that, at a minimum, APT should have discovered Davis's alleged misappropriation by June 28, 2018, more than three years before APT filed the misappropriation claims against Davis. *See, e.g.*, ECF No. 1 ¶ 28 ("Stoddard co-founded with Davis MarketDial, a Delaware corporation, intending to compete with APT in the predictive software business for retailers."); *id.* ¶ 32 ("Upon information and belief, Davis was a member of a BCG team that had access to APT's software."); *id.* ¶ 53 ("As co-founder and chief data scientist

of MarketDial, it is inevitable that Stoddard intentionally and/or inherently disclosed APT's confidential information and trade secrets that he obtained while at McKinsey to MarketDial, for the benefit of MarketDial and Stoddard, and to the detriment of APT."); *id.* ¶ 75 ("Upon information and belief, Stoddard solicited and collected APT's trade secret information, and used MarketDial as part of a scheme to misappropriate such trade secrets to get MarketDial up and running to develop software products to compete with APT and steal its business. . . . At a minimum, Stoddard and MarketDial could not have reasonably compartmentalized trade secret information learned from APT and thus inevitably would have used such information in developing their own competing products."); *id.* ¶ 76 ("Further, on information and belief, given Stoddard's position as the Chief Data Scientist and co-founder of MarketDial, it is inevitable that Stoddard has shared and will continue to share APT's trade secret information with MarketDial, a direct competitor of APT, or fellow MarketDial employees, who may use, or are using[,] this information to APT's detriment.").

However, at this stage, the court must view the allegations in the light most favorable to APT. *See Burnett*, 706 F.3d at 1235. Based on the allegations in APT's original complaint, a reasonable person, viewing such allegations in the light most favorable to APT, could conclude that, while Stoddard and MarketDial misappropriated APT's trade secrets, Davis did not personally engage in such misappropriation. Even though Davis was co-founder and CEO of MarketDial, a reasonable person could conclude from the original complaint that Davis was shielded from personal involvement in Stoddard and MarketDial's alleged misappropriation of APT's trade secrets. Therefore, APT's original complaint does not establish that APT discovered Davis's alleged misappropriation more than three years before it filed the TAC, and it also does not conclusively establish that APT should have discovered Davis's alleged misappropriation more

than three years before it filed the TAC, since that is generally a question of fact for a jury to determine. *See Maughan v. SW Servicing*, 758 F.2d 1381, 1387–88 (10th Cir. 1985) ("It is settled law in the majority of circuits that the issue of when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact for the jury."); *McKinnon v. Tambrands*, 815 F. Supp. 415, 418 (D. Utah 1993) ("The court notes at the outset the majority rule that when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact for the jury."). Consequently, the court declines to dismiss APT's misappropriation of trade secrets claims against Davis on the basis that they are barred by the applicable statutes of limitations.

## CONCLUSION AND ORDER

The court rules as follows:

The court GRANTS IN PART and DENIES IN PART Defendants' Motion for Partial Dismissal (ECF No. 195). The court dismisses APT's claims for breach of contract against Stoddard (count IV) and breach of contract against Davis (count V) WITH PREJUDICE. The court dismisses APT's claims for fraudulent misrepresentation and fraudulent nondisclosure against Stoddard (count VI), civil conspiracy against Stoddard, Davis, and MarketDial (count VII), and tortious interference with contract against Davis and MarketDial (count VIII) WITHOUT PREJUDICE. The court declines to dismiss APT's claims for misappropriation of trade secrets under the DTSA and UUTSA against Davis (counts I and II).

DATED March 17, 2022.

BY THE COURT

Jill N. Parrish

United States District Court Judge