IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| APPLIED PREDICTIVE TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> MARKETDIAL, INC., JOHN M. STODDARD, and MORGAN DAVIS, <br><br> Defendants. | **MEMORANDUM DECISION & ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (AMENDED)** <br><br> Case No. 2:19-cv-496-JNP-CMR <br><br> District Judge Jill N. Parrish |

Applied Predictive Technologies, Inc. ("Plaintiff" or "APT") asserts a number of claims against MarketDial, Inc. ("MarketDial"), John M. Stoddard ("Mr. Stoddard"), and Morgan Davis ("Mr. Davis") (collectively, "Defendants"). Before the court are two motions for summary judgment relating to APT's claims for misappropriation of trade secrets. ECF Nos. 443 ("Defendants' Motion" or "Mot.") (filed under seal), 445 (filed under seal). For the reasons set out below, Defendants' Motion is **GRANTED**, and Davis's Motion is **DENIED** as moot.

## FACTUAL BACKGROUND

### A.  Factual Predicate

APT is a business analytics company. It serves customers "in a variety of industries, including retail, restaurants, financial services, consumer packaged goods, airlines, automotive, hotels, insurance, life sciences, healthcare, and telecommunications and media." ECF No. 188 ("TAC") ¶ 23. Importantly, APT owns software called Test & Learn ("T&L"), which it licenses

to businesses for use in the design and analysis of business experiments. At its core, the software is an A/B test methodology designed to identify business initiatives likely to succeed:

> For example, McDonald's might want to know if introducing a new sandwich will increase profits. T&L would use McDonald's data to identify test stores in which the new sandwich should be introduced, identify control stores in which the new sandwich should not be introduced, and compare the behavior across those two groups. McDonald's could then tell whether the new sandwich will boom or bust.

Mot. at 1. To do this, T&L uses data feeds provided by customers consisting of tailored categories of information requested by APT.

APT has repeatedly alleged and maintained that T&L is the result of tens of millions of dollars of capital investment and more than 20 years of development efforts. TAC ¶ 74. APT alleges that the value of its T&L platform, and business model generally, is attested to by its $600 million acquisition by Mastercard in 2015. *Id*. APT claims that its business model is so valuable and unique that "no competitor before or since has built a similarly competing solution without APT trade secrets," and that "APT had no meaningful market competitors prior to MarketDial." ECF No. 552 at 4 ("Opp'n Mem.") (filed under seal) at 45, 59.

In 2015, APT shared documents and information regarding its business model, and T&L in particular, with McKinsey & Co. ("McKinsey"), a business consulting firm. Through its relationship with McKinsey, APT sought to be recommended to McKinsey's clients. Among the McKinsey personnel who reviewed the information APT shared with McKinsey was Mr. Stoddard, who was tasked with evaluating dozens of software offerings to determine their potential value to McKinsey clients. Mr. Stoddard was an associate on the McKinsey team working on evaluating these software offerings for a period of about five months (from February 20, 2015, until July 16, 2015).

Defendants characterize the information provided to Mr. Stoddard as high-level marketing documents that did not reveal any secrets about how T&L operated. In contrast, APT maintains that the information it provided to McKinsey contained valuable insight into T&L and the general business strategies of APT. Specifically, it argues that it provided "a roadmap for developing a successful predictive business analytics software business with a playbook for how to successfully build, market, sell and deploy predictive business analytics software to customers." Opp'n Mem. at 2.

While employed at McKinsey, Mr. Stoddard requested APT documents and shared them with Mr. Davis. In April 2016, Mr. Stoddard and Mr. Davis founded MarketDial. Through 2016, Mr. Davis and Mr. Stoddard developed MarketDial business analytics software. They maintain that they did so by consulting with a university professor, writing relatively rudimentary software scripts using R (a language for statistical computing and graphics), and hiring a software development company to help develop the product, never relying on information that could be considered a trade secret. But APT argues that they developed the MarketDial software through extensive misappropriation of APT trade secrets. Mot. at 6; Opp'n Mem. at 10. APT further argues that during Mr. Stoddard's time at MarketDial, he accessed documents purportedly containing trade secret information that he previously had obtained through his employment at McKinsey.

APT also alleges that Sharon Choi, a MarketDial employee who had seen two demonstrations of the T&L software before her employment by MarketDial, inappropriately shared information from these demonstrations with MarketDial. First, while employed at Guitar Center, Ms. Choi received information from APT regarding its business operations and the T&L software from a pitch APT made to Guitar Center for the T&L product. After she left Guitar

Center, Ms. Choi retained at least some of these materials and, in 2019, while working at MarketDial, shared them with Josh Baran, another MarketDial employee. Second, while employed by Torrid in 2017, Ms. Choi saw and took screenshots of a presentation on T&L that APT gave to Torrid. Ms. Choi, while still working at Torrid, sent those screenshots to Mr. Baran in October of 2017 in response to an email she had received from him.

### B. Procedural History

On June 28, 2018, APT sued MarketDial for patent infringement and misappropriation of trade secrets. APT subsequently amended its complaint multiple times. In September 2019, Defendants moved to dismiss APT's Second Amended Complaint pursuant to FED. R. CIV. P. 12. ECF No. 104. In an order dated November 25, 2020, this court granted in part and denied in part Defendants' motion. *Applied Predictive Techs., Inc. v. Marketdial, Inc.*, 2020 U.S. Dist. LEXIS 221981, at *77, 2020 WL 6940736 (D. Utah Nov. 25, 2020) ("*APT I*"). It dismissed APT's patent infringement and unfair competition claims, but declined to dismiss APT's claims for misappropriation of trade secrets as insufficiently pleaded. *Id*.

APT then filed its Third Amended Complaint ("TAC") on July 27, 2021. The TAC alleged that MarketDial, Mr. Stoddard, and Mr. Davis misappropriated and used APT's trade secret information. Specifically, APT alleged:

a. APT has incorporated its trade secrets into all of its software offerings, including but not limited to its Test & Learn® software, which uses such trade secrets to improve the value and performance of the software;
b. APT's Test & Learn® software uses trade secrets to allow rapid measurement of incremental impact of business initiatives, including optimal selection of specific criteria to improve test results;
c. APT's Test & Learn® software uses patented methods and systems for determining optimal parameter settings for business initiative testing used for testing initiatives for business locations included in a business network, which are enhanced by trade secrets beyond the patented methods that isolate the cause-and-effect impact of each marketing initiative;

4

    d.  APT's trade secrets provide confidential methods that determine specific characteristics that are used to select a set of test locations or markets that will enhance the accuracy of testing, which characteristics were identified and selected by APT based upon many years of trial and error and software engineering utilizing the results of such trial and error;

    e.  APT has developed trade secrets that are used in its software to identify specific criteria to be assessed to reduce inaccuracies in the testing of business initiatives;

    f.  APT uses the trade secrets in its software to analyze test results and build out models that recommend the markets/sites where particular business programs will have the best impact;

    g.  APT's trade secrets include techniques to refine test measurement at a customer level;

    h.  APT utilizes dashboards that display test results to customers in a confidential format;

    i.  APT utilizes a set of particular confidential user interfaces (UIs) and architecture that provide simplified reporting of results for customers; these easy-to-use interfaces provide more effective reporting of test results to customers that can be used by customers to more effectively use the trade secrets incorporated into APT's software to assist customers in analyzing business initiative test results, and to make more effective and profitable business decisions;

    j.  APT utilizes trade secrets incorporated into its software to guide clients on the number of sites that should be used to help design tests that are significant and predictive of rollout performance;

    k.  APT software incorporates trade secrets that automatically generate a set of key outputs and keeps them up-to-date during the test; a customer using the APT software can then use these APT trade secrets, including a set of APT's confidential UIs, to easily add outputs to the analysis or turn the results into a presentation;

    l.  APT has developed trade secrets that include confidential business strategies and testing methods unique to certain clients or certain industries;

    m.  APT has developed trade secrets that include confidential strategies for, among other things (i) effectively deploying APT's Test & Learn® software through partnerships with consulting firms, (ii) enhancing client work with a robust and scalable Test & Learn® software platform, and (iii) using the Test & Learn® software platform to drive marketing effectiveness;

    n.  APT has developed trade secrets that include compilations of certain of the trade secrets described above that, when taken together, provide a roadmap, or playbook, for effectively deploying predictive analytics software tools to clients, building an effective predictive analytics software business, effectively marketing predictive analytics software to potential clients and effectively providing competitive predictive analytics software products and services ("APT's Trade Secret Playbook").

TAC ¶ 70. The TAC also added Mr. Davis as a defendant and added breach-of-contract claims against Mr. Stoddard and Mr. Davis, along with various tort claims against all Defendants.

Defendants moved for partial dismissal of the TAC pursuant to FED. R. CIV. P. 12(b)(6). The court, in an order dated March 17, 2022, granted in part and denied in part this motion. While the court dismissed APT's contract and tort claims, it declined to dismiss the trade secrets claims brought against Mr. Davis. *Applied Predictive Techs., Inc. v. Marketdial, Inc.*, 598 F. Supp. 3d 1264, 1291 (D. Utah 2022) ("*APT II*"). Defendants had argued that APT's federal and state claims for misappropriation of trade secrets against Mr. Davis were barred by the applicable statute of limitations. *Id*. at 1289. However, because the TAC did not contain dates or information suggesting that APT had or should have discovered Mr. Davis's alleged misappropriation of trade secrets more than three years before filing the TAC, the court declined to dismiss the trade secrets claims against Mr. Davis. *Id*. at 1290.

### C.  The Instant Motion and the Alleged Trade Secrets

Plaintiff's remaining claims arise from the Defendants' alleged misappropriation of APT's trade secrets. APT's two misappropriation of trade secrets claims—its first and second causes of action—are brought under federal law, 18 U.S.C. § 1836 *et seq*., and Utah law, UTAH CODE ANN. § 13-24-1 *et seq*., respectively. Defendants argue that they are entitled to summary judgment as to the misappropriation of trade secrets claims because "APT cannot identify a protectable trade secret, has no evidence of misappropriation, and cannot prove damages." Mot. at 1. APT responds that it has sufficiently identified and specified the trade secrets it claims, including under a compilation theory of trade secrets, and that it will be able to prove all elements of its case at trial. Opp'n Mem. at 4-5.

APT relies on its delineation and explanation of its trade secrets contained in its responses to Defendants' first interrogatory. Opp'n Mem. at 4. That interrogatory asked APT to "identify and describe, with specificity, each and every one of the alleged trade secrets that

6

Plaintiff alleges or contends Defendants misappropriated or misused." ECF No. 439-8 ("Ex. 8")

at 4. The trade secrets described in APT's interrogatory responses, outlined in much greater detail

in Part III of this order, are as follows:

 a. Standard Deployment Guide, Ex. 42;
 b. Partner Capabilities Briefing, Ex. 43;
 c. T&L Effectiveness Guide, Ex. 44;
 d. Industry/Client Strategy Discussions, Ex. 45;
 e. T&L Technical Information;
 f. Confidential Clients and Industry Targets, Ex. 46;
 g. Test & Learn Presentation, Exs. 47-49;
 h. A compilation of (a) through (g);
 i. 9/27/2017 APT Presentation to Sharon Choi of Torrid, Exs. 50-52;
 j. A compilation of (a) through (i);
 k. Guitar Center information (embodied in nine documents and concepts (i)-(ix), Exs. 53-60;
 l. A compilation of (a) through (k);
 m. Client data feeds used for the T&L platform and the methods for developing the same, as embodied in seven documents, Exs. 61-67;
 n. A compilation of (a) through (m).

Mot. at 9.[1]

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "A fact is

material only if it might affect the outcome of the suit under the governing law. And a dispute

---

[1] Claimed trade secrets (a)-(f) were identified by APT in its initial response to Defendants' first interrogatory and subsequently amended through APT's August, 2021 first supplemental response, which additionally claimed alleged secrets (g)-(j). In its third supplemental response in March of 2022, APT additionally claimed secrets (k)-(l) and, two months later, in its fourth supplemental response, secrets (m) and (n) (also modifying its description of claimed trade secret (b)).

over a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1186 (10th Cir. 2016).

Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008). However, this does not mean that nonmovants may "defeat summary judgment by relying on ignorance of the facts, on speculation, or on suspicion." *Genzer v. James River Ins. Co.*, 934 F.3d 1156, 1160 (10th Cir. 2019) (citation omitted). "Rather, to defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) (cleaned up).

In any case, a plaintiff "must still identify sufficient evidence requiring submission to the jury," *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1142 (10th Cir. 2009); *accord Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005), where such evidence offered is in admissible form. *Wetherill v. Bank IV Kan., N.A.*, 145 F.3d 1187, 1191 (10th Cir. 1998). Finally, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## DISCUSSION

### I.      Trade Secret Elements

APT brings misappropriation of trade secrets claims under both federal and state law.

18 U.S.C. § 1836(b)(1) creates a private cause of action for owners of trade secrets to seek relief

from trade secret misappropriation. Utah, in turn, has adopted the uniform trade secrets statute,

which does much the same. *See* UTAH CODE ANN. § 13-24-1 *et seq*. Under the federal statute,

trade secrets are defined as

> all forms and types of financial, business, scientific, technical, economic, or
> engineering information, including patterns, plans, compilations, program
> devices, formulas, designs, prototypes, methods, techniques, processes,
> procedures, programs, or codes, whether tangible or intangible, and whether or
> how stored, compiled, or memorialized physically, electronically, graphically,
> photographically, or in writing if—
>> (A) the owner thereof has taken reasonable measures to keep such
>> information secret; and
>> (B) the information derives independent economic value, actual or
>> potential, from not being generally known to, and not being readily
>> ascertainable through proper means by, another person who can obtain
>> economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

The definition of trade secrets under the Utah statute is substantially similar. *See* UTAH

CODE ANN. § 13-24-2(4). Misappropriation or acquisition by improper means of a trade secret, in

turn, is defined under the federal statute to mean the

> (A) acquisition of a trade secret of another by a person who knows or has reason
> to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied
> consent by a person who—
>> (i) used improper means to acquire knowledge of the trade secret;
>>
>> (ii) at the time of disclosure or use, knew or had reason to know that the
>> knowledge of the trade secret was—

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that—

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5).

As to § 1839(5)(B)(i), "improper means" is defined in § 1839(6) to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]" The Utah statute contains substantially similar term definitions. *See* UTAH CODE ANN. § 13-24-2(1)-(2).

Under the uniform trade secrets act, a plaintiff in a misappropriation of trade secrets action must show "(1) the existence of a trade secret, (2) communication of the trade secret to [a defendant] under an express or implied agreement limiting disclosure of the secret, and (3) [a defendant's] use of the secret that injure[d] [the plaintiff.]" *Bimbo Bakeries USA, Inc. v. Sycamore*, 39 F.4th 1250, 1261 (10th Cir. 2022). The same analysis is properly applied to trade secrets misappropriation claims brought under federal law. *Accord Inteliclear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (considering claims brought under the federal trade secrets statute together with a state uniform trade secrets act "because the elements are substantially similar"). Thus, to guide its trade secrets misappropriation claims through the summary judgment stage, APT must point to genuine disputes of fact material regarding (1) the

10

existence of a trade secret; (2) the misappropriation or acquisition by improper means of such trade secret; and (3) Defendants' use of the trade secret to APT's injury.

## II.      Identification of Protectable Trade Secrets

Defendants argue that summary judgment is appropriate because APT has failed to satisfy its burden of adequately delineating or explaining the trade secrets at issue.[2] The question of what constitutes a protectable trade secret is generally a question of fact. *See Rivendell Forest Prods. v. Ga.-Pacific Corp.*, 28 F.3d 1042, 1044 (10th Cir. 1994). However, a trade secrets plaintiff "bear[s] the burden of proving the existence of a trade secret, and there is no presumption in [its] favor." *Bimbo Bakeries USA, Inc. v. Sycamore*, 39 F.4th 1250, 1262 (10th Cir. 2022) (quoting *USA Power, LLC v. PacifiCorp*, 2016 UT 20 ¶ 49, 372 P.3d 629, 649-50 ("*USA Power II*")); *accord Sw. Stainless, Ltd. P'ship v. Sappington*, 582 F.3d 1176, 1190 (10th Cir. 2009) ("The burden is upon the party claiming [trade secret] protection to show the existence of the trade secret.").

Because Plaintiff lacks any entitlement to a presumption of a trade secret, it must necessarily define its claimed trade secrets "in a manner that allows the fact-finder to determine if a trade secret exists under the statute." *USA Power II*, 2016 UT 20, ¶ 48, 372 P.3d 629. As part of its burden of proving the existence of a trade secret, Plaintiff bears the burden of *defining* the trade secret "in a manner that would allow the fact-finder to determine if it met the statutory requirements of" the trade secrets statute. *Id*. ¶ 49. This, in turn, requires, informing the fact-

---

[2] Defendants' Motion also questions (a) whether APT used reasonable measures to protect its alleged trade secrets, (b) whether APT can adduce sufficient evidence to create genuine disputes of material fact regarding the issue of misappropriation, and (c) whether APT has sufficiently disaggregated its claimed damages per trade secret in such a way that would allow a jury to award damages for the misappropriation of individual trade secrets.

finder of "what it is *that the plaintiff claims is not generally known* or readily ascertainable." *Id.* ¶ 49 (emphasis added).[3]

This issue of trade secret identification and definition is central to this order for the claims brought under both federal and state law. As a general matter, because of their substantial similarities, the federal trade secrets statute and state uniform trade secrets statutes are often considered in tandem. This, in part, stems from the fact that the federal statute was expressly modeled on the uniform trade secrets statute. *Inteliclear*, 978 F.3d at 657; *B&P Littleford, LLC v. Prescott Mach., LLC*, No. 20-1449/1451, 2021 U.S. App. LEXIS 25590, at *15 (6th Cir. Aug. 24, 2021) (unpublished); S. Rep. No. 114-220 (2016).

In this action, the court similarly determines that the federal and Utah statutes' substantially similar term definitions and treatment of trade secrets misappropriation invites consideration of the two claims together, marrying federal appellate courts' and Utah courts' articulation of trade secrets jurisprudence. As a result, this court relies on both the trade secret jurisprudence that has emerged in federal appellate courts and under the Utah act.[4]

## A. Defining Trade Secrets on Summary Judgment

Judge Easterbrook, in interpreting the uniform trade secrets statute in a germinal and highly influential opinion, characterized the demand for specificity and parsing out secrets from

---

[3] *USA Power II* additionally adopted the standard articulated by this court in *Utah Med. Prods., Inc. v. Clinical Innovations Assocs., Inc.*, 79 F. Supp. 2d 1290, 1313 (D. Utah 1999), requiring, "in the summary judgment posture, that the plaintiff define the claimed secret in a way that allowed the statute to be meaningfully applied." 2016 UT 20, ¶ 49 n.48.

[4] To the extent that standards regarding such identification and definition may diverge between the federal and Utah statutes, it is most likely with regard to the degree of particularity demanded from plaintiffs in identifying trade secrets before demonstrating a triable issue of fact, as is discussed below. The court concludes, however, that APT has failed to create a triable issue of fact regarding the existence of any trade secret under both the state and federal statutes.

non-secrets as arising from the uniform statute's definition of trade secrets. *See Idx Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002). As discussed below, this demand has also been imported into judicial analysis of the federal trade secrets statute. Again, this requires that the plaintiff identify a sufficient basis for the fact-finder to conclude that

> (A) the owner [of the claimed secret] has taken reasonable measures to keep such information secret; and
> (B) *the information derives independent economic value*, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3) (emphasis added).

Where descriptions of purported trade secrets are "too vague and inconclusive," summary judgment is appropriate as a matter of law. *Id*. This is not a controversial proposition. As the Tenth Circuit has noted, trade secrets, by statute, must be defined in such a way that the fact-finder can determine if information claimed as a trade secret derives independent economic value from not being generally known to or readily ascertainable by those who could obtain economic value from its disclosure. *Bimbo Bakeries USA, Inc. v. Sycamore*, 39 F.4th 1250, 1262 (10th Cir. 2022) (quoting *USA Power II*, 372 P.3d at 649-50).

The plaintiff bears the burden of proving the existence of a trade secret, and there is no presumption in [its] favor." *Id*. Thus, because of the way in which trade secrets are defined by statute, "broad assertion[s]" cannot logically match the particular elements of trade secrets outlined by the statutory definition, including that such a claimed trade secret is "valuable, not

13

known to others who might profit by its use, and has been handled by means reasonably designed to maintain secrecy." *Idx*, 285 F.3d at 583-84.[5]

To illustrate the point that a plaintiff must pin down its alleged secrets by identifying what's known or readily ascertainable by those in the industry, Judge Easterbrook explained that "a 43-page description of the methods and processes underlying and the inter-relationships among various features making up IDX's software package" is an insufficient means of defining a claimed trade secret. *Id*. at 583-84. This is not necessarily because the plaintiff in that case failed to give enough information, but because the claimed definition "does not *separate the trade secrets from the other information* that goes into any software package," which is "vital" under the definition of trade secrets contained in the statute. *Id*. at 584 (emphasis added).

Providing too much information without careful explanation and craft in argumentative memoranda "leaves mysterious exactly which pieces of information are the trade secrets." *Id*; *REXA, Inc. v. Chester*, 42 F.4th 652, 663 (7th Cir. 2022); *Imax Corp. v. Cinema. Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998) ("The plaintiff 'should describe the subject matter of the trade secret with *sufficient particularity* to *separate it from matters of general knowledge* in the trade or of special knowledge of those persons . . . skilled in the trade.'") (emphasis added and citation omitted). Additionally, because such elements as independent economic value are inherent to the definition of a trade secret, it necessarily follows that such showings must be made "per trade

---

[5] As Judge Easterbrook explained,

> [r]eluctance to be specific is understandable; the more precise the claim, the more a party does to tip off a business rival to where the real secrets lie and where the rival's own development efforts should be focused. Still, tools such as protective orders are available to make this process less risky, and unless the plaintiff engages in a serious effort to pin down the secrets a court cannot do its job.

*Idx*, 285 F.3d at 583.

secret." *Synopsys, Inc. v. Risk Based Sec., Inc.*, 70 F.4th 759, 773 (4th Cir. 2023). It is inappropriate to simply produce voluminous amounts of information and "ask[] the district judge to parse through it to determine what seem[s] valuable and generally unknown[.]" *Inteliclear*, 978 F.3d at 660.

The requirement that a plaintiff sculpt and parse out knowns from unknowns, rather than simply pointing to voluminous documents purporting to contain the entirety of information constituting some practice or technology, is similarly implicated by the Utah statute. Indeed, the Utah Supreme Court has required trade secrets plaintiffs to identify trade secrets in a "manner that allows the fact-finder to determine if a trade secret exists under the statute." *USA Power II*, 372 P.3d at 649-50; *accord id.* ¶ 49 n.48 (citing *Utah Med. Prods. v. Clinical Innovations Assocs.*, 79 F. Supp. 2d 1290, 1313 (D. Utah 1999)). It also necessarily requires stringing together a coherent theory of a trade secret in argument, rather than simply citing to raw materials generated through discovery. *Synopsys, Inc.*, 70 F.4th at 769 ("[A] plaintiff does not satisfy his burden by identifying something that 'could qualify as trade secrets,' but also must come forward with 'evidence that these items met the definition of a trade secret.'") (citation omitted). That is, plaintiffs must identify, draw out, and explain with sufficient clarity the trade secrets claimed through their memoranda, rather than simply "cite and incorporate by reference" "documents that purportedly reference or reflect the trade secret information." *Inteliclear*, 978 F.3d at 658.

Virtually every circuit court has elected to follow Judge Easterbrook's reasoning in *Idx* and require this specificity from trade secret plaintiffs. Simply put, a demand for specificity, sculpting, and pinning down of trade secrets at summary judgment has become a matter of

practical consensus in American trade secrets law.[6] These principles have also been explicitly recognized by several district courts of the Tenth Circuit. *See Dodson Int'l Parts, Inc. v. Altendorf*, 347 F. Supp. 2d 997, 1010 (D. Kan. 2004) (collecting cases); *Utah Med. Prods.*, 79 F. Supp. 2d at 1313. As a result, this court determines that the *Idx* standard is properly applicable to the instant action with regard to APT's claims under both the federal and Utah statutes.

Demanding that plaintiffs pin down their alleged trade secrets necessarily follows not only from the statutory definition of trade secrets under the trade secrets statutes but also from the nature and demands of "the summary judgment posture," 2016 UT 20, ¶ 49 n.48, totally independent of any "particularity" requirement *per se*. In order for the court to ensure that a genuine dispute exists, and that a jury's verdict rendered for plaintiffs would be reasonable and based on sufficient evidence, the court must be able to assure itself that a trade secret is reasonably defined. In the trade secrets context, summary judgment properly acts as a filtering mechanism to prevent the submission to a jury of trade secrets claims that would demand the jury to "hunt through the details in search of items meeting the statutory definition." *Idx*, 285 F.3d at 584. This means that the jury must have a sufficient basis to know what the secret *is* and *isn't*.

---

[6] *See TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*, 966 F.3d 46, 54 (1st Cir. 2020) (citing *Idx* and adopting the above-stated standards); *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, 68 F.4th 792, 801 (2d Cir. 2023) (same); *Givaudan Fragrances Corp. v. Krivda*, 639 F. App'x 840, 845 & n.11 (3d Cir. 2016) ("It is patently obvious that trade secrets must be identified with enough specificity to put a defendant on notice of what is actually alleged to have been stolen.") (unpublished); *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 381 (6th Cir. 2022) (citing *Idx* and adopting the above-stated standards); *Inteliclear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 659 (9th Cir. 2020) (same); *Olaplex, Inc. v. L'Oréal USA, Inc.*, 855 F. App'x 701, 712 (Fed. Cir. 2021) (unpublished).

A failure to parse out what's known or readily ascertainable from what's truly unknown can undermine courts' confidence in jury verdicts. This point is evidenced by the Tenth Circuit's recent reversal of a district court's denial of a defendant's renewed motion for judgment as a matter of law following a jury verdict in favor of a trade secrets plaintiff. *See generally Bimbo Bakeries*, 39 F.4th at 1250. While the Tenth Circuit stated that it did "not doubt" that plaintiff had a protectable trade secret, it held that "the versions it tried to claim in [the] litigation are far too broad to be protectable." *Id*. at 1270.

At summary judgment, there is "no presumption" of a protectable trade secret to a plaintiff's benefit, and to avail itself of the benefits of the instructional jury trial, a plaintiff is obliged to reveal what the trade secret is, what it is not, and why it is valuable. *See Water & Energy Sys. Tech., Inc. v. Keil*, 1999 UT 16, ¶ 12, 974 P.2d 821. This does not demand that the plaintiff prove its case at summary judgment, but it at least demands that it specify what it is it claims to be known, generally ascertainable, or unknown and thereby constitutive of the secret. *USA Power II*, 2016 UT 20, ¶ 48 (emphasis added).

Trade secrets plaintiffs must assure the court that the theory presented to the jury will be coherent and capable of supporting a favorable verdict. Simply stating that the hard work will be done later—at trial—is not enough. As the Ninth Circuit stated in *Inteliclear*, "[c]ourts and juries [] require precision because, especially where a trade secrets claim involves a sophisticated and highly complex system, the district court or trier of fact will not have the requisite expertise to define what the plaintiff leaves abstract." 978 F.3d at 658.

### B.  Considerations Imposed by "Compilation" Trade Secrets

APT rests the weight of its case on a compilation theory of trade secrets. Every trade secret claimed by APT in its responses to Defendants' interrogatories is described by APT as a

17

compilation trade secret. *See* Ex. 8 at 9-10, 13, 15, 17, 19-26, 50-54, 57, 63-64, 67, 72-73. What's more, and as is discussed below, APT asserts that several of its compilation trade secrets consist of compilations of other compilations.

Generally, compilations of information may be considered trade secrets, even if each constituent piece of information is in the public domain, so long as "the unified process, design and operation of" such compilation meets the statutory definition. *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003). However, the latent demand for specificity and parsing in the definition of a trade secret, baked into the uniform trade secrets statutory definitions and inherent to preparation of a case for submission to the jury, is particularly pronounced where, as here, compilation trade secrets are at issue. *See Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 381 (6th Cir. 2022); *accord USA Power II*, 2016 UT 20, ¶ 49.

In making a determination of whether a compilation is protectable, borrowing from Utah law's articulation of a general standard provided by the Restatement of Torts, the court looks to

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in its business; (3) the extent of measures taken by the business to guard the secrecy of its information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*USA Power I*, 2010 UT 31, ¶ 45, 235 P.3d 749; *accord Bimbo Bakeries*, 39 F.4th at 1261.

Because every trade secret claimed by APT is styled as a compilation, APT is required to identify sufficient information for the fact-finder to establish that the compilations were sufficiently pinned down. Sufficient evidence must be adduced that something about this particular compilation, and the relationship between information contained therein, was actually

secret under the statutory definition and itself generated value through secrecy. *See SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 491 F.3d 350, 354 (8th Cir. 2007) ("[S]imply to assert [that] a trade secret resides in some combination of otherwise known data is not sufficient [to prove a claim], as the combination itself must be delineated with some particularity in establishing its trade secret status."). As is discussed below, in the case of compilation trade secrets consisting of other compilations of trade secrets, these demands for specificity are necessarily heightened yet again, preventing a free-fall into abstraction or confusing the jury. As is the case with all trade secrets, compilation trade secrets must create discrete value. *See Synopsys, Inc.*, 70 F.4th at 772.[7]

### C.  APT has Failed to Carry its Burden

With these standards in mind, the court concludes that APT has failed to sufficiently carry its burden of identifying, defining, and parsing out its claimed trade secrets in this case. Relatedly, the court concludes that APT has failed to adduce sufficient evidence to support a finding that its trade secrets are independently valuable. APT's opposition memorandum—along with its responses to interrogatories and expert reports—fail to disclose the trade secrets or their value with sufficient clarity such that the court or a jury could meaningfully identify the secrets or render a verdict on APT's behalf without relying on mere conjecture. It is not enough for APT

---

[7] This also means that the compilation of information actually existed and is not merely a post hoc grouping of information ginned up for the purpose of litigation. *See Coda Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 2023 U.S. Dist. LEXIS 57556, 2023 WL 2734684, at *20 n.12 (N.D. Ohio Mar. 31, 2023).

to argue that determining the existence of trade secrets "is an intensively factual inquiry," Opp'n Mem. at 53, and assert that summary judgment is inappropriate as a result.[8]

APT's arguments reflect broad assertions that fail to provide evidence on which a reasonable jury could conclude that the statutory definition of trade secrets has been met. *Idx*, 285 F.3d at 583-84. While Plaintiff's opposition memorandum insists that it has identified the trade secrets at issue, it has not. Rather, it provides, at times, paragraph-long string cites lacking explanatory parentheticals or any identifiable structure. In many cases, the citations seem to be included merely because they refer to the trade secret, not because they meaningfully disclose the secret, parse out known or readily ascertainable information, or explain the value proposition. In some cases, the citations are simply *non sequitur*.

APT argues that it "explained the trade secrets" in response to Defendants' interrogatory number 1. *See* Opp'n Mem. at 4. However, APT's responses to Defendants' interrogatories reveal only cursory, high-level descriptions of *categories* or *sources* of information allegedly comprising each trade secret, without much more. Even worse, when prodded to "identify and explain all facts and sources of information that support, refute, or otherwise relate to any contention that Plaintiff's trade secret derives independent economic value from not being generally known to and not being readily ascertainable through proper means by another person" (Defendant's interrogatory no. 6), APT elected to state generally and in cursory terms that "APT's trade secrets have tremendous economic value from not being generally known and from not being readily ascertainable." Ex. 8 at 89-90; *contra Synopsys, Inc.*, 70 F.4th at 769-74. Rather

---

[8] In fact, APT's argument that it has identified and defined protectable trade secrets is somewhat cursory, consisting of just over a page of argument. Opp'n Mem. at 52-54. As a result, the court relies on APT's responses to Defendants' statements of undisputed facts to glean some sense of APT's theories of the trade secrets, their boundaries, and what they claim or exclude.

than speak to each trade secret (or any in particular) to explain how value is to be proved, or to acknowledge what aspects of each compilation is already known within the industry (or otherwise readily ascertainable), APT remarks on its general business investments, market influence, and industry awards. *Id*. at 90.

Other materials produced by APT are hardly more specific. They do not meaningfully identify *what* in each trade secret ought to be picked out of the compilation as generally known or readily ascertainable. Neither do they reveal *how* each compilation trade secret derives value from not being generally known, taken as a whole. APT consistently resorts to general contentions about investment and development costs of T&L generally without speaking to particular trade secrets sufficient to support a jury finding that the compilations meet the statutory definition of a trade secret in the first place. But APT's efforts to assert its own general corporate value in lieu of demonstrating the independent economic value of each claimed trade secret is tantamount to "sleight-of-hand" in a failed effort to stave off summary judgment. *Synopsys, Inc.*, 70 F.4th at 769-74.

Elsewhere (such as in the case of trade secret (m)), APT fails to identify what parts of voluminous documents allegedly containing secrets aren't part of the secret, might not be generally known within the industry, or aren't readily ascertainable. Thus, there is insufficient record basis for a lay jury to conclude that a trade secret existed under the statutory definition. The demand that a plaintiff identify what is not generally known in the industry is not necessarily onerous. For example, *USA Power II* simply states that "it is necessary for the fact-finder to know what it is that the plaintiff *claims* is not generally known or readily ascertainable." 2016 UT 20, ¶ 48 (emphasis added). Thus, adducing sufficient evidence to satisfy the demand of *USA Power II* does not mean marshaling conclusive evidence that some aspects of a claimed secret

are known or unknown. But, at the very least, it requires identifying what a plaintiff *claims* is known or not with reasonable specificity and providing some evidentiary basis for the elements of the statutory definition (for example, the independent economic value of the claimed secret).

Similarly, it is not enough to place on the doorsteps of the court volumes of expert reports, technical documents, and other materials (or incorporate such materials by reference through string cites in memoranda), insist that somewhere in all of it lies bits and pieces of information that could be assembled in such a way that resembles the statutory definition of a trade secret, and declare that there is a genuine dispute as to a material fact.[9]

To do so is to treat the court or a finder of fact like a "pig[], hunting for truffles buried in briefs." *Rocky Mt. Wild, Inc. v. United States Forest Serv.*, 56 F.4th 913, 927 (10th Cir. 2022) (quoting *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995)). "A party may not simply point toward a pile of sand and expect the court to build a castle. In both district and appellate courts, the development of an argument is a party's responsibility, not a judicial duty." *Salt Lake City v. Kidd*, 2019 UT 4, ¶ 35, 435 P.3d 248. And, against the counsel of *Idx* and *Inteliclear*, 978 F.3d at 658, much of APT's opposition memorandum leaves it to the court to piece together what is supposed to be within the ambit of the trade secrets, what's without it, and how independent economic value is to derived from the secret or combination of secrets. For this reason alone, summary judgment is appropriate.

---

[9] APT seems to suggest throughout its opposition memorandum that it will show its hand down the line—that once it is speaking to the jury, it will divulge its secrets and what it means when it refers to "methods" and "how" it accomplishes certain tasks in a valuable, secret manner. But the jury can only render verdicts based on the evidence presented to it—it cannot justifiably and reasonably conclude that some compilation of information generated value for APT without a genuine and credible factual basis. Thus, based on what APT has presented to this court, a verdict in its favor would be ripe for a meritorious motion as a matter of law as was the case in *Bimbo Bakeries*. 39 F.4th at 1260.

Summary judgment was Plaintiff's chance to put its cards on the table and make an argument, rather than simply string-cite exhibits and insist that from the mosaic of exhibits a trade secret might emerge at trial. *See SEC v. GenAudio Inc.*, 32 F.4th 902, 942 (10th Cir. 2022) (citing *Citizens for Appropriate Rural Rds. v. Foxx*, 815 F.3d 1068, 1077 (7th Cir. 2016)). Simply stated, this court will not do APT's job for it by mining its trade secrets from the raw materials, dusting off known information and techniques, and preparing its case for submission to the jury. Neither will it act as stage director to "prod the actors through rehearsals until the proper performance is achieved." *Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000). For these reasons, the court concludes that summary judgment on APT's remaining claims, pleaded under the federal and state trade secrets statutes, is appropriate.

### D.  A Note on Utah Law and the "Particularity" Requirement

As discussed above, the court concludes that APT has fallen short of the demands of both the federal trade secrets statute and the Utah uniform trade secrets statute. In doing so, this court considered restatements and discussions of trade secrets law from both federal and Utah courts. However, it acknowledges that, due to some lack of clarity in Utah precedent (including regarding the relationship between the Utah courts' standards and the standards generally adopted by other jurisdictions), there may be some potential daylight between the particularity demanded from the two statutes in defining and describing trade secrets at summary judgment.

Unlike the courts of some other states (as well as the great weight of federal circuit courts), the Utah Supreme Court has declined to read into Utah's uniform trade secrets statute a *per se* "particularity" requirement, *see id.* ¶ 48 & n.44. Considering Utah's disclaimer of a particularity rule, it seems that, at times, some federal circuit courts have adopted interpretations of the federal statute (or, often, the uniform statute) that outstrip the demands of the Utah courts.

23

For example, the Seventh Circuit, in interpreting the uniform trade secrets statute, recently stated that case law in that circuit "requires a *high level of specificity* when a plaintiff makes a claim for misappropriation of a trade secret." *REXA*, 42 F.4th at 663 (emphasis added).

Because of the arguable divergence between state and federal law as it relates to the particularity requirement, the court emphasizes that it did not rely on a demanding particularity requirement in its consideration of APT's two remaining claims. Even under the seemingly more lax standard that Utah courts have adopted under its iteration of the uniform statute, this court is satisfied that, putting any "particularity" requirement to one side, APT has nonetheless failed to "define[] [the claimed trade secrets] in a manner that allows the fact-finder to determine if a trade secret exists under the statute." *USA Power II*, 2016 UT 20, ¶ 48. Similarly, APT has failed to identify the trade secret "in a manner that would allow the fact-finder to determine if it met the statutory requirements of" the trade secrets statute, *id*. ¶ 49, in many cases because it failed to inform this court of "what it is *that* [*it*] *claims is not generally known* or readily ascertainable," *id*. ¶ 49 (emphasis added), as demanded under both federal and Utah law.[10]

### III.    APT's Claimed Trade Secrets

#### A.  Trade Secret A: Standard Deployment Guide

The court now turns to the particular trade secrets claimed by APT and the parties' arguments as to whether each is sufficiently identified and defined. The first trade secret claimed by APT (trade secret (a), the "Standard Deployment Guide") is a seven-page document. Ex. 42. It

---

[10] To the extent that there is meaningful variation between the two standards, APT's failure is particularly marked in the arena of federal law as to its federal claim, which clearly demands a much higher degree of particularity and specificity in the demarcation of trade secrets.

is alleged to contain "the logical architecture, types of servers, specific software, maintenance routines, security features and protocols, etc. related to APT's Test & Learn software," Mot. at 51 (cleaned up), itself supposedly including "multiple" compilation trade secrets. Ex 8 at 19-20. APT argues that its amended responses to MarketDial's interrogatories sufficiently explain and define trade secret (a), including "by incorporating the document . . . which contains the trade secrets." Opp'n Mem. at 13. However, the Standard Deployment Guide itself does not provide a sufficient evidentiary basis for the fact-finder to conclude that a trade secret existed.[11]

Similarly, APT's responses to MarketDial's interrogatories simply describe the type of information contained in the Standard Deployment Guide,[12] rather than delineating the boundary of what, exactly, is secret therein. Ex. 8 at 8-9. That is, APT fails to identify what about the logical architecture, types of servers, specific software, maintenance routines, etc., is secret or otherwise meets the statutory definition.[13] The interrogatory response simply concludes with a

---

[11] Simply incorporating, by reference, the document purportedly containing the trade secret falls squarely within the error identified by Judge Easterbrook in *Idx*. Citing the document itself "does not separate the trade secrets from the other information that goes into any other" technical architectural design. 285 F.3d at 583-84.

[12] That is,

> information *concerning* the logical architecture, types of servers, specific software, maintenance routines, security features and protocols, hosting facilities, flow and nature of client communications, data transfer protocols, backup structure and procedures, third party services used, client services, timetables for roll-outs, and support offerings with respect to building T&L teams.

Opp'n Mem. at 13-14 (emphasis added).

[13] For example, an APT expert says that the disclosures made by the Standard Deployment Guide must be viewed "in conjunction with the overall compilation of information" that MarketDial had access to—a far cry from clearly delineating the secret and its independent economic value or outlining how this compilation itself is protectable under the standards delineated in *USA Power II*. Ex. 38 at 202:7-16 ("[The Standard Deployment Guide] discloses the technical infrastructure. It discloses what the data center should look like, what protocols to use, backup

pleading-like, cursory allegation that the secret derives value under the statutory definition of trade secrets without saying how or why. *Id.* at 9.[14]

---

solutions, installations, support requirements. And, again, you have to see that in conjunction with the overall compilation of information that MarketDial and Mr. Stoddard had access to."); *accord* Ex. 15 at 155:14-156:5; *contra Synopsys, Inc.*, 70 F.4th at 769-74.

Even where, for example, APT's designated representative identifies certain practices purportedly described in the Standard Deployment Guide as unique, Ex. 30 at 38-42 (testimony of APT designated representative regarding the purportedly unique "zero footprint user interface" and "format types that we will allow data to be accessed in, such as HTML"), APT's own experts equivocated on the question of whether the practices outlined in the Standard Deployment Guide were generally known or readily ascertainable:

> I do view single decisions here as being trade secret information in addition to the compilation. Coming back to the fact that a number of these are actually -- while not unique to APT, were not the common industry standard choice in every case and were done in a way that required additional innovation in the software such that we viewed it as a competitive advantage and confidential.

Ex. 29 at 145:9-146:6.

But, as the Federal Circuit has recognized, "[a] method that is infrequently used (i.e., is unconventional) may well be readily ascertainable—or even generally known." *Olaplex*, 855 F. App'x at 710 (Fed. Cir. 2021) (unpublished). Thus, testimony that a method or practice is uncommon in an industry, without more, does not provide an evidentiary basis for a fact-finder to conclude that information is secret under the statutory definition, which demands more than mere unconventionality. *USA Power II*, 372 P.3d at 649; *Idx*, 285 F.3d at 583-84.

[14] APT's citations to other exhibits and documents are no more instructive. For example, APT cites to Ex. 122 ¶¶ 312, 315. Paragraph 312 cursorily states that the Standard Deployment Guide "is an example of teaching the sequence of steps for subscriber focus. It teaches that as part of the installation phase of a system like APT's, the vendor must be prepared to offer concurrent professional services to subscribers for building the Test and Learn team; helping institutionalize a Test and Learn process; further assistance with business questions." Similarly, paragraph 315 states that the document "also taught the importance of security for clients wanting to use business predictive analytics testing software and disclosed confidential information about APT's architecture, deployment, implementation, security and client relationships." *Accord* Ex. 125 at ¶¶ 129-30.

But claiming that the document teaches a lesson is not the same as explaining, with any clarity, what the lesson is or explaining how it is not generally known or creates independent economic value. Other exhibits cited do nothing more than reference the Standard Deployment Guide. For example, Exhibit 124, ¶ 34 merely states that the Standard Deployment Guide contains "confidential information" and refers to broad classes of information without any more.

In combing through APT's other cited exhibits, the court did find one reference that was somewhat more specific. In one exhibit, APT's designated representative describes "three different user interface elements that we provide to the customer. They would include the web server, the reporting server, and the map rendering server," purportedly unique to APT "in the way [it] set them apart." Exhibit 30 at 32:15-33:18. But "the way [APT] set them apart" is not disclosed, and there is not indication as to whether such way of setting the servers apart is readily ascertainable or known within the industry, how such setting apart interacts with other information within the Standard Deployment Guide compilation, or how it might provide value by not being generally known as a whole compilation.[15]

APT contends that some emergent characteristic of all of these citations, put together, reveals a secret, trims what's already known or readily ascertainable, and demonstrates independent economic value. But the court, having reviewed the materials cited, disagrees. The court thus determines that APT's claimed trade secret (a) is not backed by sufficient evidence to

---

[15] APT's general allegation that some information identified in the Standard Deployment Guide is "critical to" the operation of predictive business analytics software, without more, fails to demonstrate this value. APT cites to deposition testimony that the Standard Deployment Guide is "trying to share with the customer that the system we have built is highly available . . . performing, . . . monitored correctly," etc. Exhibit 30 at 53:19-54:8. But this does not provide an evidentiary basis for a finding that the Standard Deployment Guide met the statutory definition of a trade secret.

This is especially true where another of APT's experts couldn't say "[w]hether or not" the components of the technical architecture are "put together in some way that's unique or different." Ex. 15 at 155:14-157:22 ("Yeah, I guess I would just have to say, there are some standardized components that are on this summary list. Whether or not they are put together in some way that's unique or different, I honestly don't know. It doesn't necessarily look like it, but it may or may not. I just don't know[.]").

support a finding that it satisfies the definitional elements of a trade secret under the federal or state statutes.[16]

## B.  Trade Secret B: Partner Capabilities Briefing

APT claims as trade secret (b) a presentation or presentations offered to McKinsey, which purportedly contain secret information regarding APT's corporate structure, capitalization, client locations, client identities, key benefits of T&L, etc. Mot. at 53; Opp'n Mem. at 16-17; Exs. 43, 144. APT claims that trade secret (b) is a compilation trade secret. Ex. 8 at 20; Opp'n Mem. at 18. The Partner Capabilities Briefing speaks to APT practices and T&L capabilities—such as how null simulations are repeatedly applied. Opp'n Mem. at 18. However, it remains unclear what APT is claiming as a trade secret: is it claiming the use of such null simulations or some particular methodology supposedly disclosed in the Partner Capabilities Briefing? In either case, APT fails to provide sufficient evidence from which the fact-finder could conclude that such information is non-public or not otherwise readily ascertainable to those in the industry, and how independent economic value could thus be derived.[17]

---

[16] Additionally, the court harbors grave doubt that APT has adduced sufficient evidence to show that the information claimed as trade secret (a) was misappropriated or used. APT provided only equivocal, oftentimes speculative statements about the possibility of misappropriation and use of a secret (even assuming, *arguendo*, that there was a secret in the first place). When asked, for example, "[d]o you know if MarketDial's technical systems and processes in any way mimic what is found in this Standard Deployment Guide," the APT consultant and expert witness testified, "I know a few high-level details of ways that it would mimic it in terms of -- as claimed by MarketDial publicly being, you know, cloud-based solution, but no details of how it would follow this beyond that." Ex. 29 at 135:1-8.

[17] *E.g.*, Ex. 124 at 10-11 (describing the secrets in the Partner Capabilities Briefing as, *inter alia*, "confidential case studies," "an appendix with rich technical information and company practices," and a portion of the appendix showing how null simulations were repeatedly applied to find a distribution of null outcomes, which can be used to adjust variables and select control sites to achieve the most accurate outcomes"); *accord* Ex. 29 at 155:4-160:5; Ex. 15 at 194:1-195:5, 198:11-199:25.

28

Other evidence cited by APT is equivocal, abstract, or off-point in crafting an explanation for the Partner Capabilities Briefing's value proposition. Instead, it merely offers "assumptions or speculations" that the Partner Capabilities Briefing would "assist [in the formation of a business relationship with McKinsey] by educating principals at McKinsey about the methods, business models, design, [and] customer interfaces [of T&L]." Ex. 38 at 118:2-119:12; *accord* Ex. 15 at 198:11-199:25.[18]

A somewhat detailed walkthrough of the Partner Capabilities Briefing cited by APT as identifying the secret, *see* Ex. 125 ¶¶ 30-89, similarly fails to parse out and flag what information might be known or generally ascertainable within the industry. While the testimony provided by this Exhibit speaks to the perceived value of the information provided in the Partner Capabilities Briefing, it fails to identify what information therein is or is not generally known or readily

---

[18] The second citation provided for the proposition that the Partner Capabilities Briefing was independently valuable, Ex. 125 ¶ 23, is total *non sequitur*. APT arguably comes closer to showing why information in the Partner Capabilities Briefing might be economically valuable through the report of its proffered experts. *See* Ex. 122 ¶¶ 306-311 (testimony regarding the value of "knowing the list of tests specific to the financial services sector and other in advance" as a "must have"); Ex. 124 ¶¶ 23, 33 (testifying that value is gained by shortcutting a "lengthy and costly trial-and-error process"). But these experts nonetheless fail to explain the dimensions of the secret or provide sufficient information from which the fact finder could conclude that this knowledge is not generally known or readily ascertainable.

APT asserts that the Partner Capabilities Briefing contained information that not "all clients . . . would be commonly doing" or "that are not obvious." Ex. 122 ¶¶ 721-23. But this is not the same as claiming that the information in the Briefing was not generally known or readily ascertainable within the industry. And while optimal control group selection may no doubt be important (even independently economically valuable), as APT's expert testified, APT does not thread the needle of building a case as to how the Partner Capabilities Briefing offered not-generally-known techniques, methods, or information regarding optimal control group selection in such a way that created independent economic value. See Ex. 121 ¶¶ 93-94 ("Better control matching increases the statistical power of a test, which is fundamental to the science of testing.").

ascertainable.[19] And APT's expert's testimony on this point is insufficient to provide a proper basis for a fact-finder's conclusion that the information is not generally known or readily ascertainable. Rather, it is akin to the 43-page "description of the methods and processes" found to be insufficiently specific, and which failed to separate knowns and unknowns in *Idx*. *See* 285 F.3d at 583-84.[20] For this reason, a verdict in APT's favor would be vulnerable for much the same reasons as in *Bimbo Bakeries*.

### C. Trade Secret C: T&L Effectiveness Guide

Trade secret (c), the Effectiveness Guide, Ex. 44, is another slide presentation (titled "Using APT Test & Learn to Drive Marketing Effectiveness"), allegedly containing secret information regarding APT's use of client data feeds combined with APT data. Mot. at 55-56. APT contends that trade secret (c) is a compilation trade secret. Ex. 8 at 21. APT's opposition memorandum cursorily states that trade secret (c) "contains trade secret information as to specific aspects of APT's business and software," Opp'n Mem. at 23, and calls the presentation "a roadmap for developing a successful predictive analytics software business with a playbook for how to build, market, sell and deploy a predictive analytics software to clients." *Id*. APT also

---

[19] Even where APT comes closest to doing so, however, it remains general: For example, APT's expert claims that "[w]hile the use of null simulators is a well-known concept in statistics, the way that APT discloses its use of simulators to assess parameters and strategies is unique to APT." *Id*. ¶ 68. However, the expert does not clearly identify what it is about APT's use of null simulators, exactly (described in scarce detail in the several preceding paragraphs) that is unique.

[20] APT states elsewhere that information "in the Partner Capabilities Briefing[] was confidential and meets the definition of trade secret," followed by a string cite, Opp'n Mem. at 22, demonstrating a failure to grapple with its burden to show the existence of a trade secret and instead placing on this court the burden of sifting through its discovery materials to make an argument on its behalf. This is especially true where one citation, Ex. 8 at 4-74, consisting of 70 pages of information, lacks meaningful parsing of what's known from what's unknown in the industry, and where other citations are off-point, Ex. 31 at 93:6-17 (containing *non sequitur* testimony), or only relevant in a highly attenuated sense. *See* Ex. 33 at 239:9-245:5.

cites to the slide presentation itself, Ex. 44, and its response to MarketDial's interrogatories, as further defining the trade secret claimed.

But APT's responses to the interrogatories simply state that the slideshow discloses "how" T&L accomplishes any number of tasks and functions, Ex. 8 at 11-14, explaining neither how the slideshow does this, nor what information might be already known or readily ascertainable within the industry. And despite claiming, in its interrogatory responses, that trade secret (c) discloses the "how" behind so many processes, APT's experts were significantly more equivocal.[21] For largely the same reasons as the Partner Capabilities Briefing, *see* Ex. 15 at 219:13-220:11, APT has not carried its burden of demonstrating that claimed trade secret (c) qualifies as a protectable compilation trade secret.[22]

### D.  Trade Secrets D & E: McKinsey Discussions, Information

Trade secrets (d) and (e) consist of the broader corpus of discussions and documents shared by APT with McKinsey, including "the totality of the information shared with [Mr.]

---

[21] APT experts claimed, for example, that although the slideshow does not actually explain "the methods behind" APT's identification and matching of key attributes to minimize bias and improve measurement accuracy, Ex. 38 at 169:13-24, the inclusion of attribute bias in the user interface, by itself, is part of a compilation trade secret. *Id*. at 169:13-24, 169:25-172:20; *accord* Ex. 15 at 222:1-13 (testimony, in response to the question "what's confidential or trade secret about the information about Mastercard that's set forth in slides 28 through 31," "Yeah, I -- I don't know"). None of this is sufficient to create a basis for a finding in the Plaintiff's favor by a reasonable jury. Again, what is known or readily ascertainable and what is not would be ripe for fact-finder speculation.

[22] APT is particularly guilty here of obfuscating argument by pointing the court to documents referenced in other documents. Opp'n Mem. at 23. And although this court is not obligated to make APT's arguments for it, it concludes upon review of the documents cited that APT has failed to adduce sufficient evidence of a protectable trade secret that has been wrongfully misappropriated.

Stoddard." Mot. at 57. As a compilation of compilations,[23] these claimed trade secrets become even more attenuated from any specific and particular actual technique, process, methodology, or any discrete information. The frailty of compilation-of-compilation trade secrets is further discussed below.

However, beyond cursorily alleging that these secrets have value, APT has not adduced sufficient evidence of such value. Here, APT is guilty of "point[ing] to broad areas" of information and "assert[ing] that something there must have been secret and misappropriated." *USA Power II*, 2016 UT 20, ¶ 49 (internal quotation marks omitted). Worse yet, APT points to broad classes of communications without even parsing out information supposed to have been communicated. Opp'n Mem. at 15. Whether or not such a trade secret could later be made out of all of this information is beside the point—what matters is that APT failed to do so when opposing summary judgment.

APT's descriptions of these compilations are broad, cursory, and non-specific. Ex. 8 at 14-15. Its attempt to break trade secret (e) into subparts e.1-e.16, while creating an additional veneer of complexity, neither refines the contours of the claimed trade secret nor meaningfully advances APT's burden of establishing a compilation trade secret. As before, APT insists that trade secret (e) discloses any number of "method[s]" or ways "how" T&L accomplishes certain tasks without actually identifying the underlying "how" or satisfactorily explaining what is secret, what isn't secret, and how independent economic value is derived.

### E.  Trade Secret F: Client Identities

---

[23] These trade secrets are themselves supposed to be compilations and trade secret (e) is itself claimed to be a compilation of trade secrets (a)-(d).

APT has elected not to pursue its claim under trade secret (f), and the court does not address it here. *See* Opp'n Mem. at 27.

### F.  Trade Secret G: T&L Presentation

Claimed trade secret (g) consists of a slide presentation, Exs. 47, 48, which contains T&L "formatting, presentations, tables and graphical user interface and how it could be used to deliver value to business clients as part of a predictive business analytics software business." Ex. 8 at 49. The slideshow is a "subset" of the Partner Capabilities Briefing. Opp'n Mem. at 28. And because APT has not demonstrated that the Partner Capabilities Briefing is or contains a trade secret (as discussed above), trade secret (g) fails for the same reasons.

### G.  Trade Secret I: Torrid Presentation

Claimed trade secret (i) consists of a slide presentation given to Ms. Choi, then an employee of Torrid. Ex. 8 at 52. APT states that trade secret (i) should be understood as a compilation trade secret. Opp'n Mem. at 28. The slideshow, Exs. 50, 52, appears to contain relatively high-level information about APT formulated as a pitch to potential clients. And, as with the other slide presentations previously discussed, it is unclear what, in particular, is supposed to be secret about such presentations or how independent economic value is to be derived therefrom. Here, too, APT's opposition memorandum relies on its interrogatory responses. Ex. 8 at 52-53.[24] However, these responses are similarly vague. They state little, if anything, more than that the presentation includes "limited aspects of APT's trade secret user interface, software algorithm, and methodology," "detailed descriptions of . . . confidential

---

[24] APT's opposition memorandum, at 28, cites to Ex. 8 at 49-51. The court understands this to be a scrivener's error, however, as Ex. 8 discusses claimed trade (i) at 52-53, not 49-51.

software," and allegations that such secrets derived independent economic value from not being generally known. *Id*.[25]

### H. Trade Secret K: Guitar Center Presentation

Claimed trade secret (k) consists of a series of slide deck presentations, Exs. 53-60, offered to Guitar Center. Mot. at 60. Trade secret (k) is voluminous and consists of hundreds of slides containing information about APT generally and T&L in particular. However, as above, insufficient evidence is adduced to support a jury verdict in APT's favor.[26]

---

[25] One of APT's experts repeatedly states that the Torrid presentation contained trade secret information, Ex. 122 ¶¶ 373, 585-86, 686-87, 806, and points to one email discussing apparently technical details. Ex. 122 ¶¶ 686-87. However, APT fails to adduce a sufficient evidentiary basis to support a favorable verdict by claiming what in the email is not known or readily ascertainable or how independent economic value is derived therefrom.

Additionally, the court is skeptical that an "expectation/implied agreement" between Ms. Choi and APT, Opp'n Mem. at 29, could satisfy the misappropriation or improper means elements of the trade secret definition. *See Sw. Stainless, Ltd. P'ship v. Sappington*, 582 F.3d 1176, 1190 (10th Cir. 2009). However, because the court concludes that a protectable trade secret has not been sufficiently identified, it need not reach this issue.

[26] APT's interrogatory responses cited in its opposition memorandum do not meaningfully assist the court in understanding the boundaries of the claimed trade secret and would similarly be of little or no aid to the finder of fact. *See* Ex. 8 at 57-62 While APT's memorandum mentions the presence of "trade secrets relating to" such things as APT's Market Basket Analyzer, APT's Benchmarker, and new developments in T&L, it fails to explain what these secrets are in context, as well as what exactly it is that is claimed to be not generally known or readily ascertainable in any way that generates independent economic value. *Id*. at 58. Instead, APT's responses generally focus on its theory of misappropriation but fail to sufficiently identify or prove the existence of any protectable compilation trade secret in the first place.

APT's other citations purportedly demonstrating the trade secrets identified in (k), Opp'n Mem. at 30, do not even relate to the trade secret, and APT's citations purporting to demonstrate independent economic value fail to do so. *E.g.*, Ex. 21 at 105:4-20 (explaining Josh Baran's employment history with Guitar Center, but not relating in any way to the purportedly secret information shared with him); Ex. 14 at 198:19-199:1, 211:20-212:2 (explaining labels on the slides designating them as confidential, but not describing the purportedly secret information); Ex. 33 at 107:6-18 (merely mentioning the Torrid presentation); Ex. 29 at 254:10-256:14 (discussing the pricing strategy at issue in the slide deck but failing to explain any theory of independent economic value).

### I.  Trade Secret M: Client Data Feeds

Claimed trade secret (m) is a compilation trade secret. Opp'n Mem. at 31. It includes information regarding

> (a) the types of data [] needed to perform accurate and productive predictive analytics tests; (b) identification of the specific client's best sources of data; (c) mapping and correlation of relationships among data sets; (d) validation and cleansing of data; and (e) updating of data based upon APT's confidential experience and knowledge.

Opp'n Mem. at 31.

The data feeds contain, according to APT, "tailored data points APT requested" from clients, from which the "specific types of data required" may be inferred, including data points requested from particular clients. *Id*. at 32. APT identifies seven documents, Ex. 8 at 69-70, which explore and explain the purported trade secret as it relates to selecting, linking, and analyzing data. *Id*. Even though the Defendants were not alleged to have access to these documents themselves, APT argues that they misappropriated the underlying "know-how" by obtaining the data feeds. Opp'n Mem. at 33.[27]

---

Even where particular pieces of information purportedly contained in the Guitar Center presentation are identified, including information about the Basket Analyzer, Ex. 122 ¶¶ 361-70, APT does little more than allege that information obtained by MarketDial included "information about APT's Basket Analyzer that was not for public consumption." *Id*. ¶ 362 (emphasis added). That such information was not for public consumption, of course, is a far cry from not being generally known or readily ascertainable. *E.g.*, *Olaplex*, 855 F. App'x at 710 (Fed. Cir. 2021) (unpublished).

[27] APT discloses some of the data points requested from one individual client, Maverik. Ex 122 at 165-169, 173-75 (listing some categories of data points requested from Maverik). While APT does not disclose the actual data points that would have constituted trade secrets in the data feeds of other clients, APT argues that MarketDial's acquisition of other data feeds would constitute misappropriation for the same reasons as with Maverik. *See id*. at 182-86. From this information, APT argues that MarketDial was able to both glean a sense of key data inputs as to particular clients for its software platform and gain insight as to data cleansing processes developed by APT, thereby bypassing costly trial and error processes. *Id*. ¶¶ 496-99.

APT's explanation of the secrecy and independent economic value of the information within trade secret (m) in its interrogatory response is too cursory and general to match the statutory definition of trade secrets:

> The APT Data Feeds from clients were built on APT's confidential trade secret information. The APT Data Feeds were built on APT's own, confidential approach that constitute APT's trade secrets. The APT Data Feeds built by APT with clients using APT's trade secrets were valuable to clients, would be valuable to competitors, and could not be reasonably ascertained by a competitor without obtaining access to APT confidential information. A client using APT's Test & Learn software would have additional visibility into how the APT Data Feed was structured and used in the Test & Learn software. In APT's experience, its clients never had data organized in as broad and valuable of a way before working with APT to determine the types of data to organize and provide to APT[.]

Ex. 8 at 71.

The testimony APT offers to show secrecy of claimed trade secret (m) is similarly imprecise and fails to parse out what is claimed to be secret against what is claimed to be generally known or readily ascertainable.[28] Neither does APT provide a sufficient evidentiary basis for a finding that trade secret (m) created independent economic value from not being generally known. Ex. 8 at 71; *see also* Ex. 39 at 145:18-146:7, 146:12-154:25, 190:6-25, 223:5-18.[29]

---

[28] *See* Ex. 39 at 150:16-151:20, 152:5-154:19 (expert testimony claiming that MarketDial "benefited" from access to the data feed information, but in no way parsing out what is or is not known or generally ascertainable); *id*. at 190:6-25 (testimony regarding the general nature of the data feeds); *id*. at 223:5-18 (explaining, in broad terms, that although MarketDial's hardware and software tools were different, it received "a blueprint as to what to do from the confidential and proprietary information"). Merely claiming that the data feeds provided a blueprint for success, however, is a far cry from carrying the burden of adducing sufficient information to show that the data feeds could constitute a trade secret under the relevant statutory definitions.

[29] While the nature and boundaries of trade secret (m) receive significantly more expert attention and detail than the other claimed trade secrets, *see* Ex. 122 at 163-94; Ex. 121 at 43-50, APT nonetheless fails to claim or identify what aspects of the data feeds are generally known or readily ascertainable. *USA Power II*, 2016 UT 20, ¶ 48; *Idx*, 285 F.3d at 583-84.

### J.  Trade Secrets H, J, L, N: Metacompilations

APT's remaining claimed trade secrets—(h), (j), (l), and (n)—are compilation trade secrets consisting of various combinations of other claimed trade secrets. Again, because many of the other trade secrets claimed are themselves compilations, trade secrets (h), (j), (l), and (n) are compilations of compilations (or, in short, metacompilations).

APT argues that its interrogatory response sufficiently defines these compilation trade secrets. *See* Ex. 8 at 74-79. But this interrogatory response and its amendments do little more than reference its voluminous responses to other interrogatories, which APT also cites as defining the compilation trade secrets in its opposition memorandum. *See* Opp'n Mem. at 36 (citing Ex. 8 at 4-74). Pointing to 70 pages of general descriptions of categories of information claimed to have been misappropriated is not specific enough, *Idx*, 285 F.3d at 583-84, nor does it serve to adduce evidence that the metacompilations satisfy any of the elements to be considered

---

APT experts, for example, cite the illustrative example of information regarding "store remodels," Ex. 122 ¶ 472, as one example of "key inputs" reflected in APT data feeds requested from clients. However, APT's expert report again resorts to generalities by stating that "APT asked for specific store remodel data inputs," *id*., and while "anyone can hypothesize that store remodels can provide benefits to a business," "the devil is in the details," and "APT was able to incorporate all these factors into its software to provide further benefits and analyses to its subscribers." *Id*. ¶¶ 473-74.

But merely providing one general category of informational inputs that APT requested falls short of actually identifying *what*, in particular, was requested, how or why it was not generally known or readily ascertainable, or how value was generated. In short, APT has failed to identify what, in particular, it requested that others would have failed to recognize. Similarly, what were others asking for, and what would they have readily ascertained to be a key input?

While APT lists some data inputs requested from Maverik and other clients, it does not satisfactorily parse out what it claims would be known, what would be generally expected or readily ascertainable, or what about the combination of requested data points generated independent economic value, beyond simply saying as much. *E.g.*, Ex. 121, ¶ 106. As MarketDial suggests, APT does not "explain[] which data in the data feeds is purportedly secret or how APT's data-modification process is disclosed in or evident from the data feeds themselves." Mot. at 61.

in determining whether a compilation meets the statutory definition of a trade secret. *See USA Power I*, 2010 UT 31, ¶ 45.[30]

*     *     *

For these reasons, the court concludes that no trade secret claimed by APT is sufficiently identified or defined as to allow submission to the jury under either the federal or state trade secrets claims asserted by APT. For this reason, MarketDial's motion for summary judgment is **GRANTED**.

## IV.    Resolution of Defendants' Remaining Motions

Because summary judgment is appropriate upon Defendants' Motion, the court need not reach Mr. Davis's Motion. Additionally, Defendants filed several motions to exclude expert testimony and opinion, including as to proffered experts Emily Robinson, ECF Nos. 454, 456 (filed under seal), Patrick Kilbourne, ECF Nos. 457, 459 (filed under seal), Steven Kursh, ECF Nos. 539, 447 (filed under seal), Stefan Thomke, ECF Nos. 540, 449 (filed under seal), Roger Smith, ECF Nos. 451, 451 (filed under seal), and Brett Harrison, ECF Nos. 542, 453 (filed under

---

[30] The court understands these metacompilations to be abstract, post hoc groupings and re-combinations of other alleged trade secrets generated either primarily or solely for the purpose of this litigation.

Rather than refer to actual groupings of documents or information that were compiled by APT to create value, these metacompilations consist of large sets of information considered together after the fact as part of this litigation matter. As a result, it is difficult—if not impossible—to imagine how the information relates together, or related together, and may have generated value to form a secret at the time that constituent parts were alleged to have been misappropriated. It is simply too abstract to retrospectively piece disparate sources of information, never before actually compiled, say that the whole is a secret, and that it created or can create value.

To the extent that the individual compilations themselves are subject to summary judgment for being vague, abstract, or "broad areas" of information, these metacompilations are even more subject. Simply drawing boundaries, for the purpose of litigation, around huge swaths of information, without much more, cannot create a genuine dispute of material fact, and it is not an appropriate vehicle to submit trade secrets claims to the fact-finder.

38

seal). Because this court concludes that Defendants are entitled to summary judgment, these motions are hereby **DENIED** as moot.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion, ECF Nos. 537, 443 (filed under seal) is **GRANTED**. Mr. Davis's Motion, ECF Nos. 538, 445 (filed under seal) is **DENIED** as moot. All other pending motions in this action are likewise **DENIED** as moot.

DATED August 12, 2024.

BY THE COURT

Jill N. Parrish
United States District Court Judge