IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| APPLIED PREDICTIVE TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> MARKETDIAL, INC., JOHN M. STODDARD, and MORGAN DAVIS, <br><br> Defendants. | **MEMORANDUM DECISION & ORDER GRANTING DEFENDANTS' MOTION FOR ATTORNEYS' FEES** <br><br> Case No. 2:19-cv-00496-JNP-CMR <br><br> District Judge Jill N. Parrish <br><br> Magistrate Judge Cecilia M. Romero |

Before the court is a motion for attorneys' fees filed by Defendants MarketDial, Inc. ("MarketDial"), John M. Stoddard ("Stoddard"), and Morgan Davis ("Davis") (collectively, "Defendants"). ECF No. 663 ("Defs.' Mot."). Plaintiff Applied Predictive Technologies, Inc. ("Plaintiff" or "APT") filed this action in the District of Utah asserting claims relating to patent infringement and misappropriation of trade secrets. ECF No. 1 ("Pl.'s Compl."). For the reasons set forth herein, Defendants' Motion is **GRANTED**.

## BACKGROUND

APT and MarketDial provide business analytics to their clients. MarketDial, founded in 2016, is a new competitor in the market. Prior to founding MarketDial, Defendants Stoddard and Davis worked at a consulting firm, McKinsey & Company, Inc. ("McKinsey"), where they became privy to APT confidential information. After leaving McKinsey, Stoddard and Davis founded MarketDial, which became APT's only serious competitor in the market.

APT filed this lawsuit in June 2018 alleging patent infringement and trade secret misappropriation. APT's patent infringement claims were dismissed on Defendants' motion to dismiss while its trade secret claims were eventually dismissed at summary judgment. Defendants allege that this action "was an anticompetitive lawsuit, designed to put an upstart competitor out of business before it could gain enough traction to impact APT's monopoly position in the market." Defs.' Mot. at 2. Plaintiff responds that "the case was diligently pursued by APT in good faith, and that APT's claims are supported by substantial evidence showing Defendants obtained access to APT confidential information, improperly copied APT confidential information, and used APT confidential information to develop MarketDial's software and business strategy." ECF No. 679 ("Pl.'s Opp.") at 1.

Throughout its course, this case has been heavily litigated, as evidenced by the docket entries exceeding 700, over 50 of which occurred after the court's entry of judgment. After nearly six years of litigation and intensive discovery, the court granted Defendants' motions for summary judgment and entered a judgment in favor of Defendants. ECF Nos. 647 ("MSJ Order"), 648 ("Judgment"). The court concluded that summary judgment was appropriate because APT failed to identify a trade secret.

Subsequently, Defendants filed this pending motion for attorneys' fees. Defendants argue they are entitled to attorneys' fees under the Defend Trade Secrets Act ("DTSA"), the Utah Uniform Trade Secrets Act ("UUTSA"), Utah Code § 78B-5-825 ("Bad Faith Litigation"), and 35 U.S.C. § 285 ("the Patent Infringement Fee Provision"). Last November, the parties filed a joint stipulation regarding partial settlement. Defendants agreed to dismiss their claims for attorneys' fees under the Patent Act. Now, Defendants request the court award them attorneys' fees totaling

$2,807,755.79 under the DTSA, the UUTSA, and Utah's Bad Faith Litigation statute. Thus, the court will consider only Defendants' motion for attorneys' fees relating to the trade secrets dispute.

## DISCUSSION

Under the DTSA and the UUTSA, the court may award the prevailing party reasonable attorney's fees if "a claim of [] misappropriation is made in bad faith." 18 U.S.C. § 1836(b)(3)(D); *see also* Utah Code Ann. §§ 13-24-5; 78B-5-825.[1] Bad faith is not defined in either statute. But courts have widely adopted a two-step inquiry to determine bad faith in the context of attorney's fees: The court must find that (1) the plaintiff's claims were objectively specious or frivolous, and (2) there is evidence of subjective misconduct. *Hammerton, Inc. v. Heisterman*, 2008 U.S. Dist. LEXIS 65483, at *19 (D. Utah 2008); *see also FAS Techs. v. Dainippon Screen Mfg.*, 2001 U.S. Dist. LEXIS 15444, at *7 (N.D. Cal. 2001); *Contract Materials Processing v. Kataleuna GmbH Catalysts*, 222 F. Supp. 2d 733, 747-48 (D. Md. 2002); *Workplace Techs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*, 664 F. Supp. 3d 1142, 1159 (S.D. Cal. 2023). Finally, "the award of attorneys' fees is subject to the trial court's discretion, to be overturned only for abuse of discretion." *Lam, Inc. v. Johns-Manville Corp.*, 668 F.2d 462, 476 (10th Cir. 1982).

As an initial matter, Defendants are the prevailing party as they have won "completely on every claim at issue . . ." *Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 76 F.3d 1178, 1182 (Fed. Cir. 1996). All of Plaintiff's claims were either dismissed at the motion to dismiss phase or summary judgment phase. And APT does not dispute that Defendants are the prevailing party. Defendants further argue that, as the prevailing party, they are entitled to attorneys' fees because

---

[1] Utah's Bad Faith Litigation statute and the UUTSA both require bad faith. The only difference is that the UUTSA only applies to trade secret disputes.

Plaintiff's claims were made in bad faith. The court first sets out its findings of fact and then applies the standard for bad faith under the DTSA and the UUTSA to those findings. Finding Plaintiff's claim for misappropriation was made in bad faith, the court then addresses whether the fees requested are reasonable.

I.   **FINDINGS OF FACT**

Stoddard and Davis founded MarketDial in April 2016. Prior to MarketDial's creation, APT had no meaningful market competitors. In October 2016, APT first suspected MarketDial had access to sensitive information. Based on evidence that Stoddard had downloaded APT confidential information, shared that information with Davis, and then started a competing company, APT filed this lawsuit.

But after intensive discovery, it became clear that APT could not define a single trade secret, because none existed. Nor could it produce sufficient evidence relating to its alleged trade secrets' economic value. Although Defendants had access to APT confidential information, APT could not provide any evidence of any trade secret implicated by that information. Thus, there was simply no evidence to support that Defendants had access to APT's trade secrets, much less misappropriated them.

Rather than dismissing the claims or litigating the case in a professional manner, APT doubled down on its assertions, submitting copious records and flooding the docket with motions. This caused Defendants' attorneys to put more time into the litigation than a typical intellectual property dispute would require. From the filing of the complaint to this motion, Defendants' attorneys spent 10,260 hours over 6 years. And up until summary judgment, APT continued to provide "volumes of expert reports, technical documents, and other materials." Yet, it failed to identify a single trade secret, the first element of a trade secret claim. MSJ Order at 20.

In its argument on Defendants' motion for summary judgment, APT offered only broad assertions and conclusory statements. Because APT could not provide a clear explanation of the trade secret, it instead consistently submitted numerous filings of so-called "evidence," none of which adequately described the trade secret but continued to rack up attorneys' fees. In its briefings on the matter, APT provided the court "paragraph-long string cites lacking explanatory parentheticals or any identifiable structure. In many cases, the citations seem to be included merely because they refer to the trade secret, not because they meaningfully disclose the secret, parse out known or readily ascertainable information, or explain the value proposition. In some cases, the citations are simply *non sequitur*." *Id.*

Similarly, APT's responses to Defendants' interrogatories "reveal[ed] only cursory, high-level description of *categories* or *sources* of information allegedly comprising each trade secret, without much more." *Id.* In response to Defendants' request to define its trade secrets' economic value, APT presumptively replied, "APT's trade secrets have tremendous economic value from not being generally known and from not being readily ascertainable." *Id.* And to make up for the lack of a defined trade secret, APT added post-hoc rationales, including that its trade secrets were "metacompilations" of other alleged trade secrets, clearly generated for the primary purpose of this litigation. In attempting to define these "metacompilations," APT offered interrogatory responses that only referenced volumes of other interrogatory responses which then only generally described categories of information that were claimed to be misappropriated. By keeping its alleged trade secrets undefined and ambiguous, APT was able to continue with the litigation, incurring expenses that it could afford as a bigger, more established company.

APT had every incentive to show all its cards and clearly demonstrate any trade secrets at summary judgment, lest its case be dismissed. Considering these circumstances, APT's consistent

failure to define *any* trade secret or provide *any* evidence supporting its claims, coupled with its voluminous filings, gives rise to the reasonable inference that APT knew it had no claim at all and sought to distract the court and the opposing party with profuse documentary records. If it did have a claim, APT would have identified its trade secret at the motion for summary judgment phase. Instead, APT insisted that everything it filed was secret, suggesting that it would reveal its trade secret "down the line—that once it is speaking to the jury, it will divulge its secrets and what it means when it refers to 'methods' and 'how' it accomplishes certain tasks in a valuable, secret manner." *Id.* To clarify, the court's ruling at summary judgment was not based on any technical finding or ambiguity in the law. The holding was based on Plaintiff's inability to put forth *any* evidence to support its trade secret claim.

Further, APT litigated this case in an aggressive manner, incurring attorneys' fees beyond those justified in a normal intellectual property dispute. For example, after the court fully considered APT's motion to retain a seal on the court's order on summary judgment, the court unsealed the order, partially denying APT's motion. ECF No. 688. Because the issue had been fully considered and the parties' arguments heard, the court added that "[n]o further objections, motions, or memoranda by the parties on the issue of retaining seal on the summary judgment order will be received." *Id.* Still, APT filed a motion to vacate the court's order as well as a motion to expedite consideration of its motion. ECF Nos. 690, 691. The motion then warranted a response from MarketDial, incurring attorneys' fees and filings on the docket. ECF No. 693. This example is indicative of the way in which APT litigated the entire case and exemplative of why the litigation incurred fees beyond a normal intellectual property dispute.

APT's actions also give rise to a reasonable inference that this litigation was undertaken for the purpose of putting an upstart competitor out of business. The court bases this conclusion

6

on APT's knowledge of MarketDial's financial runway after targeted questioning in depositions, the intensity in which it litigated the case, the lack of support for its misappropriation claim, and the fact that MarketDial was APT's only real competitor and threat to its monopoly over the market.

## II. CONCLUSIONS OF LAW

In reviewing the facts of this case, the court concludes that Plaintiff's trade secret misappropriation claims were (1) objectively specious and (2) subjectively made in bad faith. The court addresses each prong below.

### A. APT's trade secret claim was objectively specious

Objective speciousness may be found where there is "a complete lack of evidence supporting Plaintiff's claims." *SGS Acquisition Co. Ltd. v. Linsley*, 2023 U.S. Dist. LEXIS 55270, at * 6 (D. Colo. 2023); *see also Johnson Matthey Process Techs., Inc. v. Aru LLC*, 603 F. Supp. 3d, 1374, 1380 (S. D. Ga. 2022) ("A prevailing party can establish that the claim against it was objectively specious by demonstrating that there was no misappropriation or threatened misappropriation or that the opposing party could not have suffered any economic harm." (internal quotation marks omitted)).

The first prong of the bad faith test requires a finding that a claim is objectively specious *or* frivolous, thus implying a distinction between a frivolous claim and a specious one. A specious claim is one that "superficially appears to have merit but there is a complete lack of evidence to support [it]." *Workplace Techs.*, 664 F. Supp. 3d at 1159 (interpreting the "speciousness" requirement under the California Uniform Trade Secrets Act). A specious claim may even sound logical or convincing, but it is ultimately hollow and lacks substantiation.

In *Workplace Techs.*, the district court found plaintiff's claim under the California Uniform Trade Secrets Act and the DTSA objectively specious because it failed to clearly identify the trade secret that it claimed the defendant misappropriated. The court reasoned that plaintiff's "articulation of its trade secret was simply too vague to convey an understanding of its parameters or to separate it from matters of general knowledge." *Id.* Here, APT's attempted explanation of its trade secret is similarly vague and ambiguous.

Although APT's misappropriation claims may not have been objectively frivolous from the outset, they were objectively specious considering APT was never able to define the trade secret at the heart of its claim. APT began this litigation on the premise that Stoddard and Davis had downloaded files and accessed confidential information without APT's approval. Although this misconduct may have given rise to other claims, it became abundantly clear that APT had no basis for a trade secret claim. To prove a claim under the DTSA and the UUTSA, the plaintiff must first show that a trade secret exists. But APT failed to do so here, even after extensive discovery. Thus, even though the claim superficially appeared to have merit from the outset, it ultimately lacked any evidentiary support. *See Workplace Techs.*, 664 F. Supp. 3d at 1159.

Plaintiff argues that "substantial evidence supports that APT had viable trade secrets and viable misappropriation claims," citing its ample evidentiary submissions, which included "interrogatory responses, expert witness reports, and both expert and fact witness deposition testimony . . ." Pl.'s Opp. at 4. But none of these evidentiary submissions supported its claim. Defendants argue that "APT has been unable to meaningfully describe or define the purported trade secrets at the heart of this lawsuit." Defs.' Mot. at 4. The court agrees.

In *Linsley*, the court held that even though the plaintiff's claims survived summary judgment, the claims were objectively specious because the plaintiff failed to provide any evidence

8

of the defendants' disclosure or use of the alleged trade secrets, "and had presented only speculative assertions regarding damages." *Linsley*, 2023 U.S. Dist. LEXIS 55270, at * 13. Here, APT also failed to provide any evidence relating to two elements of its misappropriation claim: (1) existence of a trade secret and (2) economic value of the alleged trade secret. Thus, APT's claim is objectively specious.

### B.  APT engaged in subjective misconduct

A court may find subjective misconduct "'where a plaintiff knows or is reckless in not knowing that its claim for trade secret misappropriation has no merit.'" 2008 U.S. Dist. LEXIS 65483, at *19 (quoting *Contract Materials*, 222 F. Supp. 2d at 744). "Subjective misconduct may be proven by direct evidence of actual knowledge or may be inferred from the speciousness of plaintiff's trade secret claim and its conduct during litigation." *Id.*

In *Hammerton*, this court found that there was no evidence of subjective misconduct where the plaintiff withdrew trade secret claims that lacked evidence at summary judgment. The court then denied summary judgment on the plaintiff's remaining trade secret claim but plaintiff ultimately moved to dismiss that claim with prejudice to avoid a fruitless trial. The court reasoned that the fact "[t]hat Plaintiff broadly framed the trade secret claims surrounding the [trade secret claim that survived summary judgment] does not equate to a finding of subjective misconduct-- even though the withdrawn claims were eventually dropped." *Id.* at *23. Indeed, there was evidence that the *Hammerton* plaintiff took steps to act in good faith.

But unlike the *Hammerton* plaintiff, APT did not take any steps to withdraw its trade secret claims when it became apparent that it had no evidence to support them. Instead, APT did the opposite. It sought to aggressively litigate every issue, flooding the docket with motions and documents of so-called "evidence" that amounted to nothing. It is apparent that this was done to

9

put an upstart competitor out of business because no other motive could explain the amount of much time and money it invested in litigating a fruitless claim. And APT, a successful tech company that was acquired by Mastercard in 2015 for $600 million, had the resources to out-litigate MarketDial. Thus, the court finds APT engaged in subjective misconduct and therefore its trade secret claim was pursued in bad faith.

### III. AWARD AMOUNT

Under the DTSA and the UUTSA, the court may "award reasonable attorney's fees to the prevailing party" if it finds "a claim of misappropriation is made in bad faith." 18 U.S.C. § 1836(b)(3)(D); *see also* Utah Code Ann. § 13-24-5. Finding APT's misappropriation claim was made in bad faith, the court now turns to what fees are reasonable.

In their original motion, Defendants sought $3,558,895.50 in attorneys' fees. Plaintiff objected to that total, offering three arguments. First, APT argued that Defendants were improperly seeking fees from other proceedings. Second, APT argued that Defendants were improperly seeking an amount previously paid by APT in connection with the settlement of a discovery dispute. Finally, APT argued that Defendants' fee request is plagued by billing inconsistencies and that the fees are generally unreasonable. In their reply, Defendants conceded to APT's first two arguments and reduced their fee request to $3,307,755.79. The parties then filed a joint stipulation to reduce Defendants' claim for fees to $2,807,755.79 to account for their partial settlement. Thus, the only remaining arguments for the court to address regarding the fee amount are APT's claim about billing inefficiencies and the reasonableness of APT's fees. The court addresses each in turn.

APT first argues that "Defendants' invoices include numerous billing inconsistencies that call into question their reliability." Pl.'s Opp. at 20. But the only evidence APT provides to support that conclusion consists of a few discrepancies in the dates that calls were documented between

10

the attorneys. And a few discrepancies in dates does not amount to a finding that Defendants' fee calculation is unreliable. Further,

> the determination of fees should not result in a second major litigation . . . trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.

*Fox v. Vice*, 563 U.S. 826, 838 (2011). Thus, the court will not scrutinize in detail every entry made by Defendants. This is not an audit. Rather, the court will consider whether Defendants' fee calculation is generally reasonable given the length and intensity of the litigation.

APT argues that Defendants' fees were unreasonable because their insurers were unwilling to pay their attorneys' rates. In doing so, APT requests a fee reduction of $486,778.92 in fees paid to the law firm of Goodwin Proctor. Defendants respond that rates insurers pay are customarily much lower than those paid by an ordinary party due to the high volume of work insurers offer. Thus, Defendants contend, whether an insurer pays an attorney's fee is not a reliable benchmark for determining reasonableness.

Notably, APT provides no evidence comparing Defendants' attorney fee rates to average rates in intellectual property disputes. Defendants, on the other hand, provide four declarations from four different law firms regarding the hours their attorneys worked on the case and total fees charged. According to these declarations, the attorneys spent a total of 10,260 hours working on Defendants' case and charged a total of $3,623,895, more than the amount Defendants initially requested. ECF Nos. 665-3 ("Chatterjee Decl.") ¶ 10; 665-4 ("Anderson Decl.") ¶ 10; 665-8 ("Finberg Decl.") ¶ 12; 665-9 ("Call Decl.") ¶ 11. This amounts to an average rate of $353 per hour. And the court finds $353/hour is a reasonable fee for an intellectual property dispute in Salt

Lake City, Utah. Even if the court considers the average fees charged by each law firm, the fee is still reasonable. At the high end, Goodwin Proctor charged an average of $652 an hour, but Snow, Christensen & Martineau only charged an average fee of $238 an hour. Taken together, the average fee charged by the four firms that worked on Defendants' case was $402 per hour, which is still a reasonable fee for an intellectual property dispute in Utah.

Further, the way in which this case was litigated incurred fees beyond what a normal intellectual property lawsuit would incur. This is primarily because APT was so aggressive in driving the litigation. In arguing its trade secret claim, APT submitted copious documents that MarketDial's attorneys had to spend hours reviewing to provide a proper defense. And after six and a half years of litigation, the docket contains over 700 entries. Therefore, the court concludes that Defendants' revised request for attorneys' fees in the amount of $2,807,755.79 is reasonable given the intensity, length, and subject matter of the litigation.

## CONCLUSION & ORDER

For the foregoing reasons, Defendants' Motion, ECF Nos. 663 (filed under seal), is **GRANTED**. The court ORDERS Plaintiff to pay Defendants $2,807,755.79 in attorneys' fees.

DATED March 25, 2025

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge